# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TODD M. HARPER, in his personal capacity and in his official capacity as a Member of the National Credit Union Administration Board, and TANYA F. OTSUKA, in her personal capacity and in her official capacity as a Member of the National Credit Union Administration Board, <br><br>          Plaintiffs, <br><br>       -against- <br><br> SCOTT BESSENT, in his official capacity as Secretary of the Treasury, LARRY FAZIO, in his official capacity as Executive Director of the National Credit Union Administration, KYLE S. HAUPTMAN, in his official capacity as Chairman of the National Credit Union Administration Board, TRENT MORSE, in his official capacity as Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel Office, and DONALD J. TRUMP, in his official capacity as President of the United States, <br><br>          Defendants. | Civil Action No. 1:25-cv-01294-AHA <br><br><br><br><br> **ORAL ARGUMENT RESPECTFULLY REQUESTED** <br><br> **RELIEF BEFORE MAY 22 RESPECTFULLY REQUESTED** |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND JUDGMENT ON THE MERITS

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 2

    I.     Statutory Background. ................................................................................. 2

    II.    Factual Background. .................................................................................... 6

LEGAL STANDARD.............................................................................................. 11

ARGUMENT ........................................................................................................... 12

    I.     The President Cannot Remove Plaintiffs from the NCUA Board Without
        Cause.......................................................................................................... 12

        A.    The President Lacks Authority to Remove Board Members
              Without Cause. ........................................................................... 13

            1.   Statutory Text and Context Confirm that Congress Protected the
                 NCUA Board from At-Will Removal. ............................................... 13

            2.   The NCUA's Structure and Function Confirm Board Members Are
                 Protected from At-Will Removal. ...................................................... 16

        B.    Congress's Removal Protections Respect the Separation of Powers........ 20

    II.    This Court Should Provide a Complete Remedy to Plaintiffs. ............................ 21

CONCLUSION.......................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

CASES:                                                                    Page(s)

*Berry v. Reagan*,
  No. 83-CV-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ........................................... 22, 23, 24

*BNSF Ry. Co. v. Loos*,
  586 U.S. 310 (2019) ........................................................................................................ 15

*Calcutt v. Fed. Deposit Ins. Corp.*,
  37 F.4th 293 (6th Cir. 2022) ......................................................................................... 18

*Cheney v. U.S. Dist. Ct. for D.C.*,
  542 U.S. 367 (2004) ....................................................................................................... 25

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ................................................................................................. 11, 22

*Food & Water Watch, Inc. v. Vilsack*,
  79 F. Supp. 3d 174 (D.D.C. 2015) ................................................................................ 11

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) ....................................................................................................... 18

*Glenn v. Thomas Fortune Fay*,
  222 F. Supp. 3d 31 (D.D.C. 2016) ................................................................................ 21

*Grundmann v. Trump*,
  2025 WL 782665 (D.D.C. Mar. 12, 2025) .................................................................... 22

*Harris v. Bessent*,
  2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ................................................................. 21

*Harris v. Bessent*,
  2025 WL 679303 (D.D.C. Mar. 4, 2025) ............................................................ 22, 24, 25

*Hazardous Waste Treatment Council v. U.S.E.P.A.*,
  861 F.2d 270 (D.C. Cir. 1988) ...................................................................................... 15

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) ................................................................... 13, 17, 20, 23, 24

*In re Nat'l Nurses United*,
  47 F.4th 746 (D.C. Cir. 2022) ....................................................................................... 12

*Kalbfus v. Siddons*,
    42 App. D.C. 310 (D.C. Cir. 1914) ................................................................ 25

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ......................................................................... 23

*Lovitky v. Trump*,
    949 F.3d 753 (D.C. Cir. 2020) ..................................................................... 12

*Mackie v. Bush*,
    809 F. Supp. 144 (D.D.C. 1993) ................................................................... 22

*Marbury v. Madison*,
    5 U.S. 137 (1803) ................................................................................ 23, 24

*March for Life v. Burwell*,
    128 F. Supp. 3d 116 (D.D.C. 2015) ............................................................. 12

*Mistretta v. United States*,
    488 U.S. 361 (1989) .................................................................................. 19

*Morrison v. Olson*,
    487 U.S. 654 (1988) .................................................................................. 21

*Muscogee (Creek) Nation v. Hodel*,
    851 F.2d 1439 (D.C. Cir. 1988) ................................................................... 15

*Muthana v. Pompeo*,
    985 F.3d 893 (D.C. Cir. 2021) ..................................................................... 12

*New York v. Biden*,
    636 F. Supp. 3d 1 (D.D.C. 2022) ................................................................. 21

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................. 11

*POM Wonderful LLC v. F.T.C.*,
    894 F. Supp. 2d 40 (D.D.C. 2012) ............................................................... 22

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................... 24

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ................................................................. 24

*Seila Law LLC v. Consumer Financial Protection Bureau*,
    591 U.S. 197 (2020).......................................................... 14, 16, 17, 18, 20, 21

*Severino v. Biden,*
    71 F.4th 1038 (D.C. Cir. 2023) ................................... 13, 14, 16, 19, 20, 22

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) ...................................................................... 11

*Stone v. INS*,
    514 U.S. 386 (1995)..................................................................................... 15

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ............................... 4, 5, 12, 14, 15, 16, 18, 19, 22, 25

*U.S. ex rel. Williams v. NEC Corp.*,
    931 F.2d 1493 (11th Cir. 1991) .................................................................. 15

*United States v. Malmin*,
    272 F. 785 (3d Cir. 1921)........................................................................... 25

*United States v. Wilson*,
    290 F.3d 347 (D.C. Cir. 2002) ................................................................... 14

*Wiener v. United States*,
    357 U.S. 349 (1958)............................................................................. 13, 19

*Wilcox v. Trump*,
    2025 WL 720914 (D.D.C. Mar. 6, 2025)............................................. 22, 24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)......................................................................................... 11

**STATUTES:**

12 U.S.C. § 1752a ................................................................................... 3, 14

12 U.S.C. § 1752a(b) ...................................................................... 3, 15, 17

12 U.S.C. § 1752a(c) ........................................................................... 12, 17

12 U.S.C. § 1752a(d) ........................................................................... 10, 24

12 U.S.C. § 1766 ..................................................................................................... 6

12 U.S.C. § 1781 ..................................................................................................... 5

12 U.S.C. § 1786 ..................................................................................................... 6

12 U.S.C. § 1786(e)(2)–(3), (k) .............................................................................. 6

12 U.S.C. § 1786(e), (g) ........................................................................................ 19

12 U.S.C. § 1786(j)(2) ....................................................................................... 6, 20

12 U.S.C. § 1812 ................................................................................................... 18

12 U.S.C. § 242 ..................................................................................................... 18

12 U.S.C. §§ 1766, 1789 .................................................................................. 5, 20

12 U.S.C. §§ 1795, 1795–1795k ............................................................................ 5

15 U.S.C. § 78d ..................................................................................................... 18

5 U.S.C. § 551 ........................................................................................................ 6

