**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TODD M. HARPER and TANYA F. OTSUKA,

                   *Plaintiffs*,

*v.*

                  Civil Action No. 1:25-cv-01294-AHA

SCOTT BESSENT, *et al.*,

                   *Defendants*.

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT AND IN SUPPORT OF
<u>DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .......................................................................................................................2

I.      Statutory Background. ..................................................................................................2

II.     Factual Background. ....................................................................................................4

LEGAL STANDARD ...............................................................................................................5

ARGUMENT ............................................................................................................................6

I.      The President may remove NCUA Board members at will because Congress did not
        indicate an intention to overcome the presumption of at-will removal.....................6

        A.      The Plain Text of the NCUA's Organic Statute Does Not Impose Any
                Restrictions On The President's Ability To Remove Board Members. .......7

        B.      The Structure and Function of the NCUA Do Not—And Cannot—Provide
                Implied Removal Restrictions....................................................................9

II.     Plaintiffs Are Not Entitled to the Relief They Seek...................................................15

        A.      Plaintiffs Are Not Entitled To Reinstatement.. ...........................................15

        B.      Plaintiffs Have Not Satisfied the Injunction Factors ...................................18

                1.      Plaintiffs have not suffered an irreparable injury. .............................19

                2.      The balance of the equities and public interest weigh strongly in favor
                        of the Government. .............................................................................21

        C.      Plaintiffs Are Not Entitled to Declaratory Judgment or Mandamus Relief. ...........22

CONCLUSION...........................................................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama,*
  742 F.3d 1023 (D.C. Cir. 2014) ................................................................................................5

*Alcresta Therapeutics, Inc. v. Azar,*
  318 F. Supp. 3d 321 (D.D.C. 2018) ........................................................................................20

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.,*
  64 F.4th 1354 (D.C. Cir. 2023) ...............................................................................................19

*Baker v. Carr,*
  369 U.S. 186 (1962) ................................................................................................................17

*Barnes v. Kline,*
  759 F.2d 21 (D.C. Cir. 1984) ..................................................................................................20

*Berry v. Reagan,*
  1983 WL 538 (D.D.C. Nov. 14, 1983) *vacated per curiam*, 732 F.2d 949 (D.C. Cir. 1983) ....18, 20, 21

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ....................................................................................................................13

*Cafeteria and Restaurant Workers Union, Local 473, A.F.L.-C.I.O. v. McElroy,*
  367 U.S. 886 (1961) ................................................................................................................22

*Carlucci v. Doe,*
  488 U.S. 93 (1988) ....................................................................................................................7

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ................................................................................................19

*Church v. Biden,*
  573 F. Supp. 3d 118 (D.D.C. 2021) ........................................................................................20

*City of Arlington v. FCC,*
  569 U.S. 290 (2013) ..................................................................................................13, 14, 15

* *Collins v. Yellen,*
  594 U.S. 220 (2021) ..........................................................................................................*passim*

*Consolidated Edison Co. v. Ashcroft,*
  286 F.3d 600 (D.C. Cir. 2002) ................................................................................................23

*Davis v. Billington,*
  76 F. Supp. 3d 59 (D.D.C. 2014) ............................................................................................19

*Davis v. Pension Benefit Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ................................................................5

*Dellinger v. Bessent*,
  604 U.S. ---, 145 S. Ct. 515 (2025) ........................................................17

*Dellinger v. Bessent*,
  2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ..............................18, 20, 22

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ...............................................................................19

*Farris v. Rice*,
  453 F. Supp. 2d 76 (D.D.C. 2006) ..........................................................19

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...............................................................................23

\* *Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) ..........................................................................*passim*

*Great Lakes Dredge & Dock Co. v. Huffman*,
  319 U.S. 293 (1943) ...............................................................................23

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ...............................................................................17

*Harkrader v. Wadley*,
  172 U.S. 148 (1898) ...............................................................................17

*Harris v. Bessent*,
  2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ............................................16

*Heckler v. Ringer*,
  466 U.S. 602 (1984) ...............................................................................23

*Hetreed v. Allstate Ins. Co.*,
  135 F.3d 1155 (7th Cir. 1998) .................................................................19

\* *Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) ........................................................... 11, 12, 16, 20

*In re Sawyer*,
  124 U.S. 200 (1888) ...............................................................................17

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) .................................................................................6

*Keim v. United States,*
   177 U.S. 290 (1900) ..................................................................................................7

*Macauley v. Waterman S.S. Corp.,*
   327 U.S. 540 (1946) ................................................................................................23

*Mar. for Life v. Burwell,*
   128 F. Supp. 3d 116 (D.D.C. 2015) .........................................................................6

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ..................................................................................................5

* *Mississippi v. Johnson,*
   71 U.S. (4 Wall.) 475 (1867) ...................................................................................1

*Morrison v. Olson,*
   487 U.S. 654 (1988) ................................................................................................11

*Munaf v. Geren,*
   553 U.S. 674 (2008) ..................................................................................................5

* *Myers v. United States,*
   272 U.S. 52 (1926) ..........................................................................................*passim*

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................................19

*Parsons v. United States,*
   167 U.S. 324 (1897) ............................................................................................8, 16

*PHH Corp. v. CFPB,*
   881 F.3d 75 (D.C. Cir. 2018) ................................................................................12

*Raines v. Byrd,*
   521 U.S. 811 (1997) ................................................................................................20

*Sampson v. Murray,*
   415 U.S. 61 (1974) ............................................................................................19, 22

*Samuels v. Mackell,*
   401 U.S. 66 (1971) ..................................................................................................23

* *Seila Law v. CFPB,*
   591 U.S. 197 (2020) ........................................................................................*passim*

* *Severino v. Biden,*
   71 F.4th 1038 (D.C. Cir. 2023) .......................................................................*passim*

*Sherley v. Sebelius*9
    644 F.3d 388 (D.C. Cir. 2011) ................................................................. 5, 18

*Shurtleff v. United States,*
    189 U.S. 311 (1903) ..................................................................................16

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ......................................................... 7, 11, 18

*Trump v. United States,*
    603 U.S. 593 (2024) ..................................................................................13

*United States v. Lindsey,*
    634 F.3d 541 (9th Cir. 2011) ...................................................................10

*United States v. Perkins,*
    116 U.S. 483 (1886) ..................................................................................11

*Walton v. House of Representatives,*
    265 U.S. 487 (1924) ..................................................................................17

*Watkins v. United States,*
    354 U.S. 178 (1957) ....................................................................................9

*White v. Berry,*
    171 U.S. 366 (1898) ..................................................................................17

*Wiener v. United States,*
    357 U.S. 349 (1958) ....................................................................... 11, 13, 16, 20

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .................................................................................. 5, 19

*Yardmasters of Am. v. Harris,*
    721 F.2d 1332 (D.C. Cir. 1983) ...............................................................21

## **Constitutional Provisions**

U.S. Const. art. I ...........................................................................................14

U.S. Const. art. II .................................................................................*passim*

U.S. Const. art. III .......................................................................................14

## **Statutes**

5 U.S.C. § 551 *et seq.* ....................................................................................4

7 U.S.C. § 2 ..................................................................................................10

12 U.S.C. § 1752 *et seq.*..................................................................................................................2

12 U.S.C. § 1752a....................................................................................................................*passim*

12 U.S.C. § 1766.............................................................................................................3, 4, 13, 14