5 U.S.C. § 554 ....................................................................................................... 19

**RULES:**

Fed. R. Civ. P. 56 ................................................................................................. 12

**LEGISLATIVE MATERIALS:**

123 Cong. Rec. 27,396 (1977) .......................................................................... 4, 12

An Act to amend the Federal Credit Union Act so as to provide for an independent Federal
    Agency for the supervision of federally chartered credit unions, and for other purposes,
    Pub. L. No. 91-206, 84 Stat. 49 (1970) ............................................... 2, 3, 4, 12, 14

Federal Credit Union Act of 1934,
    Pub. L. No. 73-467, 48 Stat. 1216 (1934) ....................................................... 2

Financial Institutions Regulatory and Interest Rate Control Act of 1978,
    Pub. L. No. 95-630, 92 Stat. 3641 (1978) ....................................................... 3

H.R. Rep. No. 1383, 95th Cong., 2d Sess. 26 (1978) ................................... 4, 12, 14, 18

H.R. Rep. No. 2021, 73d Cong., 2d Sess. 1–2 (1934) ...................................... 2

S. Rep. No. 555, 73d Cong., 2d Sess. 1, 3 (1934) ........................................ 2

S. Rep. No. 751, 94th Cong., 2d Sess. 3–4 (1976) ........................................ 3

**EXECUTIVE MATERIALS:**

Exec. Order No. 9148, 7 Fed. Reg. 3145 (Apr. 30, 1942) ................................. 2

**ADMINISTRATIVE MATERIALS:**

12 C.F.R. § 725.1 ......................................................................... 5

12 C.F.R. § 746.101 ....................................................................... 6

12 C.F.R. § 746.103 .................................................................... 6, 19

12 C.F.R. § 791.2 ........................................................................ 10

12 C.F.R. §§ 747.1–747.40 ............................................................. 6, 19

12 C.F.R. §§ 747.3, 747.18 ............................................................... 19

12 C.F.R. Parts 702, 741 ................................................................. 20

Capital Adequacy: The Complex Credit Union Leverage Ratio; Risk-Based Capital,
    86 Fed. Reg. 72784 (Dec. 23, 2021) ................................................... 7

Cyber Incident Notification Requirements for Federally Insured Credit Unions,
    88 Fed. Reg. 12811 (Mar. 1, 2023) .................................................... 7

Financial Innovation: Loan Participations, Eligible Obligations, and
    Notes of Liquidating Credit Unions,
    88 Fed. Reg. 67570 (Sept. 29, 2023) .................................................. 7

Succession Planning,
    89 Fed. Reg. 104865 (Dec. 26, 2024) .................................................. 7

**OTHER AUTHORITIES:**

William Blackstone, *Vol. 3, Commentaries on the Laws of England* (1768) .............. 24

**INTRODUCTION**

This case challenges the unlawful removal of two Senate-confirmed Members of the Board of an independent federal regulator, the National Credit Union Administration (NCUA), which is vital to the stability of the Nation's financial system. The NCUA is governed by a non-partisan board of three experts serving fixed, staggered terms of six years. But the President purported to terminate plaintiffs Todd M. Harper and Tanya F. Otsuka in the middle of their terms, without advance notice, without explanation, and without cause. That removal violates the protections Congress established and fundamentally undermines the NCUA's independence.

The stakes are significant. The NCUA's independence serves important goals, much like the independence of the Federal Deposit Insurance Corporation and the Federal Reserve System. Congress determined that keeping these financial supervisory agencies independent promotes the national interest by shielding their oversight from shifting political winds. The NCUA itself protects the more than 142 million Americans who have a checking or savings account, a credit card, or a home or car loan with credit unions—which are nonprofit financial institutions created to help all communities access the financial system. The NCUA's mandate includes safeguarding over $2 trillion in credit-union assets and over $1.75 trillion in credit-union deposits—just as the FDIC protects deposits in banks, and the Federal Reserve promotes the stability of the Nation's banking and financial systems.

The President's unprecedented removal of Mr. Harper and Ms. Otsuka not only violates Congress's mandate, but it has also paralyzed the NCUA Board, depriving it of a quorum and preventing it from fulfilling its statutory mandate. Plaintiffs thus seek declaratory and injunctive relief to restore the Board's lawful composition, vindicate the independence Congress mandated, and protect the Nation's financial system from political interference.

# BACKGROUND

## I.     Statutory Background.

**A.**  Congress enacted the Federal Credit Union Act in 1934 in response to the collapse of the Nation's credit markets during the Great Depression. Pub. L. No. 73-467, 48 Stat. 1216. As traditional lenders shut out working Americans, credit became scarcer and interest rates rose to the point that individuals of limited means could no longer obtain loans. *See* S. Rep. No. 555, 73d Cong., 2d Sess. 1, 3 (1934); H.R. Rep. No. 2021, 73d Cong., 2d Sess. 1–2 (1934). Congress believed that the Nation's "industrial recovery depend[ed] on the buying power" of ordinary citizens, and established "a Federal Credit Union System" to "bring normal-credit resources on a cooperative basis" to the people. S. Rep. No. 555, *supra*, at 1, 3; *see* H.R. Rep. No. 2021, *supra*, at 1–2. That led to the development of credit unions, not-for-profit entities where ordinary Americans can place deposits and obtain credit, including via credit cards and home loans.

During the decades that followed, federal oversight over credit unions shifted across federal agencies. At one point, it fell to the FDIC to perform for credit unions much the same work it now performs for FDIC-insured institutions, Exec. Order No. 9148, 7 Fed. Reg. 3145 (Apr. 30, 1942). Then, in 1970, Congress created the National Credit Union Administration as an "independent Federal Agency for the supervision of federally chartered credit unions." Pub. L. No. 91-206, 84 Stat. 49.

**B.**  At its inception, the NCUA was managed by a single "Administrator," assisted by an advisory board. *Id.* at 50. The advisory board comprised a Chair and one member from each of the federal credit union regions, each of whom had to be "persons of tested credit union experience." *Id.* Under the 1970 statute, the Administrator functioned as the "chief executive officer" of the NCUA. *Id.* The President appointed the Administrator with the "advice and consent of the Senate,"

and the Administrator "serve[d] at the pleasure of the President." *Id.* The Chair of the advisory board also "serve[d] at the pleasure of the President." *Id.*

Congress substantially changed the management structure of the NCUA in 1978 and adopted the independent structure in effect today. The Senate Report for a bill that was an identical predecessor to the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub. L. No. 95-630, 92 Stat. 3641, explained that, under the prior regime, "[t]he Administrator of the [NCUA] [wa]s the only Federal financial regulator to serve at the pleasure of the President without tenure," S. Rep. No. 751, 94th Cong., 2d Sess. 3–4 (1976). The Committee explained why it was necessary to change that structure and to align the NCUA with its cousins (*id.*):

> The lack of tenure [at the NCUA] tends to politicize the day-to-day decisionmaking process and raises the specter of not knowing whether taking a particular controversial position on a controversial issue might cost the Administrator his job.