12 U.S.C. § 1781–1790(c)....................................................................................................................2

12 U.S.C. § 1782...................................................................................................................................13

12 U.S.C. § 1786.............................................................................................................3, 4, 13, 14

12 U.S.C. § 1795–95k............................................................................................................................3

12 U.S.C. § 2241..................................................................................................................................10

12 U.S.C. § 2242..................................................................................................................................10

12 U.S.C. § 3401 *et seq.* ....................................................................................................................2

22 U.S.C. § 2501-1..............................................................................................................................10

22 U.S.C. § 2503..................................................................................................................................10

28 U.S.C. § 2202..................................................................................................................................23

45 U.S.C. § 231f..................................................................................................................................10

An Act to amend the Federal Credit Union Act of 1968,
   Pub. L. No. 91–206, 84 Stat. 49 (Mar. 10, 1970) ...............................................................2, 8

The Financial Institutions Regulatory and Interest Rate Control Act of 1978,
   Pub. L. No. 95-630, 92 Stat. 3641 (1978) ..................................................................................2

## <u>Rules</u>

Fed. R. Civ. P. 56(a)...........................................................................................................................5

Fed. R. Civ. P. 65(a)...........................................................................................................................6

## <u>Regulations</u>

12 C.F.R. part 700–61..........................................................................................................................3

12 C.F.R. § 747.203...............................................................................................................................3

12 C.F.R. § 747.3...................................................................................................................................13

12 C.F.R. § 747.5...................................................................................................................................4

12 C.F.R. § 747.703............................................................................................................. 3, 13

**<u>Periodical Materials</u>**

Antonin Scalia, *The Rule of Law as a Law of Rules*,
   56 U. Chi. L. Rev. 1175 (1989) ....................................................................................10

**<u>Other Authorities</u>**

Brookings Institutions, *Credit Union Regulation at a Crossroads: A Conversation with NCUA Board Member Todd M. Harper*, YouTube (May 1, 2025),
   https://www.youtube.com/watch?v=nQsg7KqGKfQ ......................................................21

National Credit Union Administration, *About NCUA: Mission and Values* (last visited May 5, 2025),
   https://perma.cc/CU3Z-22WM ........................................................................................3

Press Release, NCUA to Hold Meeting on May 22 (Apr. 25, 2025),
   https://perma.cc/7QVH-Q6GS ........................................................................................5

National Credit Union Administration, *Newsroom: NCUA Releases Staff Message on the Current NCUA Board* (Apr. 18, 2025), https://ncua.gov/newsroom/press-release/2025/ncua-releases-staff-message-current-ncua-board...............................................................................................................................21

**INTRODUCTION**

The President of the United States lawfully removed Plaintiffs Todd M. Harper and Tanya F. Otsuka from their positions as Board members of the National Credit Union Administration ("NCUA"). Plaintiffs nevertheless contend that this Court should reinstate them to their former positions, empowering them to exercise executive power as principal officers of the United States, unaccountable to the democratically elected President, even after the President has chosen to remove them. Article II—and Supreme Court precedents construing it—foreclose that argument.

Because the Constitution vests all of the executive power in the President and entrusts him alone with "tak[ing] Care that the Laws be faithfully executed," U.S. Const. art. II § 3, the President bears sole responsibility for executive officers acting on his behalf. Accordingly, Courts have long presumed that the President may remove at will any such officer for whom he cannot continue to be responsible. *See Myers v. United States*, 272 U.S. 52, 134 (1926).

Congress may overcome that presumption for certain positions, but it must make its intent to restrict the President's removal power crystal clear. Congress did not even attempt to do so here. The NCUA's organic statute is silent as to any restrictions on the President's power to remove Board members. *See* 12 U.S.C. § 1752a. And nothing about the structure of the NCUA or function of the Board indicates congressional intent to constrain the President's removal power. Indeed, the Supreme Court has already observed that Congress did not "impos[e] any restriction on the President's power to remove" the leadership of "the National Credit Union Administration[.]" *Collins v. Yellen*, 594 U.S. 220, 249 (2021) (citing 12 U.S.C. § 1752a). Further, even if Congress had enacted a removal restriction, any such restriction would be unconstitutional because the NCUA exercises significant executive power—including regulatory, investigative, and enforcement power. The President therefore must be able to remove its leaders at will.

Even if Plaintiffs were correct that their dismissals were somehow unlawful, they would not be entitled to reinstatement. Such relief would exceed the traditional equitable authority of courts and violate the longstanding separation-of-powers principle that courts lack jurisdiction to enjoin the President in the exercise of his official duties. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867).

1

This Court should therefore deny Plaintiffs' motion and enter summary judgment in favor of Defendants.

## BACKGROUND

### I.     Statutory Background

The National Credit Union Administration is the executive agency that oversees federal credit unions and federally-insured, state-chartered credit unions pursuant to the Federal Credit Union Act. *See* 12 U.S.C. § 1752a(a) ("There is established in the executive branch of the Government an independent agency to be known as the National Credit Union Administration.").  At its creation in 1970, the NCUA was led by a single Administrator with assistance from an advisory board, *see* An Act to amend the Federal Credit Union Act of 1968, Pub. L. No. 91–206, 84 Stat. 49, 49–50 (Mar. 10, 1970) (establishing the NCUA).  Eight years later, Congress enacted the Financial Institutions Regulatory and Interest Rate Control Act of 1978, overhauling the regulatory landscape of depository financial institutions.  *See* The Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub. L. No. 95-630, 92 Stat. 3641 (1978) (codified at 12 U.S.C. § 3401 *et seq.*).  Title V of that Act restructured the NCUA and expanded its responsibilities.  *See id.*, Title V, 92 Stat. at 3680 (codified at 12 U.S.C. § 1752 *et seq.*).

The 1978 amendments created the organizational structure of the NCUA that remains in place today.  Instead of an Administrator and advisory board, a new NCUA Board was to manage the agency.  *See* 12 U.S.C. § 1752a(d).  The Board consists of three members, *id.* § 1752a(b)(1), appointed by the President with the advice and consent of the Senate.  The President designates one member to serve as Chairman, and each member serves a staggered six-year term, so the term of one member expires every two years.  *See id.*  No more than two Board members can belong to the same political party, and "[a] majority of the Board" constitutes a quorum, *id.* § 1752a(d).

At the same time it restructured the NCUA, Congress also expanded its responsibilities.  It made the NCUA responsible for administering the National Credit Union Share Insurance Fund, which insures the accounts of federally chartered credit unions and many state chartered credit unions. *See* 12 U.S.C. § 1781–1790(c).  Congress also created the National Credit Union Central Liquidity

Facility, which advances funds to member credit unions so that they are able to meet their liquidity needs, and charged the NCUA with managing that facility as well. *See* 12 U.S.C. § 1795–95k. The NCUA continues to supervise credit unions and administer the Insurance Fund and the Liquidity Facility. Its mission is to "[p]rotect[] the system of cooperative credit and its member-owners through effective chartering, supervision, regulation, and insurance."[1]

The Board oversees the NCUA's operations and wields substantial regulatory authority in administering the Federal Credit Union Act. *See generally* 12 U.S.C. § 1766(a) ("The Board may prescribe rules and regulations for the administration of this chapter . . . . Any central credit union chartered by the Board shall be subject to such rules, regulations, and orders as the Board deems appropriate[.]"); 12 C.F.R. part 700–61 (regulations affecting credit unions); *see also* 12 U.S.C. § 1766(i)(2) ("In addition to the authority conferred upon it by other sections of this chapter, the Board is authorized . . . to . . . perform such other functions or acts as it may deem necessary or appropriate to carry out the provisions of this chapter[.]").