> Ironically, the difficulties encountered by a nontenured Administrator were dramatically emphasized on the very day the Subcommittee on Financial Institutions held the hearing on [NCUA] restructuring. At the hearing, the Administrator himself acknowledged the difficulties inherent in serving without tenure.... Within hours after his appearance before the subcommittee, the Administrator was summoned to the White House and dismissed.

> At the very least, therefore, the committee recognizes the need to provide tenure for the Administrator in order to strengthen the [NCUA]'s status as an independent agency.

In line with these observations, Congress eliminated the single Administrator and advisory board in 1978, and created the three-member NCUA Board in place today. *See* 12 U.S.C. § 1752a. The President appoints each Member, by and with the advice and consent of the Senate. *Id.* Each Member serves a fixed, staggered six-year term, meaning that the term of one Member would expire every two years. *Id.* Moreover, no more than two Members could belong to the same political party. *Id.* The President designates one of them as Chair. *Id.* And all members must be "broadly representative of the public interest" and must have experience "relating to a broad range of financial services, financial services regulation, or financial policy." 12 U.S.C. § 1752a(b).

In a marked departure from the prior statute, which expressly provided that the Administrator and the Chair of the advisory board "serve[d] at the pleasure of the President," Pub. L. No. 91-206, *supra*, at 50, Congress eliminated that prescription, and the 1978 statute provided no such removal authority over NCUA Board Members. As Senator McIntyre, sponsor of the Senate amendment that became § 1752a, explained, "the principal thrust of [the] amendment [was] to transfer management of the [NCUA] from a single Administrator who serves at the pleasure of the President to a three-member board with fixed terms of office." 123 Cong. Rec. 27,396 (1977).

The House Report from the Committee on Banking, Finance and Urban Affairs similarly explains that Congress sought to enhance the NCUA's independence. H.R. Rep. No. 1383, 95th Cong., 2d Sess. 26 (1978). The House Report notes that the restructuring and vesting of control of the NCUA in a multi-member board with fixed terms would align the NCUA's governance with that of "[o]ther financial institutions[,] regulatory agencies and other independent agencies." *Id.*

The D.C. Circuit discussed these 1978 amendments in *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996). Although the D.C. Circuit in *Swan* ultimately assumed without deciding that the President could remove NCUA Board Members only for cause, it emphasized that the amended statutory structure strongly supported the conclusion that Members enjoyed protection from removal (other than for cause) during their terms. The court emphasized that Congress "replaced the NCUA Administrator, who had explicitly served at the pleasure of the President, with a Board composed of three members," and had "deleted all reference to the President's removal powers." *Id.* at 982. The D.C. Circuit also noted that Congress's enactment reflected a deliberate effort to align the NCUA's structure with other independent financial regulators, including the FDIC, the Federal Reserve Board, and the Federal Trade Commission. *Id.* Each of those agencies had long

been understood to operate with removal protections—express or implied—intended to preserve expert, politically insulated oversight of the financial system. *See id.*

**C.** The NCUA's primary mission is to "protect[] the system of cooperative credit and its member-owners through effective chartering, supervision, regulation, and insurance."[1] As part of that mission, the NCUA administers the National Credit Union Share Insurance Fund, which (much like the FDIC's insurance program) insures the deposits of more than 142 million credit-union members and serves as the credit-union system's financial backstop. *See* 12 U.S.C. § 1781 *et seq*. The agency also oversees the Central Liquidity Facility, a government corporation created "to improve the general financial stability of credit unions by meeting their liquidity needs"; the NCUA thus functions as a lender of last resort for credit unions, and it can provide short-term liquidity to member credit unions during times of market stress. *See* 12 C.F.R. § 725.1; 12 U.S.C. §§ 1795, 1795–1795k. As of December 31, 2024, the NCUA exercised oversight over 4,455 federally insured credit unions with assets totaling $2.31 trillion and net loans of $1.65 trillion.[2]

The NCUA Board oversees the agency's operations. Congress vested the Board with a defined set of quasi-legislative powers sufficient to allow it to function as an expert regulator within the credit-union system. The Board can issue regulations for the administration of the Federal Credit Union Act; take action to safeguard member interests, conserve credit-union assets, and protect the National Credit Union Share Insurance Fund; and exercise incidental powers necessary to carry out these responsibilities. 12 U.S.C. §§ 1766, 1789.

---

[1] *Mission and Values*, NAT'L CREDIT UNION ADMIN. (May 30, 2024), https://ncua.gov/about/mission-values.

[2] NAT'L CREDIT UNION ADMIN., QUARTERLY CREDIT UNION DATA SUMMARY 2024 Q4, at i (2025), https://ncua.gov/files/publications/analysis/quarterly-data-summary-2024-Q4.pdf.

The Board also possesses limited quasi-judicial authority, allowing it to adjudicate enforcement matters necessary to fulfill its supervisory role. The Board may initiate administrative proceedings against federally insured credit unions and institution-affiliated parties, issue cease-and-desist orders, and remove credit union officers or directors for unsafe practices or breaches of fiduciary duty. *See* 12 U.S.C. § 1786. These proceedings are adjudicated before administrative law judges, in accordance with the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, with final decision-making authority vested in the Board itself, *see* 12 U.S.C. § 1786(e)(2)–(3), (k); 12 C.F.R. §§ 747.1–747.40. As part of its adjudicative duties, the Board also reviews appeals of "material supervisory determinations" made by the agency. 12 C.F.R. § 746.101; 12 U.S.C. § 1766. Appeals to the Board may include claims of creditors of institutions in conservatorship or liquidation; share insurance claims; and composite examination ratings assessing the overall financial condition of an individual credit union. 12 C.F.R. § 746.103. The Board's final decision following such a proceeding may be appealed to the appropriate U.S. Court of Appeals. *See* 12 U.S.C. § 1786(j)(2).