The Board also has the authority to investigate unsafe or unsound practices and alleged violations of applicable laws. *See, e.g.,* 12 U.S.C. § 1786(p) (providing that, in connection with any proceeding, examination, or investigation, the Board shall have the power to administer oaths and affirmations, to take depositions, and to issue, revoke, quash, or modify subpoenas); *see also* 12 C.F.R. § 747.703 (authority to conduct formal and informal investigations). If the Board believes a violation occurred, it serves the offending party a notice of the charges with a statement of the facts constituting the alleged violation, and gives the party an opportunity to correct it. *See* 12 U.S.C. § 1786(b); *see also* 12 C.F.R. § 747.203. If the party fails to do so, the Board may then hold an administrative hearing to determine whether the evidence establishes the violation and supports enforcement action. *See* 12 U.S.C. §§ 1786(b), (e).

In exercising its enforcement authority, the Board may issue a cease-and-desist order and require the offending credit union or party to remedy the violation. *See* 12 U.S.C. § 1786(e). Available

---

[1] National Credit Union Administration, *About NCUA: Mission and Values* (last visited May 5, 2025), https://perma.cc/CU3Z-22WM.

remedies include restitution, reimbursement, or any other action the Board deems appropriate.  *See id.*  The Board may also remove offending parties from office and prohibit them from participating "in any manner" in "the affairs of any insured credit union," or "any insured depository institution," *see* 12 U.S.C. § 1786(g).  And it may assess monetary penalties against credit unions and affiliated parties, ranging from $5,000 per day to $1,000,000 per day for particularly egregious violations.  *See* 12 U.S.C. § 1786(k).  To ensure compliance, the Board can enforce its orders in federal district court.  *See id.* § 1786(k).

Finally, the Board may terminate the insured status of a credit union, *see* 12 U.S.C. § 1786.  And it can suspend or revoke the charter of any federal credit union, or place the same in involuntary liquidation, upon "finding that the organization is bankrupt or insolvent, or has violated any of the provisions of its charter, its bylaws, this chapter, or any regulations issued thereunder."  12 U.S.C. § 1766(b)(1).

Administrative proceedings undertaken in connection with the Board's investigative and enforcement actions are tried before an administrative law judge in accordance with the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, *see* 12 C.F.R. § 747.5, with final decision-making authority vested in the Board.  The Board's final decision may be appealed to the appropriate U.S. Court of Appeals.  *See* 12 U.S.C. § 1786(j).

## II.    Factual Background

During his first term in office, President Trump nominated Plaintiff Todd Harper to serve a partial term on the NCUA Board, and the Senate confirmed his nomination.  *See* Plaintiffs' Statement of Material Facts ("SOMF") ¶ 1–2, ECF No. 3-2 (citing Harper Decl. ¶ 1).  While Mr. Harper was serving that term, then-President Biden assumed office and designated Mr. Harper as Chairman of the Board.  *See id.* ¶ 3.  Former President Biden later nominated Mr. Harper to serve a full six-year term, and the Senate confirmed that nomination as well.  *Id.* ¶ 4.  On July 11, 2022, Mr. Harper was sworn in to a term that was set to expire on April 10, 2027.  *Id.* ¶¶ 4–5.

President Biden also nominated Plaintiff Tanya Otsuka to the NCUA Board, and after the Senate confirmed her, she was sworn in on January 8, 2024, to a term that was set to run through

August 2, 2029. *Id.* ¶¶ 6–8 (citing Otsuka Decl. ¶ 2). When President Trump assumed office for his second term, he designated the third Board member, Kyle S. Hauptman, to serve as Chairman.

On April 15, 2025, Trent Morse, the Deputy Director of Presidential Personnel, notified Mr. Harper via email on behalf of President Trump that his position on the NCUA Board was terminated, effective immediately. *Id.* ¶ 11. The notice also thanked Mr. Harper for his service. *Id.* Mr. Harper learned of his termination that same day. *Id.* ¶ 9–10. Ms. Otsuka was also informed of her termination on April 15. *Id.* ¶ 12. The notice she received similarly indicated that her termination was effective immediately and thanked her for her service. *Id.*

Chairman Hauptman remains on the Board, *id.* ¶ 16, and the next Board meeting—which will consist solely of informational briefings and be fully open to the public—is scheduled for May 22, 2025.[2]

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). The movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The "most important factor" is whether the movant has "established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[2] *See* Press Release, NCUA to Hold Meeting on May 22 (Apr. 25, 2025), https://perma.cc/7QVH-Q6GS.

Under Federal Rule of Civil Procedure 65(a), the Court may consolidate a preliminary injunction hearing with a trial on the merits if the record is sufficient for a determination on the merits under the summary judgment standard. *See* Fed. R. Civ. P. 65(a); *see also Mar. for Life v. Burwell*, 128 F. Supp. 3d 116, 124 (D.D.C. 2015). That course of action makes sense here; there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law. Accordingly, this Court should enter summary judgment in favor of Defendants.

## ARGUMENT

Plaintiffs' motion fails for several reasons. First, nothing in the NCUA's organic statute limits the President's authority to remove Board members. *See generally* 12 U.S.C. § 1752a; *see also Collins*, 594 U.S. at 249 (2021) (stating that Congress did not impose any restrictions on the President's power to remove leaders of the NCUA (citing 12 U.S.C. § 1752a)); *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023) (explaining that courts may not infer removal restrictions unless Congress's intent to impose those restrictions is "clear in a statute" due to "the background presumption that the President may remove anyone he appoints"). And neither the structure of the NCUA nor the functions assigned its leaders indicate congressional intent to constrain the President's removal power. On the contrary, this Court should construe the NCUA's organic statute to permit at-will removal because the NCUA exercises significant executive power, such that any restrictions on the President's ability to remove Board members would raise grave constitutional concerns. *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). Finally, putting all of that aside, even if Plaintiffs, as they contend, were unlawfully removed from their positions, they would not be entitled to reinstatement. Accordingly, Plaintiffs' motion must fail.

## I.     The President may remove NCUA Board members at will because Congress did not indicate an intention to overcome the presumption of at-will removal.

Plaintiffs claim that the President cannot remove NCUA Board members without cause. *See* ECF No. 3-1 at 12. But under the Constitution, "the President's removal power is the rule, not the exception." *Seila Law v. CFPB*, 591 U.S. 197, 228 (2020) (citing *Myers v. United States*, 272 U.S. 52 (1926) and *Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010)). "Because of the background presumption

that the President may remove anyone he appoints, Congress must make it clear in a statute if it wishes to restrict the President's removal power." *Severino*, 71 F.4th at 1044; *see also Carlucci v. Doe*, 488 U.S. 93, 99 (1988) ("[A]bsent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'" (quoting *Keim v. United States*, 177 U.S. 290, 293 (1900))).