## II.    Factual Background.

**A.** On February 6, 2019, President Donald J. Trump nominated plaintiff Todd M. Harper to the NCUA Board. Harper Decl. ¶ 1. The Senate confirmed Mr. Harper on March 14 by unanimous voice vote, an indication of broad, bipartisan support for his appointment. *Id.* ¶ 2. Mr. Harper was sworn into office on April 8, 2019, to serve a partial term.[3] *Id.* On January 20, 2021, President Joseph R. Biden designated Mr. Harper as Chair of the Board. *Id.* ¶ 3. That same year, President Biden nominated him to serve a full six-year term. *Id.* ¶ 4. The Senate confirmed that

---

[3] *Harper Sworn in as NCUA Board Member*, Nat'l Credit Union Admin. (Apr. 8, 2019), https://ncua.gov/newsroom/press-release/2019/harper-sworn-ncua-board-member.

nomination by a vote of 59 to 40 on June 8, 2022, and he was sworn in on July 11, 2022.[4] His current term extends through April 10, 2027. *Id.*

Mr. Harper brought deep experience and a steady hand to the NCUA. A longtime public servant with more than two decades of experience in financial-services policy and oversight, he served as staff director for the House Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, where he played a central role in shaping reforms following the 2008 financial crisis. *Id.* ¶ 6. As Chair, Mr. Harper led a series of initiatives to strengthen the credit-union system, including:

- The adoption of risk-based capital standards, 86 Fed. Reg. 72784 (Dec. 23, 2021);

- Cybersecurity oversight through the Information Security Examination program[5] and a new cyber incident reporting rule, 88 Fed. Reg. 12811 (Mar. 1, 2023);

- Greater flexibility for credit unions to leverage fintech partners and products, 88 Fed. Reg. 67570 (Sept. 29, 2023);

- Finalization of a rule establishing succession planning processes for key credit-union positions, 89 Fed. Reg. 104865 (Dec. 26, 2024);

- Stronger consumer protections, including greater transparency around overdraft and non-sufficient funds fees.[6]

---

[4] *Senate Confirms Harper to Full Term on the NCUA Board*, NAT'L CREDIT UNION ADMIN. (June 8, 2022), https://ncua.gov/newsroom/press-release/2022/senate-confirms-harper-full-term-ncua-board.

[5] *NCUA's Information Security Examination and Cybersecurity Assessment Program*, NAT'L CREDIT UNION ADMIN. (Sept. 16, 2024), https://ncua.gov/regulation-supervision/regulatory-compliance-resources/cybersecurity-resources/ncuas-information-security-examination-and-cybersecurity-assessment.

[6] NAT'L CREDIT UNION ADMIN., 24-CU-03, CONSUMER HARM STEMMING FROM CERTAIN OVERDRAFT AND NON-SUFFICIENT FUNDS FEE PRACTICES (2024), https://ncua.gov/regulation-

*Id.* ¶ 7. During his tenure on the Board from April 2019 to December 2024, the credit-union system's net worth increased by $83.9 billion; total loans outstanding increased $550 billion; and federally insured credit unions added 24 million members, with membership in these institutions reaching 142.3 million members in the fourth quarter of 2024.[7]

**B.** President Biden nominated plaintiff Tanya F. Otsuka to the NCUA Board on or about September 21, 2023. Otsuka Decl. ¶ 1. The Senate unanimously confirmed her by voice vote on December 20, 2023, and she was sworn in on January 8, 2024.[8] Her term runs through August 2, 2029. *Id.* ¶ 2.

Ms. Otsuka brought over a decade of experience in financial-services law and policy to the NCUA. Beginning her career as an attorney at the FDIC in the wake of the 2008 financial crisis, she gained experience in supervision, enforcement, resolution, assessments, and deposit insurance. Immediately before her appointment, Ms. Otsuka served on the staff of the Senate Banking, Housing, and Urban Affairs Committee, working on bipartisan bills that helped maintain the strength of the credit-union system. *Id.* ¶ 3.

In her time on the Board, Ms. Otsuka was an active partner in further ensuring the system's resilience, supporting small credit unions, and improving agency operations. She helped bolster consumer financial protection and played a key role in strengthening the agency's underserved

---

supervision/letters-credit-unions-other-guidance/consumer-harm-stemming-certain-overdraft-and-non-sufficient-funds-fee-practices.

[7] *Compare* NAT'L CREDIT UNION ADMIN., QUARTERLY CREDIT UNION DATA SUMMARY 2019 Q2, at i (2019), https://ncua.gov/files/publications/analysis/quarterly-data-summary-2019-Q2.pdf, *with* NAT'L CREDIT UNION ADMIN., QUARTERLY CREDIT UNION DATA SUMMARY 2024 Q4, at i (2025), https://ncua.gov/files/publications/analysis/quarterly-data-summary-2024-Q4.pdf.

[8] *Otsuka Sworn In as 25th NCUA Board Member*, NAT'L CREDIT UNION ADMIN. (Jan. 8, 2024), https://ncua.gov/newsroom/press-release/2024/otsuka-sworn-25th-ncua-board-member.

area application process, expanding access to financial services for underserved communities. *Id.* ¶ 4.

**C.**   On April 15, 2025, at 7:00 p.m., defendant Trent Morse, Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel Office, sent Mr. Harper an email stating in full: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the National Credit Union Administration is terminated, effective immediately. Thank you for your service." Mr. Harper's access to his government email account had been discontinued earlier that evening, and the message—sent to the wrong address—did not reach him until it was forwarded to a personal account on April 17. Harper Decl. ¶ 11.

One minute after sending a message to Mr. Harper, at 7:01 p.m. on April 15, Mr. Morse sent an identically worded email to Ms. Otsuka, likewise purporting to terminate her appointment as a Member of the Board "effective immediately." Otsuka Decl. ¶ 6.

Neither email provided any reason for the termination or asserted any basis for cause. Harper Decl. ¶ 12; Otsuka Decl. ¶ 7. Nor could they. The President removed Mr. Harper and Ms. Otsuka despite them faithfully carrying out the mission Congress assigned to the NCUA Board: ensuring the safety and soundness of credit unions, protecting consumers, and promoting public confidence in the credit union system.

On April 16, 2025, White House press secretary Karoline Leavitt defended the terminations while confirming that President Trump had not terminated plaintiffs for cause; Ms. Leavitt explained that "President Trump is the chief executive of the executive branch and reserves the right to fire anyone he wants."[9] Two days later, on April 18, 2025, the NCUA informed its

---

[9] Pete Schroeder, *Trump Fires Democratic Board Members of the Credit Union Watchdog*, REUTERS (Apr. 16, 2025, 12:21 PM), https://www.reuters.com/world/us/trump-fires-democratic-board-members-credit-union-watchdog-statements-2025-04-16/.

employees that "President Donald J. Trump terminated the positions of Todd Harper and Tanya Otsuka" and that "Todd, Tanya, and their staff are no longer employed with the agency."[10]

**D.**  The President's removal of Mr. Harper and Ms. Otsuka is unprecedented. In the nearly 50 years since Congress created the NCUA Board in 1978, no President has attempted to remove a Member whose term had not yet expired. The President has not identified any inefficiency, neglect of duty, or malfeasance by Mr. Harper or Ms. Otsuka to justify their removal. Nor has he provided them with notice or a hearing. Harper Decl. ¶¶ 12–14; Otsuka Decl. ¶¶ 7–9.

The President's action has left the NCUA Board without a quorum, rendering it unable to implement Congress's mandate in full. Only one Board Member, defendant Kyle S. Hauptman, remains as both the agency's sole Board Member and its Chairman. But the Federal Credit Union Act vests the powers of the agency in "the Board," not in any one individual, with a quorum requiring a majority of the Board. 12 U.S.C. § 1752a(d). And the "agreement of at least two of the three Board members is required for any action by the Board." 12 C.F.R. § 791.2. With only a single Member purporting to exercise authority, the NCUA cannot faithfully and fully carry out the supervisory, regulatory, and institutional functions that Congress intended.