Since limiting the President's removal authority presents separation of powers concerns, courts will not assume that Congress intended to do so "unless the statutory text makes Congress's intent to test constitutional lines apparent." *Severino*, 71 F.4th at 1044. There are only two ways that Congress could send such a clear signal: by imposing a removal restriction in the plain text of a statute or by "clearly indicat[ing] its intent to restrict removals through the statutory structure and function of an office." *Id.*; *see also id.* at 1044 n.2 ("These two tests ask only whether a statute should be read as limiting the President's removal power. If a statute does so, the question of the constitutionality of that restriction would still need to be decided."). Here, the Supreme Court has already observed that Congress did not impose any restrictions on the President's power to remove NCUA Board members, *see Collins*, 594 U.S. at 249, so the presumption of at-will removal prevails.

### A. The plain text of the NCUA's organic statute does not impose any restrictions on the President's ability to remove Board members.

Nothing in the text of the NCUA's organic statute expresses a congressional intent to restrict the President's power to remove Board members. The statute does not impose conditions or restraints on the timing or reasons for their removal. It provides that "[t]he Board shall consist of three members, who are broadly representative of the public interest, appointed by the President, by and with the advice and consent of the Senate." 12 U.S.C. § 1752a(b)(1). To be sure, the statute also sets each Board member's term at six years, *see id.* § 1752a(c) ("The term of office of each member of the Board shall be six years[.]"), and provides that those terms will be staggered. But that does not mean, as the D.C. Circuit assumed in *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996),[3] that Board

---

[3] The issue in *Swan v. Clinton* was whether holdover NCUA Board members have removal protection. *See Swan v. Clinton*, 100 F.3d 973, 976 (D.C. Cir. 1996). Though the court held that holdover members do not enjoy such protection, 100 F.3d at 988, it assumed without deciding that NCUA Board members have removal protection during their appointed terms, primarily because of the legislative

members cannot be removed during their terms.  On the contrary, as the D.C. Circuit has since explained,  "[w]hen used in federal appointment statutes, the word 'term' has a long-settled meaning of limiting a person's tenure in office, not investing the person with a guaranteed minimum period of service."  *Severino*, 71 F.4th at 1045.  That is, a "term" "is a ceiling, not a floor, on the length of service." *Id.*; *see also Parsons v. United States*, 167 U.S. 324, 327–28 (1897) (holding that a fixed statutory term of service does not affect the President's presumptive removal power).  Thus, nothing in the text indicates that Congress intended to limit the President's power to remove NCUA Board members.

In opposition, Plaintiffs argue that this Court should infer congressional intent to limit the President's ability to remove current NCUA Board members because in 1970, when the NCUA was led by an Administrator and advisory board, Congress specified that the Administrator and Chairman of the advisory board served "at the pleasure of the President."  ECF No. 3-1 at 13–14 (quoting § c, 84 Stat. at 50 (establishing the NCUA)).  Plaintiffs, however, overlook that Congress completely restructured the NCUA in 1978, creating the NCUA Board and expanding the agency's responsibilities, effectively replacing the old statute wholesale.  *Compare id. with* 12 U.S.C. § 1752a.  This is not an instance in which a reader may draw inferences from Congress's choice to line-item remove certain provisions from a statute.  Congressional silence cannot, as Plaintiffs contend, equate to "a removal restriction in the plain text of [the] statute," whatever its legislative history may be.  *See Severino*, 71 F.4th at 1044.

Neither does Congress's vision of a bipartisan, expert Board suggest any limitation on the President's removal power.  *Contra* ECF No. 3-1 at 15.  The President can remove Board members at will and then appoint new members in accordance with the bipartisan makeup of the Board.  And, contrary to Plaintiffs' position, experts need not—indeed cannot—be unaccountable to a democratically elected President.  *See Seila Law*, 591 U.S. at 231–32 (citation omitted) ("One can have a government that . . . benefits from expertise without being ruled by experts.").  In our democratic republic, it is the President who leads the executive branch, and he must be accountable to the people.

___

history regarding term limits.  *Id.* at 983.  As explained herein, that assumption has not survived *Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023) or *Collins v. Yellen*, 594 U.S. 220 (2021).

So the executive officers who operate on the President's behalf must be accountable to him. *See Collins*, 594 U.S. at 278 (Gorsuch, J., concurring) ("It is the power to supervise—and, if need be, remove—subordinate officials that allows a new President to shape his administration and respond to the electoral will that propelled him to office.").

Ultimately, Plaintiffs' arguments suffer from a fundamental defect. They search the text for the President's authority to remove Board members, *see, e.g.*, ECF No. 3-1 at 15 ("[T]he statute . . . says nothing to suggest any authority to remove Board Members."). This formulation is backwards. "Because of the background presumption that the President may remove anyone he appoints, Congress must make it clear in a statute if it wishes to restrict the President's removal power." *Severino*, 71 F.4th at 1044. The text does not do so here.

## B. The structure and function of the NCUA do not—and cannot—provide implied removal restrictions.

Finding nothing helpful in the text of the statute, Plaintiffs next contend that the structure and function of the NCUA—which they argue mirror the structure and function of the *Humphrey's Executor* New Deal-era Federal Trade Commission ("FTC")—indicate that Congress intended to insulate its Board members from removal absent cause. ECF No. 3-1 at 16–20. But the Supreme Court has made clear that the NCUA is an agency for which Congress has *not* imposed "any restriction on the President's power to remove the agency's leadership." *Collins*, 594 U.S. at 249. And in any event, NCUA Board members are principal officers who lead a freestanding component within the Executive Branch and exercise significant executive power. Accordingly, the NCUA does not resemble the FTC as the *Humphrey's Executor* Court understood it, and this Court should not infer removal protections based on any asserted similarities. Further, because the entirety of the executive power is vested in the President, *see* U.S. Const. art. II, § 1, cl. 1, the President must be able to remove NCUA Board members at will. This Court should therefore decline Plaintiffs' invitation to "assume Congress legislated a potential separation of powers problem" by restricting the President's removal authority. *Severino*, 71 F.4th at 1044; *see also Watkins v. United States*, 354 U.S. 178, 204 (1957) ("[E]very reasonable indulgence of legality must be accorded to the actions of a coordinate branch of our Government.").

For the same reasons, if the Court nonetheless finds that NCUA's structure and function impliedly protect Board members from removal, those implied removal protections are unconstitutional. *See Seila Law*, 591 U.S. at 216–17.

1. Where, as here, the Supreme Court has directly addressed the existence of removal restrictions for a particular agency, *Severino*'s structure-and-function analysis is inappropriate. In *Collins*, the Supreme Court addressed the constitutionality of a for-cause removal protection for the head of the Federal Housing Finance Agency ("FHFA"), ultimately concluding that the removal restriction in that case, which was express in the statutory text, was unconstitutional. *Collins*, 594 U.S. at 256. Responding to Plaintiffs' argument that Congress's decision to label the FHFA as "independent" meant the agency should be independent from Presidential supervision, the Court explained that "independent" in this context "may mean instead that the Agency is not part of and is therefore independent of any other unit of the Federal Government." *Id.* at 248–49. And it noted that the leaders of many such "independent" agencies are nonetheless removable at-will. To illustrate the point, the Supreme Court identified a list of agencies for which the principle is true.[4] The Court thus stated: "Congress has described many agencies as 'independent' without imposing any restriction on the President's power to remove the agency's leadership. This is true, for example, of . . . the National Credit Union Administration, 12 U.S.C. § 1752a[.]" *Collins*, 594 U.S. at 249. The Supreme Court has been clear—Congress has imposed no restriction on the President's removal authority over NCUA Board members. That alone should end this inquiry. *See, e.g.*, Antonin Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1177 (1989) (noting that lower courts are bound not only by the holdings of higher courts' decisions but also by their "mode[s] of analysis"); *see also United States v. Lindsey*, 634 F.3d 541, 550 (9th Cir. 2011) ("[W]e are an intermediate court within the federal system, and as such, we must take our cue from the Supreme Court."). For that reason as well, *Swan*'s

---

[4] The agencies the Court identified were the Peace Corps, 22 U.S.C. §§ 2501–1, 2503, the Defense Nuclear Facilities Safety Board, 42 U.S.C. § 2286, the Commodity Futures Trading Commission, 7 U.S.C. § 2(a)(2), the Farm Credit Administration, 12 U.S.C. §§ 2241–2242, the National Credit Union Administration, 12 U.S.C. § 1752a, and the Railroad Retirement Board, 45 U.S.C. § 231f(a). *Collins*, 594 U.S. at 249.

assumption that NCUA Board members have removal protection during their terms, *see Swan*, 100 F.3d at 983, has not withstood the test of time.