Mr. Hauptman has called a meeting of the NCUA Board for Thursday, May 22, 2025, at 10:00 a.m.[11] But, in tacit recognition that the Board lacks a quorum and cannot take official action, the agenda includes only briefings on the National Credit Union Share Insurance Fund's performance and on voluntary employment separation programs at the NCUA. Per the agenda, the

---

[10] *NCUA Releases Staff Message on the Current NCUA Board*, NAT'L CREDIT UNION ADMIN. (Apr. 18, 2025), https://ncua.gov/newsroom/press-release/2025/ncua-releases-staff-message-current-ncua-board.

[11] *NCUA Board to Hold Meeting on May 22*, NAT'L CREDIT UNION ADMIN. (Apr. 25, 2025), https://ncua.gov/newsroom/press-release/2025/ncua-board-hold-meeting-may-22.

meeting will consist solely of informational briefings, as the Board cannot undertake its core responsibilities to supervise, regulate, and protect the credit-union system without a quorum.

On April 28, plaintiffs filed the instant action seeking declaratory and injunctive relief, and they now move for a preliminary injunction, summary judgment, and a permanent injunction. Plaintiffs respectfully request entry of final judgment by May 22 and, if the Court would benefit from additional time to consider the summary-judgment motion (and any cross-motion), respectfully request entry of a preliminary injunction before May 22 so that plaintiffs may participate in the next meeting of the NCUA Board, currently scheduled for that date.

## **LEGAL STANDARD**

To obtain a preliminary injunction, plaintiffs must show (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm" absent preliminary relief; (3) that the "balance of equities" tips in their favor; and (4) that an injunction is in "the public interest." *Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 185 (D.D.C. 2015), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Factors (3) and (4) merge when the defendant is the government. *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

To obtain a permanent injunction, plaintiffs must show "actual success" on the merits. *Winter*, 555 U.S. at 32. They must also show, similar to a preliminary injunction, (1) "an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). As with a preliminary injunction, factors (3) and (4) merge.

11

Courts apply the summary judgment standard where a preliminary injunction hearing is consolidated with a trial on the merits under Rule 65(a)(2), "the record is sufficient for a determination on the merits," and there "are no material factual disputes." *March for Life v. Burwell*, 128 F. Supp. 3d 116, 124 (D.D.C. 2015). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In addition, a district court has "original jurisdiction of any action in the nature of mandamus" where "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to [the] plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (quoting *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021)). "[M]andamus jurisdiction under § 1361 merges with the merits." *Muthana*, 985 F.3d at 910 (quoting *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020)).

## ARGUMENT

### I. The President Cannot Remove Plaintiffs from the NCUA Board Without Cause.

The President's purported termination of plaintiffs Harper and Otsuka was unlawful and invalid. The NCUA's organic statute, as amended in 1978, specifies that Board Members would serve fixed, staggered, six-year terms and, in a marked departure from the predecessor statute, Congress "deleted all reference to the President's removal powers" when it adopted that structure. *Swan*, 100 F.3d at 982; *compare* Pub. L. No. 91-206, 84 Stat. 49 (1970), *with* 12 U.S.C. § 1752a(c). Moreover, Congress plainly adopted the new structure to enhance the NCUA's independence and align it with other expert financial regulatory agencies like the FDIC and the Federal Reserve, whose governing members are not removable otherwise than for cause. *See* 123 Cong. Rec. 27,396 (1977); H.R. Rep. No. 1383, 95th Cong., 2d Sess. 26 (1978).

There can be no question that the President purported to remove plaintiffs Harper and Otsuka from their positions as Members of the NCUA Board without cause. The termination email sent on the President's behalf identified no malfeasance, neglect of duty, or other grounds for removal, and the Press Secretary later confirmed in public statements that the removal was without cause. The Court should therefore hold that the terminations violated Congress's directives.

### A.    The President Lacks Authority to Remove Board Members Without Cause.

To determine whether NCUA Board Members are protected from at-will removal, courts look to congressional intent, which may be expressed in one of two ways: "First, Congress may impose a removal restriction in the plain text of a statute. Second, Congress may clearly indicate its intent to restrict removals through the statutory structure and function of an office." *Severino v. Biden,* 71 F.4th 1038, 1044 (D.C. Cir. 2023) (cleaned up). As the D.C. Circuit explained in *Severino*, a "presumption of removability d[oes] not apply" to multi-member boards of the type addressed in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). *Severino*, 71 F.4th at 1047. Rather, when considering the removal of any member of a non-partisan, multi-member expert board, the question is whether "Congress may fairly be said to have conferred" the "power of removal." *Wiener v. United States*, 357 U.S. 349, 353 (1958).

Under these settled principles, Congress made clear that the NCUA Board Members do not serve at "the pleasure of the President" and may *not* be removed without cause.

### 1.    Statutory Text and Context Confirm that Congress Protected the NCUA Board from At-Will Removal.

The plain text and context of Congress's 1978 amendments to the Federal Credit Union Act demonstrate that NCUA Board Members may not be removed at will.

To begin, Congress made its intent clear by prescribing fixed, staggered terms for NCUA Board Members. As noted, the NCUA's organic statute originally included a single Administrator

serving as the "chief executive officer" of the agency and "at the pleasure of the President," with the assistance of an advisory board. Pub. L. No. 91-206, 84 Stat. 49, 50 (1970). And indeed, during the time Congress was considering amending the law, the President summarily removed the Administrator "[w]ithin hours after his appearance before [a Senate] committee." *Swan*, 100 F.3d at 982. Congress fundamentally restructured the agency in 1978, eliminating the Administrator and advisory board, creating a three-Member Board serving staggered six-year terms. 12 U.S.C. § 1752a; H.R. Rep. No. 1383, *supra*, at 26.

As the Court explained in *Swan*, "the strongest reason for according Board members any removal protection, in the absence of any express provision for it in the NCUA statute, is that Congress specifically amended the statute to create the Board and give its members fixed terms of office." *Swan v. Clinton*, 100 F.3d 973, 983 (D.C. Cir. 1996). Judge Silberman, concurring, saw it the same way, explaining that "the most obvious purpose" of the structural amendment adopted by Congress in 1978 was "to provide the [Board] with some measure of tenure or security against arbitrary removal." *Id.* at 990 (Silberman, J., concurring).

Indeed, Congress's decision to create a multi-member agency with members serving staggered, six-year terms would be entirely for naught if the President could remove Members without cause. "[S]taggered terms promote 'the independence, autonomy, and non-partisan nature' of an agency," *Severino*, 71 F.4th at 1049 (quoting *United States v. Wilson*, 290 F.3d 347, 359 (D.C. Cir. 2002)), and facially evince Congress's opposition to permitting a "complete change in leadership at any one time," *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 216 (2020) (cleaned up). Both goals would be impossible, and the staggered-term structure rendered nugatory, if the President could remove Members at will.