**2.**   If the Court nonetheless proceeds to examine whether the NCUA's structure and function are "operationally incompatible with at-will Presidential removal," the result is the same.  *Severino*, 71 F.4th at 1047; *see also Collins*, 594 U.S. at 250 n.18 (suggesting that only an "adjudicatory body" may be an exception to the general rule that courts must not read in removal restrictions not found in statutory text). [5]   The Constitution vests all of the "executive Power" in the President, who is given the sole responsibility to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 1, cl. 1; *id.* § 3; *see also Severino*, 71 F. 4th at 1043–44.   For nearly a century, the Supreme Court has repeatedly reaffirmed "the general rule that the President possesses 'the authority to remove those who assist him in carrying out his duties.'"  *Seila Law*, 591 U.S. at 215 (quoting *Free Enter. Fund.*, 561 U.S. at 513–14).  Without such power, the President would be unable to control those who aid him in executing the laws and "could not be held fully accountable for discharging his own responsibilities."  *Free Enter. Fund.*, 561 U.S. at 514; *see also Collins*, 594 U.S. at 278 (Gorsuch, J., concurring) ("After all, from the moment an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear." (internal quotations and citation omitted)).

The Supreme Court has thus recognized "only two exceptions to the President's unrestricted removal power."  *Seila Law*, 591 U.S. at 204.  First, in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Court held that Congress could impose for-cause removal restrictions on "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and

---

[5] While *Severino* suggests that quasi-judicial or quasi-legislative functions "can be a relevant signal that Congress meant for members of [an] agency to be shielded from Presidential removal," 71 F.4th at 1047, the Supreme Court in *Collins* offered a more limited view.  In assessing whether to infer removal protections for the acting director of the FHFA, the Court explained that *Weiner* "read a removal restriction into" the relevant statute "on the rationale that the War Claims Commission was an adjudicatory body."  *Collins*, 594 U.S. at 250 & n.18.  The Court did not ask whether the FHFA performed any quasi-judicial or quasi-legislative functions—rather, it explained that because the FHFA "[was] not an adjudicatory body," only "plain language" could take away the President's presumptive removal power.  *Id.*  Because the NCUA exercises substantial executive power, no "signal" directs this Court to read in a removal restriction here under *Collins* or *Severino*.

was said not to exercise any executive power." *Seila Law*, 591 U.S. at 216; *see also Wiener v. United States*, 357 U.S. 349, 356 (1958) (inferring removal restrictions and applying *Humphrey's Executor* to an "adjudicatory body" tasked with resolving claims for compensation arising out of World War II). Second, in *Morrison v. Olson*, 487 U.S. 654 (1988) and *United States v. Perkins*, 116 U.S. 483 (1886), the Court recognized an exception "for inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. Those exceptions represent the "outermost constitutional limits of permissible congressional restrictions on the President's removal power" under current precedent. *Id.* (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)).

NCUA Board members do not fit within either of these exceptions. They are not inferior officers with narrowly defined duties; rather, they are principal officers appointed by the President and confirmed by the Senate. *See* U.S. Const. art. II, § 2, cl. 2; 12 U.S.C. § 1752a. They oversee their own department. *See Free Enter. Fund*, 561 U.S. at 511 (explaining that a department "is a freestanding component of the Executive Branch, not subordinate to or contained within any other such component"). And they are not subservient to any other principal officer. The *Morrison* exception therefore does not apply.

Nor does the *Humphrey's Executor* exception apply. *Contra* ECF No. 3-1 at 16. In *Humphrey's Executor*, the Supreme Court upheld the constitutionality of a provision prohibiting removal of 1935 FTC Commissioners absent "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 623. Despite reaffirming the then-recent holding of *Myers v. United States*, 272 U.S. 52 (1926), that the President "[has] unrestrictable power . . . to remove purely executive officers," *Humphrey's Executor*, 295 U.S. at 632, *Humphrey's Executor* concluded that *Myers* did not control because the FTC Commissioner at issue was "an officer who occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President," *id.* at 628. Instead, *Humphrey's Executor* understood the 1935 FTC to be "an administrative body" that "carr[ied] into effect legislative policies" and "perform[ed] other specified duties as a legislative or as a judicial aid." *Id.* Those duties, according to the Court, "c[ould ]not in any proper sense be characterized as

an arm or an eye of the executive." *Id.* The Court thus understood the 1935 FTC not to be exercising executive power at all but rather to "act[] in part quasi legislatively and in part quasi judicially." *Id.* On that understanding, *Humphrey's Executor* found no constitutional problem with restricting the removal of FTC Commissioners in 1935. But as the Supreme Court made clear in *Seila Law*, that exception is limited to "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions" that exercise no executive power. *Seila Law*, 591 U.S. at 216–17 (quoting *Humphrey's Executor*, 295 U.S. at 632); *see also Wiener*, 357 U.S. at 354 (asserting that, because the War Claims Commission was a purely adjudicatory body, its tasks "require[d] absolute freedom from Executive interference").

The NCUA is no "mere legislative or judicial aid." *Seila Law*, 591 U.S. at 199. Rather, unlike the 1935 FTC at issue in *Humphrey's Executor*, the NCUA exercises significant executive power. *Contra* ECF No. 3-1 at 16–18. It investigates potential unsafe practices and violations of the Federal Credit Union Act and related regulations. *See* 12 U.S.C. §§ 1766, 1782, 1786; 12 C.F.R. § 747.703(b) ("Formal investigations involve the exercise of the NCUA Board's subpoena power."). And where the evidence supports such action, the NCUA serves offending parties a notice of the charges against them and prosecutes the violations or unsafe practices specified in the notice. *See* 12 U.S.C. §§ 1786(b), (e) (authorizing the NCUA Board to initiate administrative proceedings against insured credit unions and institution-affiliated parties that engage in unsafe practices or violations of applicable law). These are quintessential executive functions: "Investigative and prosecutorial decisionmaking is 'the special province of the Executive Branch,' and the Constitution vests the entirety of the executive power in the President." *Trump v. United States*, 603 U.S. 593, 620 (2024) (citations omitted); *see also Buckley v. Valeo*, 424 U.S. 1, 138–40 (1976) (recognizing interpreting and enforcing law through litigation as executive function).