14

Other features of the statute confirm Congress's intent to insulate Board Members from unfettered presidential control. The statute imposes substantive limits on the President's appointment power: no more than two Members may belong to the same political party, and each must be "broadly representative of the public interest" and have experience "relating to a broad range of financial services, financial services regulation, or financial policy." 12 U.S.C. § 1752a(b). Again, these indicate limits on the President's removal power, particularly as the statute, although prescribing that the President may designate one Member to serve as Chairman, says nothing to suggest any authority to remove Board Members. *See id.* § 1752a(b)(1).

Congress perhaps made its intent the clearest by "delet[ing] all reference to the President's removal powers" from the NCUA's enabling law. *Swan*, 100 F.3d at 982. As is settled, "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995); *see Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) ("Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning."). That principle of statutory construction applies with full and special force to the deletion of words, for "[w]hen a statutory provision is deleted in a subsequent reenactment, the omitted term cannot be read into the later statute." *Hazardous Waste Treatment Council v. U.S.E.P.A.*, 861 F.2d 270, 276 (D.C. Cir. 1988); *see U.S. ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1502 (11th Cir. 1991) (deletion of language during amendment reflects intent to alter the statute's meaning). This is not a matter of construing legislative history but rather of reviewing the "record of *enacted* changes Congress made to the relevant statutory text over time," constituting "the sort of textual evidence everyone agrees can sometimes shed light on meaning." *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (emphasis in original).

Given these settled legal principles, the courts must give meaning and effect to Congress's plain decision to "delet[e] all reference to the President's removal powers" from the NCUA's enabling law, when the predecessor expressly provided that the Administrator served "at the pleasure of the President." *Swan*, 100 F.3d at 982. The only way to give Congress's actions meaning is to hold that the President lacks authority to remove Members at will.

In short, the "text of the statute creating the [NCUA] clearly expresses a congressional intent to trim the President's removal power." *Severino*, 71 F.4th at 1044.

### 2. The NCUA's Structure and Function Confirm Board Members Are Protected from At-Will Removal.

In addition to the text of the NCUA's organic statute considered in the context of its enactment, Congress also "clearly indicate[d] its intent to restrict removals through the statutory structure and function" of the agency. *Severino*, 71 F.4th at 1044. As *Severino* explained, "[u]nder *Humphrey's Executor*'s and *Wiener*'s binding precedent, when Congress assigns to an agency quasi-judicial or quasi-legislative functions that are deemed to be operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential removal, even without an explicit textual statement to that effect." *Id.* at 1047. Congress did exactly that here, and Congress's intentional decision to draw on the agency structure endorsed in *Humphrey's Executor* provides further strong contextual evidence of its intent to create an independent agency whose board members would be protected from removal for reasons other than cause.

*Structure*. To begin, the structure of the NCUA closely resembles that of the "New Deal-era FTC," as described by the Supreme Court in *Seila Law*, 591 U.S. at 218, where the Supreme Court discussed *Humphrey's Executor* to illustrate the features of an independent agency, and it is quite clear that Congress intended to draw on that line of precedent in creating the modern NCUA.

As *Seila Law* explains, *Humphrey's Executor* "identified several organizational features that helped explain its characterization of the FTC as non-executive," and permissibly subject to removal restrictions. *Id.* at 216. *First*, the FTC Board was "[c]omposed of five members" with "no more than three from the same political party," signaling that it was "designed to be 'non-partisan' and to 'act with entire impartiality.' " *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). *Second*, "[t]he FTC's duties were 'neither political nor executive,' but instead called for 'the trained judgment of a body of experts' 'informed by experience.' " *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). And *third*, "the [FTC] Commissioners' staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.' " *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624).

The NCUA reflects each of those same characteristics. *First*, it is governed by a three-Member Board, with no more than two Members permitted to belong to the same political party, 12 U.S.C. § 1752a(b)(1), ensuring a "non-partisan" Board with "a group of officials drawn from both sides of the aisle," *Seila Law*, 591 U.S. at 218. *Second*, Board Members must possess "a broad range of financial services, financial services regulation, or financial policy" experience, reflecting Congress's intent that the agency be led by 'experts,' not politicians. 12 U.S.C. § 1752a(b)(2)(A). *Third*, each Member serves a staggered six-year term, *id.* § 1752a(c), which "guarantee[s] that there [is] always" experienced leadership and prevents the "abrupt shifts" and "loss of accumulated expertise" that can follow changes in presidential administrations. *Seila Law*, 591 U.S. at 218.

It is thus plain that Congress intended to draw on the agency structure addressed in *Humphrey's Executor*—where the Supreme Court recognized the constitutionality of limiting presidential removal authority. It plainly follows that, in line with its removal of specific provisions specifying that those leading the Board served at the discretion of the President (*see supra*),

Congress intended to give Members fixed terms and give them protection from removal. The Board is not an extension of the President's political will, but rather a deliberative, multi-member expert body entrusted with the apolitical task of supervising a vital segment of the financial system.

The Court will find further confirmation of Congress's intent in that regard from Congress's plain purpose in aligning the structure of the NCUA with that of the Nation's other preeminent financial regulators. *See Swan*, 100 F.3d at 982–83; H.R. Rep. No. 1383, *supra*, at 26 ("Other financial institutions[,] regulatory agencies and other independent agencies operate under the direction of a board. For example, the Federal Reserve System, the Home Loan Bank System, the FDIC . . . all have a board of directors."). Many of the nation's core financial regulators are structured much like the NCUA, and they also lack express statutory provisions governing removal. *E.g.*, 12 U.S.C. § 242 (Chair of the Board of Governors of the Federal Reserve System); 15 U.S.C. § 78d (Securities and Exchange Commission); 12 U.S.C. § 1812 (Board of Directors of the Federal Deposit Insurance Corporation). Yet, courts have long understood that the President cannot remove the leaders of these critical financial regulators at will—whether the Federal Reserve[12]; the Securities and Exchange Commission[13]; or the FDIC.[14]

In short, Congress modeled the NCUA Board on the structure that the Supreme Court considered in *Humphrey's Executor*, and that Congress used in creating the Nation's other

---

[12] *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 285 (2020) (Kagan, J., concurring in the judgment with respect to severability and dissenting in part) ("Congress has historically given—with this Court's permission—a measure of independence to financial regulators like the Federal Reserve Board . . . .").

[13] *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 487 (2010) ("decid[ing] the case with [the] understanding" that SEC "Commissioners cannot themselves be removed by the President except under the *Humphrey's Executor* standard of inefficiency, neglect of duty, or malfeasance in office") (cleaned up).