The Board also exercises the executive power to "unilaterally issue final decisions awarding . . . relief in administrative adjudications." *Seila Law*, 591 U.S. at 219; *see, e.g.*, 12 U.S.C. § 1786(s)(B); 12 C.F.R. § 747.3(f) ("Final order means an order issued by the NCUA with or without the consent of the affected institution or the institution-affiliated party, that has become final[.]"); *see also id.* §§ 1786(f), (k) (authorizing the Board to issue cease-and-desist orders and enforce such orders

in federal court); § 1786(a) (authorizing the Board to terminate the insured status of a credit union); *id.* § 1766 (authorizing the Board to place failing credit unions in involuntary liquidation). These adjudications, too, are exercises of executive power. *See Seila Law*, 591 U.S. at 216 n.2; *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013) (same).

Moreover, the Board's "enforcement authority includes the power to seek daunting monetary penalties against [credit unions and] private parties in federal court on behalf of the United States"—another "quintessentially executive power not considered in *Humphrey's Executor.*" *Seila Law*, 591 U.S. at 219. Indeed, if an insured credit union or institution-affiliated party violates any law, regulation, order, or written agreement between the credit union and the agency, the Board can impose civil penalties of up to $5,000 for each day during which such violation continues. 12 U.S.C. § 1786(k). If the violation is knowing or reckless, the Board can impose daily civil penalties of up to $1,000,000 or 1% of the credit union's assets. *See id.* § 1786(k)(D).

Finally, the NCUA Board wields the power to prescribe "rules and regulations for the administration of [the Federal Credit Union Act]." 12 U.S.C. § 1766(a). Because "interpreting a law enacted by Congress to implement the legislative mandate is the very essence of execution of the law," an agency "empowered to issue a 'regulation or order' . . . clearly exercises executive power." *Collins*, 594 U.S. at 254 (cleaned up). And that is particularly true because the NCUA "possesses the authority to promulgate binding rules fleshing out" numerous "federal statutes" with implications for "a major segment of the U.S. economy," *Seila Law*, 591 U.S. at 218. The vast scope of the NCUA's regulatory authority confirms that the NCUA exercises significant executive power. *See Collins*, 594 U.S. at 253 ("FHFA actions with respect to those companies could have an immediate impact on millions of private individuals and the economy at large."). Plaintiffs themselves allege that the NCUA is "tasked with core functions instrumental to well-functioning financial markets," Compl. ¶ 1, ECF No. 1; *see also* ECF No. 3-1 at 1 ("The NCUA itself protects the more than 142 million Americans who have a checking or savings account, a credit card, or a home or car loan with credit unions . . . . The NCUA's mandate includes safeguarding over $2 trillion in credit-union assets and over $1.75 trillion in credit-union deposits[.]").

Even so, Plaintiffs dispute this characterization of the NCUA's activities. They contend instead that the NCUA exercises "quasi-legislative" and "quasi-judicial" power. *See* ECF No. 3-1 at 19–20.[6] But legislative power is vested exclusively in Congress, *see* U.S. const. art. I, and judicial power in the federal courts, *see* U.S. const. art. III. Since the beginning of the Republic, agencies have made rules and conducted adjudications. *See City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 305 n.4 (2013). "These activities take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power.'" *Id.* (quoting Art. II, § 1, cl. 1).

In sum, then, the NCUA Board consists of principal officers who exercise significant executive power and must be accountable to the President through the removal power. *See Seila Law*, 591 U.S. at 204 ("The President's power to remove—and thus supervise—those who wield executive power on his behalf follows from the text of Article II[.]"). Rather than being "operationally incompatible with at-will Presidential removal," *Severino*, 71 F.4th at 1047, the NCUA's significant authority is constitutionally incompatible with anything but. This Court therefore should not infer restrictions on the President's removal authority without express statutory text—and if it nonetheless does imply such restrictions, it should hold that those restrictions are unconstitutional.

## II.    Plaintiffs are not entitled to the relief they seek.

As explained above, President Trump lawfully exercised his Article II authority to remove his subordinates when he removed Plaintiffs. Yet Plaintiffs ask this Court to declare that they were unlawfully terminated and issue the unprecedented relief of enjoining Defendants to reinstate them, *see* Compl., Prayer for Relief at 10; *see also* ECF No. 3-1 at 22 (stating that reinstatement "is precisely the relief plaintiffs seek"). Plaintiffs are not entitled to either form of relief. First, this Court lacks the authority to enter the injunction they request. Even if that were not the case, Plaintiffs have failed to

---

[6] Plaintiffs also focus heavily on other agencies such as the Federal Reserve Board, *see* ECF No. 3-1 at 1, but they ignore the Supreme Court's observation that the Federal Reserve's tenure protection presents a distinct question with a unique historical pedigree. *See Seila Law*, 591 U.S. at 222 n.8. That question is not at issue here.

15

satisfy the factors for injunctive relief. Nor have they established their entitlement to a declaratory judgment or writ of mandamus.

### A. Plaintiffs are not entitled to reinstatement.

Even if there were restrictions on the removal power here and those restrictions were constitutional, Plaintiffs nevertheless would not be entitled to reinstatement. This Court lacks the power to issue any order reinstating principal executive officers removed by the President. Traditionally, executive officers challenging their removal by the President have sought back pay, not reinstatement. *See Wiener*, 357 U.S. at 350 (suit "for recovery of his salary"); *Humphrey's Executor*, 295 U.S. at 612 (suit "to recover a sum of money alleged to be due . . . for salary"); *Myers*, 272 U.S. at 106 (suit "for his salary from the date of his removal"); *Shurtleff v. United States*, 189 U.S. 311, 318 (1903) (suit "for salary"); *Parsons v. United States*, 167 U.S. 324, 326 (1897) (suit "for salary and fees"). That rule reflects the obvious separation of powers problems that arise if a court attempts to reinstate— that is, reappoint—a principal executive officer removed by the President. The President cannot be compelled to retain the services of a principal officer whom he no longer believes should be entrusted with the exercise of executive power. *See Harris v. Bessent*, 2025 WL 1021435, at *4 (D.C. Cir. Apr. 7, 2025) (Rao, J., dissenting) ("The government is likely to succeed on its remedial challenge because the injunctive relief concocted by the district court is wholly unprecedented and transgresses historical limits on our equitable authority."). And the courts may not exercise the appointment power for principal officers, which the Constitution vests in the President alone.

Indeed, as the Supreme Court explained in *Myers*, many members of the First Congress argued against requiring the Senate's advice and consent for removals precisely because of the risk that such a procedure would require the President to retain someone he had sought to remove. As Representative Benson observed: "If the Senate, upon its meeting, were to acquit the officer, and replace him in his station, the President would then have a man forced on him whom he considered as unfaithful." *Myers*, 272 U.S. at 124 (citation omitted). Representative Boudinot argued: "But suppose [the Senate] shall decide in favor of the officer, what a situation is the President then in,

surrounded by officers with whom, by his situation, he is compelled to act, but in whom he can have no confidence." *Id.* at 131–32 (citation omitted). And Representative Sedwick asked rhetorically: "Shall a man under these circumstances be saddled upon the President, who has been appointed for no other purpose but to aid the President in performing certain duties? Shall he be continued, I ask again, against the will of the President?" *Id.* at 132 (citation omitted). The broad declaratory and injunctive relief Plaintiffs seek raises just this problem.