[14] *Calcutt v. Fed. Deposit Ins. Corp.*, 37 F.4th 293, 303 (6th Cir. 2022), *rev'd on other grounds*, 598 U.S. 623 (2023).

financial regulators, in order to afford the NCUA the same protections from removal and to secure its independence. *See Swan*, 100 F.3d at 982. To strip the NCUA of those protections would be to undo Congress's plain intent and to strip the Nation's other bedrock financial regulators from those protections.

*Function*. The NCUA's function further confirms Congress's decision to make the NCUA Board free from political interference. Congress vested the NCUA with "quasi-judicial or quasi-legislative functions that are deemed to be operationally incompatible with at-will presidential removal." *Severino*, 71 F.4th at 1044. This can be among the "most reliable factor[s] for drawing an inference regarding the President's power of removal." *Wiener*, 357 U.S. at 353; *Mistretta v. United States*, 488 U.S. 361, 411 (1989). If the functions of a particular agency are incompatible with presidential "influenc[e]," "a fortiori must it be inferred that Congress did not wish to have hang over the [agency] the Damocles' sword of removal by the President for no reason other than that he preferred to have on that [agency] men of his own choosing." *Wiener*, 357 U.S. at 356.

The NCUA exercises quasi-judicial functions. It conducts formal administrative proceedings to issue cease-and-desist orders, suspend or prohibit institution-affiliated parties, and remove officers or directors of federally insured credit unions for violations of law, breaches of fiduciary duty, or unsafe and unsound practices. *See* 12 U.S.C. § 1786(e), (g); 12 C.F.R. §§ 747.1–747.40. These proceedings must follow formal hearing procedures set out in the Administrative Procedure Act, with an administrative law judge presiding over contested matters before the Board makes a final decision. *See* 5 U.S.C. § 554; 12 C.F.R. §§ 747.3, 747.18. The Board also reviews appeals of "material supervisory determinations" made by NCUA staff, *i.e.*, "decision[s] . . . that may significantly affect the capital, earnings, [and] operating flexibility . . . of an insured credit union." 12 C.F.R. § 746.103. The Board's decisions are subject to review by the appropriate United

States Court of Appeals. *See* 12 U.S.C. § 1786(j)(2). Like the War Claims Commission in *Wiener*, the NCUA's role is adjudicative: it resolves legal rights and duties under statutory standards based on evidence presented in formal proceedings. These types of quasi-judicial functions demand neutrality, fairness, and expertise—qualities that are "operationally incompatible with at-will presidential removal." *Severino*, 71 F.4th at 1044.

The NCUA also exercises quasi-legislative functions that reinforce the removal protections Congress intended for the Board. As the Supreme Court recognized in *Humphrey's Executor*, quasi-legislative agencies are "created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed," and when "administering the provisions of the statute," they "act[] in part quasi legislatively." 295 U.S. at 628. Congress vested the NCUA Board with authority to promulgate rules and regulations for the administration of the Federal Credit Union Act and to safeguard the interests of credit-union members and the National Credit Union Share Insurance Fund. *See* 12 U.S.C. §§ 1766, 1789. The Board routinely issues regulations governing chartering, lending practices, governance standards, and liquidity requirements for federally insured credit unions. *See, e.g.*, 12 C.F.R. Parts 702, 741.

In sum, the NCUA's structure, statutory powers, and operational responsibilities all confirm what Congress intended: an expert, independent Board protected from at-will removal.

### B.    Congress's Removal Protections Respect the Separation of Powers.

There is no question that congressional restrictions on the President's ability to remove members of the NCUA Board are constitutional under binding Supreme Court precedent.

As was confirmed nearly a century ago, Congress may constitutionally restrict the President's ability to remove officers from "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218. The NCUA, like the agency in *Humphrey's Executor*, wields no such power. As *Seila Law* explained, the agency in *Humphrey's*

20

*Executor* was a "multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [can be] said not to exercise any executive power." *Id.* at 216. The NCUA Board shares those same characteristics. *See supra* pp. 17–18. The removal restriction here accordingly is not "of such a nature that it impedes the President's ability to perform his constitutional duty," and thus comports with the separation of powers. *Seila Law*, 591 U.S. at 217 (cleaned up) (quoting *Morrison v. Olson*, 487 U.S. 654, 691 (1988)); *see also Harris v. Bessent*, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025) (denying stay of injunction "[i]n light of the precedent in *Humphrey's Executor* and *Wiener* concerning multimember adjudicatory bodies").

## II. This Court Should Provide a Complete Remedy to Plaintiffs.

The Court should grant a complete remedy to plaintiffs and do so expeditiously to restore a quorum to the NCUA Board and allow plaintiffs to continue carrying out their statutory duties.

**A.** Plaintiffs are entitled to a declaratory judgment. There are "'no dispositive factors'" for when declaratory judgment should issue, but courts typically rely on "two criteria" when determining whether to issue declaratory relief: (1) whether the judgment will "clarify[] the legal relations at issue" and (2) whether it will "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016)).

Both factors support declaratory relief. There is no question that a judgment would settle a "substantial controversy" as to the parties' relations—namely whether plaintiffs remain duly appointed members of the NCUA Board. *See Glenn*, 222 F. Supp. 3d at 36. Declaratory relief would similarly remove the uncertainty at the heart of this case:  Whether plaintiffs were removed, and whether they can be removed from the Board absent cause.

Nor would any of the typical concerns that might weigh against declaratory relief apply: There are no questions about the "equity" of plaintiffs' conduct; the "state of the record" is fully

developed as to all relevant facts; the parties are "adverse[]" with respect to the question presented; and the "question to be decided" is one of substantial "public importance." *POM Wonderful LLC v. F.T.C.*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012).

**B.** The Court should also issue an injunction. Binding precedent makes clear that this Court may issue injunctive relief to remedy the wrongful removal of an agency officer. The D.C. Circuit in *Swan* indeed held that courts have the authority to issue injunctions to "redress" an official's "injury" caused by unlawful removal. *Swan*, 100 F.3d at 980. And just two years ago, *Severino* reaffirmed that courts "can enjoin 'subordinate executive officials' to reinstate a wrongfully terminated official." *Severino*, 71 F.4th at 1042–43 (quoting *Swan*, 100 F.3d at 980). That is precisely the relief plaintiffs seek, and courts in this Circuit have granted similar relief in other cases where the President wrongfully removed members of multi-member boards who could not be removed for reasons other than cause. *Harris v. Bessent*, 2025 WL 679303 (D.D.C. Mar. 4, 2025) (permanent injunction); *Wilcox v. Trump*, 2025 WL 720914 (D.D.C. Mar. 6, 2025) (same); *Grundmann v. Trump*, 2025 WL 782665 (D.D.C. Mar. 12, 2025) (same).

Plaintiffs plainly satisfy the factors for an injunction, as (1) they will suffer irreparable injury if an injunction is denied; (2) damages cannot address that injury; and (3) the balance of hardships and public interest favor plaintiffs. *See eBay Inc.*, 547 U.S. at 391.