A declaratory judgment or injunction reinstating Plaintiffs would also exceed the scope of this Court's equitable powers. A federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement of a public official is not such a remedy. "It is . . . well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. 200, 212 (1888). Instead, the Supreme Court explained, "[t]he jurisdiction to determine the title to a public office belongs exclusively to the courts of law," for instance through suits for back pay. *Id.* Thus, "the power of a court of equity to restrain by injunction the removal of a [public] officer has been denied in many well-considered cases." *Id.*; *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction"); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers."); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898) ("[T]o sustain a bill in equity to restrain . . . the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the government."); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another." (citation omitted)); *Dellinger v. Bessent*, 604 U.S. ---, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (explaining that, "by the 1880s this Court considered it 'well settled that a court of equity has no

jurisdiction over the appointment and removal of public officers'" (quoting *In re Sawyer*, 124 U. S. at 212)).

"Perhaps the most telling indication of the severe constitutional problem with" the remedy Plaintiffs seek "is the lack of historical precedent." *Free Enter. Fund*, 561 U.S. at 505 (citation omitted). There is no historical precedent for an Article III court to reinstate a principal officer before this year. At most, a district court in 1983 effectively reinstated removed members of the multimember U.S. Commission on Civil Rights because that court believed that the commission functioned as a "legislative agency" whose "only purpose" was "to find facts which [could] subsequently be used as a basis for legislative or executive action"—not to exercise any executive power in its own right. *Berry v. Reagan*, 1983 WL 538, at *2 (D.D.C. Nov. 14, 1983) (citations omitted), *vacated per curiam*, 732 F.2d 949 (D.C. Cir. 1983). That is no support for Plaintiffs' insistence that an agency head whom the President has fired must keep exercising core Article II executive power.

Plaintiffs suggest that the longstanding rule preventing a court from enjoining the President does not apply because they seek an injunction against subordinate Executive Branch officials. *See* ECF No. 3-1 at 22. But the relief Plaintiffs seek usurps the President's exclusive appointment authority, as the President is the "only official with the statutory and constitutional authority to appoint, remove, and supervise" agency heads. *Dellinger v. Bessent*, 2025 WL 559669, at *13 n.2 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (per curiam); *see also* U.S. Const. art. II, § 2, cl. 2 (vesting authority to appoint principal officers in President alone). Defendants Bessent, Fazio, Hauptman, and Morse have no more authority than this Court to exercise the President's appointment power at Plaintiffs' behest.[7] Therefore, any relief effecting the reinstatement of Plaintiffs would prevent the President from exercising his lawful Article II authority to select NCUA Board members of his

---

[7] In addition, Secretary Bessent is referenced nowhere in Plaintiffs' description of the facts of this case, and for good reason—he exercises no authority over the operations of the NCUA or its Board and has no power to even facially remedy Plaintiffs' alleged injuries.

choosing.  Whether the order is expressly directed at the President or not, courts lack power to issue any order reinstating principal executive officers removed by the President.[8]

### B.  Plaintiffs have not satisfied the injunction factors.

To establish their entitlement to a permanent injunction, Plaintiffs must demonstrate: "'(1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'"  A*natol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).  "When the defendant is the government, factors (3) and (4) merge."  *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Plaintiffs have not satisfied any of these factors.[9]

### 1.  Plaintiffs have not suffered an irreparable injury.

Plaintiffs can show neither that their injury is irreparable nor that monetary relief such as backpay is inadequate compensation for any injury.  Plaintiffs' claimed injury is the inability to "perform their official duties as statutorily directed," and the deprivation of a claimed "statutory right" to serve as NCUA Board members.  ECF No. 3-1 at 22 (internal quotation omitted).  That claim does

---

[8] *Swan* does not compel a contrary result.  In *Swan*, the D.C. Circuit held only that the plaintiff, a former member of the NCUA who had been removed by President Clinton, had *standing* to challenge his removal because his injury could be redressed by the actions of subordinate officials.  *Swan*, 100 F.3d at 978–81; *see also id.* at 980–81 ("[W]e hold that the partial relief Swan can obtain against subordinate executive officials is sufficient for redressability, even recognizing that the President has the power, if he so chose, to undercut this relief.").  Standing is not at issue in this case, and *Swan* expressly declined to decide whether courts have the authority to order reinstatement as a remedy, noting that it was not "determining whether we can order more complete relief[.]"  *Id.* at 981.  For the reasons stated, a court cannot do so.

[9] Plaintiffs have failed to satisfy the factors for a preliminary injunction for the same reasons, and because, for the reasons described in Part I, they are not likely to prevail on the merits.  *See Winter*, 555 U.S. at 20 (requiring movant for preliminary injunction to establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.");  *accord Sherley*, 644 F.3d at 392.

not meet the "high standard for irreparable injury," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)—a standard that is particularly rigorous in cases involving the government, given that the "[g]overnment has traditionally been granted the widest latitude in the dispatch of its own internal affairs." *Sampson v. Murray*, 415 U.S. 61, 83 (1974) (citation omitted).

The harm Plaintiffs claim amounts to a loss of position. Although Plaintiffs' removal deprives them of their employment and salary, such consequences ordinarily do not amount to irreparable injury, "however severely they may affect a particular individual." *Sampson*, 415 U.S. at 92 n.68. To the contrary, numerous courts in this Circuit and others have held that loss of employment is not irreparable injury—in part because it can be remediated through back pay and other equitable remedies. *See, e.g.*, *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998); *Davis v. Billington*, 76 F. Supp. 3d 59, 65-66 (D.D.C. 2014) (collecting cases); *Farris v. Rice*, 453 F. Supp. 2d 76, 79-80 (D.D.C. 2006) (noting that "cases are legion holding that loss of employment does not constitute irreparable injury" given "court's equitable powers to remedy for loss in employment through, for example, back pay"); *see also Dellinger*, 2025 WL 559669, at *17 (Katsas, J., dissenting). Accordingly, when principal officers have been removed from their posts, they generally have challenged that removal in suits for back pay. *See Humphrey's Executor*, 295 U.S. at 612 (challenge sought "to recover a sum of money alleged to be due"); *Myers*, 272 U.S. at 106 (same); *Wiener*, 357 U.S. at 349-51 (same).

Plaintiffs contend that their alleged harm is more than just loss of position because their "loss of the ability to perform their congressionally directed, presidentially appointed, and Senate confirmed mission transcends the 'loss of income' or 'embarrassment' involved in the typical employment action," ECF No. 3-1 at 23. But the Supreme Court has already rejected that reasoning too. Although a public official's "loss of salary" amounts to a judicially cognizable harm, his "loss of political power" does not. *Raines v. Byrd*, 521 U.S. 811, 821 (1997). The notion that public officials "have a separate private right, akin to a property interest, in the powers of their offices" is "alien to the concept of a republican form of government." *Barnes v. Kline*, 759 F.2d 21, 50 (D.C. Cir. 1984) (Bork, J., dissenting).