*First*, the harms at issue here are irreparable. Plaintiffs have a "statutory right" to serve as Board Members of an independent agency created by Congress, and "the deprivation" of that right is "irreparable." *Berry v. Reagan*, No. 83-CV-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983). The injury has "obvious[]," *id.*, and "irrevocably disruptive" effects on plaintiffs, who cannot presently perform their official duties as statutorily directed, *see Mackie v. Bush*, 809 F. Supp. 144, 146 (D.D.C. 1993), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993).

Defendants' actions also cause irreparable harm to the Board itself. Defendants seek to deprive plaintiffs of the ability to perform Congress's mandate, *i.e.*, to serve as independent Board Members. Denying a merits-stage injunction would not just "threaten[] the independence" of the Board, but also destroy its independence by implying that a co-equal branch lacks power to counteract an illegal removal of board members. *Humphrey's Ex'r*, 295 U.S. at 630; *see also Berry*, 1983 WL 538, at *5. More narrowly, plaintiffs would also be deprived of their statutory right to function as Members of the Board, which is a separate harm based on plaintiffs' inability to fulfill their six-year term. Because plaintiffs serve fixed terms, each additional day they cannot serve is a day they cannot get back; the opportunity to serve will be lost forever.

*Second*, the nature of the irreparable harm makes plain why damages are inadequate. Plaintiffs' loss of the ability to perform their congressionally directed, presidentially appointed, and Senate confirmed mission transcends the "loss of income" or "embarrassment" involved in the typical employment action; and it cannot be restored by an award of damages. *See Marbury v. Madison*, 5 U.S. 137, 173 (1803) (holding that detinue—under which Marbury could have obtained money in compensation for his office's "value"—was an inadequate remedy). Monetary damages would not give plaintiffs full relief because the injury is more than just the loss of a salary; it is the loss of a "statutory right to function" in a position directly related to a federal agency's "ability to fulfill its mandate." *Berry*, 1983 WL 538, at *5. No amount of money can fully remedy that loss.

*Third*, the balance of the equities and public interest favor plaintiffs. There is a strong public interest in the Executive "abid[ing] by the federal laws that govern [its] existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). That commonsense principle applies to removal of agency officers, *see, e.g.*, *Harris*, 2025 WL

23

679303, at *14, which reflects important public policy, *see Humphrey's Ex'r*, 295 U.S. at 624–26, 629.

An injunction would also put an end to the "obviously disruptive effect" of defendants' ongoing interference with the NCUA's activities. *See Berry*, 1983 WL 538, at *5. Plaintiffs' purported terminations have "left [the Board] without a quorum," thwarting its ability to "fulfill its mandate" that Congress prescribed. *Wilcox*, 2025 WL 720914, at *15 (quoting *Berry*, 1983 WL 538, at *5); *see* 12 U.S.C. § 1752a(d) ("A majority of the Board shall constitute a quorum.").

By contrast, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). The requested injunction would do just that: it would end the non-Presidential defendants' efforts to implement plaintiffs' unlawful purported terminations, and it would read the Federal Credit Union Act to provide removal protection for Members of the Board, just as Congress intended. Permanent injunctive relief is therefore proper.[15]

**C.** In the alternative, the Court should grant mandamus. There is a long-established Anglo-American history and tradition of courts issuing writs of mandamus in cases of unlawful removals from office. *See* 3 W. Blackstone, Commentaries on the Laws of England *264–65 ("mandamus" is a "full and effectual remedy" "for refusal or admission where a person is intitled to an office" and "for wrongful removal, where a person is legally possessed" and "the franchise[] concern[s] the public"); *Marbury v. Madison*, 5 U.S. 137, 173 (1803) (finding a "plain case for a mandamus" where an officer's commission was wrongfully withheld); *see also United States v. Malmin*, 272

---

[15] For the same reasons discussed here, plaintiffs also satisfy the standard for a preliminary injunction. Should the Court not issue its merits decision before the NCUA Board's next meeting on May 22, 2025, plaintiffs respectfully request a preliminary injunction before May 22.

F. 785, 790 (3d Cir. 1921) (collecting cases) ("[M]andamus is an appropriate remedy to restore to office one lawfully in possession and unlawfully removed.").

The D.C. Circuit has long recognized the "overwhelming" authority that "[a] mandamus to restore" lies where a person removable only for "causes specified" "is wrongfully dispossessed of [an] office." *Kalbfus v. Siddons*, 42 App. D.C. 310, 319 (D.C. Cir. 1914) (quoting *Rex v. Blooer*, 2 Burr. 1043, 1045 (1760)). Plaintiffs' entitlement to relief is "clear and indisputable." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 381 (2004) (quotation marks omitted). And mandamus is "appropriate" in the alternative, *id.*, because it would direct the non-Presidential defendants to perform the "ministerial"—*i.e.*, "not discretionary"—duty of "abid[ing] by the requirements of duly enacted and otherwise constitutional" removal restrictions. *Swan*, 100 F.3d at 977; *see also id.* at 978 (rejecting government's argument that Congress could not "impose a nonremoval duty of sufficient clarity to create a ministerial duty"); *Harris*, 2025 WL 679303, at *15 ("Were equitable injunctive relief unavailable . . . the Court would not hesitate to . . . award necessary relief through a writ of mandamus as an alternative remedy at law.") (internal quotation marks omitted).

*        *        *

The Court should act swiftly to restore plaintiffs to their rightful offices and allow them to carry out their statutory duties, as Congress intended. The President's actions threaten the NCUA's independence and the stability of the Nation's financial system. Immediate relief is needed to preserve the integrity of the agency and protect the public interest.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant declaratory relief for plaintiffs, and should enter the proposed permanent injunction submitted by plaintiffs. Should the Court not issue its merits decision before the NCUA Board's next meeting on May 22, 2025, plaintiffs respectfully request, in the alternative, that the Court enter a preliminary injunction before May 22.[16]

Respectfully submitted,

Dated: April 29, 2025
      New York, New York

/s/ Vincent Levy
Vincent Levy (NY0487)
Denis D. Metin (*Admission forthcoming*)
Christopher M. Kim (*Admission forthcoming*)
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
(646) 837-5151
vlevy@hsgllp.com

*Attorneys for Plaintiffs*

---

[16] Plaintiffs' complaint was divided into six overlapping counts. They deserve to prevail on the merits of counts one and four because, as was explained in Part I, the purported "termination of Mr. Harper and Ms. Otsuka is ultra vires," and violates the "reasonable limitations on the removal of board members of independent agencies" established by Congress pursuant to its powers under the Constitution. Compl., ECF No. 1 at 7, 8. They deserve to prevail on count two, under the Administrative Procedure Act, because, as was explained in Part I, any action taken by the defendants toward them, or the Board, with respect to their purported termination is not "in accordance with the law." *Id.* at 8. They deserve to prevail on count three (declaratory relief), count five (mandamus), and count six (injunction) for the reasons described in Part II.