Plaintiffs additionally contend that removing them from the Board will "cause irreparable harm to the Board itself" because it would threaten the Board's independence and deprive Plaintiffs

of their "statutory right to function."  ECF No. 3-1 at 23.  That is unpersuasive for at least three reasons.  First, Plaintiffs may not seek relief based on harm to the Board, a separate legal entity. "Abstract harm" to third parties "does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021); *see also Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) ("injuries to third parties are not a basis to find irreparable harm").  Second, as discussed above, the Board's claimed independence does not mean that the Board is independent from and thus unaccountable to the President—Article II forbids that result.  *See Free Enter. Fund*, 561 U.S. at 496–97.  And third, this case is unlike *Berry v. Reagan*, 1983 WL 538 (D.D.C. Nov. 14, 1983), *vacated*, 732 F.2d 949 (D.C. Cir. 1983), which Plaintiffs cite in support of their claim that denial of an injunction would irreparably harm the Board, ECF No. 3-1 at 23.  In *Berry*, President Reagan removed several members of the Commission on Civil Rights, which prevented the Commission from completing a report it was statutorily required to complete by a date certain.  1983 WL 538, at *1, *5.  This "obviously disruptive effect" on the functioning of the Commission was irreparable because, given that the Commission was set to expire, it would prevent the Commission from *ever* completing its statutory mandate.  *Id.* at *5.  By contrast, here, the NCUA will not cease to exist and, indeed, can continue to function with one Board member, as it has previously.  *See Yardmasters of Am. v. Harris*, 721 F.2d 1332, 1344 (D.C. Cir. 1983) (holding that a single member of the National Mediation Board could exercise the powers of the board when the other seats were vacant).[10]

To the extent the harm Plaintiffs assert is harm to the NCUA, *see* ECF No. 3-1 at 23, that fails as well.  As explained above, injuries to third parties are not a basis for finding irreparable harm.  In any event, denying Plaintiffs relief would not deprive the NCUA of the ability to fulfill its mandate. Indeed, Plaintiff Todd Harper conceded as much during a recent event at the Brookings Institution. In response to a question about how the NCUA will continue to function with one Board member,

---

[10] *See also* National Credit Union Administration, *Newsroom: NCUA Releases Staff Message on the Current NCUA Board* (Apr. 18, 2025), https://ncua.gov/newsroom/press-release/2025/ncua-releases-staff-message-current-ncua-board.

he said "[F]irst of all, I want to assure everybody that their money is safe at a federally insured credit union. That has not changed. And . . . the agency can continue to do its essential functions."[11] More fundamentally, though, this argument is merely a repackaging of Plaintiffs' contention that they are the best people for the position and that the President had no sound reason for removing them—*i.e.*, that a Board with Plaintiffs as members would better serve the agency's mission than one without them. That is the President's prerogative to determine.

2. **The balance of equities and public interest weigh strongly in favor of the Government.**

The balance of the equities and public interest weigh strongly against Plaintiffs' reinstatement as members of the NCUA Board. Because the NCUA is an executive agency exercising executive authority, an injunction functionally reinstating one or multiple of its principal officers would raise grave separation-of-powers concerns and work a great and irreparable harm to the Executive. The President cannot be compelled to retain the services of a principal officer whom the President no longer believes should be entrusted with the exercise of executive power. Such a remedy would undermine the accountability of the Executive Branch instilled by the Constitution. The President "is elected by the entire Nation" and all executive officers "remain[] subject to the ongoing supervision and control of the elected President." *Seila Law*, 591 U.S. at 224. Adding further carveouts from that constitutional rule—and then reinstating principal officers pursuant to those further carveouts— "heightens the concern that" the Executive Branch "may slip from the Executive's control, and thus from that of the people." *Free Enter. Fund*, 561 U.S. at 499.

Moreover, the public interest is better served by an NCUA Board member who holds the President's confidence and, accordingly, will more effectively serve him in executing his duties as Chief Executive. "[T]he Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83 (quoting *Cafeteria and Restaurant Workers Union, Local*

---

[11] Brookings Institutions, *Credit Union Regulation at a Crossroads: A Conversation with NCUA Board Member Todd M. Harper*, Youtube (May 1, 2025), https://www.youtube.com/watch?v=nQsg7KqGKfQ.

*473, A.F.L.-C.I.O. v. McElroy*, 367 U.S. 886, 896 (1961)).  "Allowing another branch of government to insulate executive officers from presidential control . . . would sever a key constitutional link between the People and their government," contrary to the public interest.  *Dellinger*, 2025 WL 559669, at *17 (Katsas, J., dissenting).  The American people elected the President to run the executive branch.  And the President has determined that keeping Plaintiffs in office no longer serves the best interests of the American people.  That democratically accountable choice should be respected.

Conversely, the public interest would not be served by reinstating Plaintiffs.  In favor of their equities, Plaintiffs put forth that their dismissal is disruptive to the functioning of the NCUA, ECF No. 3-1 at 23–24, which, for reasons already explained, need not be the case.  Finally, Plaintiffs contend that the government has no legitimate interest in flouting the law.  *Id*.  But that argument presupposes the success of their incorrect merits arguments.

### C.  Plaintiffs are not entitled to declaratory judgment or mandamus relief.

For the reasons discussed above, Plaintiffs are incorrect on the merits and thus not entitled to declaratory judgment.  Furthermore, the same principles that foreclose reinstatement likewise foreclose declaratory relief.  A court "cannot issue a declaratory judgment against the President." *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part and concurring in the judgment).  And a declaratory-judgment suit is "essentially an equitable cause of action."  *Samuels v. Mackell*, 401 U.S. 66, 70 (1971) (citation omitted).  "[T]he Declaratory Judgment Act provides that after a declaratory judgment is issued the district court may enforce it by granting 'further necessary or proper relief,' 28 U.S.C. § 2202, and therefore a declaratory judgment . . . might serve as the basis for a subsequent injunction."  *Samuels*, 401 U.S. at 72.  "[E]ven if the declaratory judgment is not used as a basis for actually issuing an injunction, the declaratory relief alone has virtually the same practical impact as a formal injunction would."  *Id*.  As a result, "the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment."  *Id*. at 73.  To be sure, there may be "unusual circumstances" where "a declaratory judgment might be appropriate" even though "an injunction [would] be withheld."  *Id*.  But "ordinarily," "where an injunction would be impermissible," "declaratory relief

23

should . . . be denied as well." *Id.* at 73; *see Macauley v. Waterman S.S. Corp.*, 327 U.S. 540, 545 n.4 (1946) ("The same principles which justified dismissal of the cause insofar as it sought injunction justified denial of the prayer for a declaratory judgment."); *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943) (noting that the Declaratory Judgment Act "only provided a new form of procedure for the adjudication of rights in conformity" with "established equitable principles.").

Plaintiffs are also not entitled to a writ of mandamus. The writ of mandamus "is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616 (1984). Mandamus is "inappropriate except where a public official has violated a 'ministerial' duty." *Consolidated Edison Co. v. Ashcroft*, 286 F.3d 600, 606 (D.C. Cir. 2002). Plaintiffs have not established that the President owes her a "clear nondiscretionary duty" and the President's selection of who should lead an Executive Branch agency is certainly not a mere ministerial task.

## CONCLUSION

For the reasons above, the Court should deny Plaintiffs' Motion for Preliminary Injunction and Judgment on the Merits and grant Defendants' cross motion for summary judgment.

Dated: May 9, 2025                                 Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*
*Civil Division*

CHRISTOPHER R. HALL
*Assistant Branch Director*

/s/ Elisabeth J. Neylan
Elisabeth J. Neylan
N.Y. Bar Reg. Number 6125736
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 616-3519

24

Email: elisabeth.j.neylan@usdoj.gov

*Counsel for Defendants*