# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TODD M. HARPER, in his personal capacity and in his official capacity as a Member of the National Credit Union Administration Board, and TANYA F. OTSUKA, in her personal capacity and in her official capacity as a Member of the National Credit Union Administration Board,<br><br><div align="center">Plaintiffs,</div><br><div align="center">-against-</div><br>SCOTT BESSENT, in his official capacity as Secretary of the Treasury, LARRY FAZIO, in his official capacity as Executive Director of the National Credit Union Administration, KYLE S. HAUPTMAN, in his official capacity as Chairman of the National Credit Union Administration Board, TRENT MORSE, in his official capacity as Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel Office, and DONALD J. TRUMP, in his official capacity as President of the United States,<br><br><div align="center">Defendants.</div> | Civil Action No. 1:25-cv-01294-AHA |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND JUDGMENT ON THE MERITS AND BRIEF IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

    I.      Plaintiffs' Removal Violates The NCUA Organic Statute. ................................... 3

    II.     Congress's Removal Restrictions Are Constitutional........................................... 10

         A.     Congress Did Not Violate the Separation of Powers................................ 10

         B.     Limiting the Agency's Independence Is Not an Appropriate Remedy for Any Perceived Constitutional Violation. .............................. 17

    III.    This Court Has the Authority To Grant The Requested Relief And Should Do So. ..................................................................................................................... 19

         A.     D.C. Circuit Authority Confirms the Availability of the Requested Relief.......................................................................................................... 19

         B.     The Court Can Grant Injunctive Relief................................................... 20

             1.    Governing Law Establishes the Availability of Injunctive Relief in Removal Cases.................................................................... 20

             2.    Tradition and History Do Not Limit Plaintiffs to Backpay. .............. 22

         C.     The Court Should Grant Injunctive Relief............................................... 24

             1.    Plaintiffs Have Suffered Irreparable Harm. ....................................... 24

             2.    The Balance of Equities and Public Interest Favor Plaintiffs. ........... 27

         D.     Plaintiffs Are Entitled to Declaratory Relief. ........................................... 28

         E.     Alternatively, This Court Can and Should Grant Mandamus.................. 29

CONCLUSION................................................................................................................ 31

## <u>TABLE OF AUTHORITIES</u>

**CASES:**                                                                    **Page(s)**

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
   897 F.3d 314 (D.C. Cir. 2018) ................................................................. 28

*Berry v. Reagan*,
   1983 WL 538 (D.D.C. Nov. 14, 1983) ............................................ 22, 24, 25, 26

*BNSF Ry. Co. v. Loos*,
   586 U.S. 310 (2019) ............................................................................. 6

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ............................................................................ 18

*Calcutt v. Fed. Deposit Ins. Corp.*,
   37 F.4th 293 (6th Cir. 2022) .................................................................. 9

*Cent. Virginia Cmty. Coll. v. Katz*,
   546 U.S. 356 (2006) ............................................................................. 5

*Church v. Biden*,
   573 F. Supp. 3d 118 (D.D.C. 2021) ......................................................... 26

*Collins v. Yellen*,
   594 U.S. 220 (2021) ................................................................ 4, 5, 6, 11, 12

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
   91 F.4th 342 (5th Cir. 2024) ................................................................ 12

*Dellinger v. Bessent*,
   2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ................................................ 22

*Elrod v. Burns*,
   427 U.S. 347 (1976) ............................................................................ 22

*Fischer v. United States*,
   603 U.S. 480 (2024) ............................................................................. 7

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ............................................................................ 22

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ............................................................................. 9

*Glenn v. Thomas Fortune Fay*,
222 F. Supp. 3d 31 (D.D.C. 2016) ................................................................. 28

*Great Lakes Dredge & Dock Co. v. Huffman*,
319 U.S. 293 (1943) ............................................................................... 24, 29

*Grundmann v. Trump*,
2025 WL 782665 (D.D.C. Mar. 12, 2025) ......................................... 20, 21, 24, 25

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ...................................................................................... 23

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
485 U.S. 271 (1988) ...................................................................................... 24

*Gundy v. United States*,
588 U.S. 128 (2019) ........................................................................................ 7

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006) ...................................................................................... 22

*Harkrader v. Wadley*,
172 U.S. 148 (1898) ...................................................................................... 23

*Harris v. Bessent*,
2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) .................................... 11, 19, 21

*Harris v. Bessent*,
2025 WL 679303 (D.D.C. Mar. 4, 2025) ...................................... 20, 21, 24, 25

*Harris v. Bessent*,
2025 WL 980278 (D.C. Cir. Mar. 28, 2025) ....................................... 19

*Hazardous Waste Treatment Council v. U.S.E.P.A.*,
861 F.2d 270 (D.C. Cir. 1988) ................................................................. 2, 4

* *Humphrey's Executor v. United States*,
295 U.S. 602 (1935) .......................................................................... 8, 13, 23, 30

*Illumina, Inc. v. Fed. Trade Comm'n*,
88 F.4th 1036 (5th Cir. 2023) ................................................................... 13

*In re Cheney*,
406 F.3d 723 (D.C. Cir. 2005) ................................................................... 29

*In re Sawyer*,
    124 U.S. 200 (1888)...................................................................................... 20, 23, 24

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004)............................................................................................. 4

*Kalbfus v. Siddons*,
    42 App. D.C. 310 (D.C. Cir. 1914)..................................................................... 29

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
    103 F.4th 748 (10th Cir. 2024)............................................................................ 13

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)................................................................................ 27

*Macauley v. Waterman S.S. Corp.*,
    327 U.S. 540 (1946)........................................................................................... 29

*Mackie v. Bush*,
    809 F. Supp. 144 (D.D.C. 1993)........................................................................ 22

* *Marbury v. Madison*,
    5 U.S. 137 (1803)................................................................................... 2, 20, 31

*Meta Platforms, Inc. v. Fed. Trade Comm'n*,
    723 F. Supp. 3d 64 (D.D.C. 2024)...................................................................... 13

*MFS Sec. Corp. v. S.E.C.*,
    380 F.3d 611 (2d Cir. 2004)................................................................................. 9

*Miller v. Clinton*,
    687 F.3d 1332 (D.C. Cir. 2012).......................................................................... 21

*Muscogee (Creek) Nation v. Hodel*,
    851 F.2d 1439 (D.C. Cir. 1988)............................................................................ 4

*Myers v. United States*,
    272 U.S. 52 (1926)............................................................................................. 23

*New York v. Biden*,
    636 F. Supp. 3d 1 (D.D.C. 2022)....................................................................... 28

*Parsons v. United States*,
    167 U.S. 324 (1987)........................................................................................... 23

*PHH Corp. v. Consumer Fin. Prot. Bureau,*
  881 F.3d 75 (D.C. Cir. 2018) ........................................................................ 12

*President v. Vance,*
  627 F.2d 353 (D.C. Cir. 1980). ..................................................................... 28

*R.I.L-R v. Johnson,*
  80 F. Supp. 3d 164 (D.D.C. 2015) ................................................................ 27

*Raines v. Byrd,*
  521 U.S. 811 (1997) ....................................................................................... 25

*Ross v. Blake,*
  578 U.S. 632 (2016) ......................................................................................... 4

*Salleh v. Christopher,*
  876 F. Supp. 297 (D.D.C. 1995) ................................................................... 28

*Sampson v. Murray,*
  415 U.S. 61 (1974) ........................................................................... 20, 24, 25

*Samuels v. Mackell,*
  401 U.S. 66 (1971) ................................................................................... 28, 29

* *Seila Law LLC v. Consumer Financial Protection Bureau,*
  591 U.S. 197 (2020) ............................................ 9, 10, 11, 12, 15, 16, 18

*Service v. Dulles,*
  354 U.S. 363 (1957) ....................................................................................... 20

**Severino v. Biden,*
  71 F.4th 1038 (D.C. Cir. 2023) .................................................. 7, 8, 9, 21, 22, 23

*Shurtleff v. United States,*
  189 U.S. 311 (1903) ....................................................................................... 23

* *Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996) ................................... 1, 3, 7, 17, 21, 22, 23, 30

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ....................................................................................... 21

*United States v. Booker,*
  543 U.S. 220 (2005) ....................................................................................... 18

*United States v. Salerno,*
  481 U.S. 739 (1987) ....................................................................................................... 19

*United States v. Wilson,*
  290 F.3d 347 (D.C. Cir. 2002) ..................................................................................... 28

*Vitarelli v. Seaton,*
  359 U.S. 535 (1959) ....................................................................................................... 20

*Walton v. House of Representatives,*
  265 U.S. 487 (1924) ....................................................................................................... 23

*Washington v. Reno,*
  35 F.3d 1093 (6th Cir. 1994) ....................................................................................... 27

*Webster v. Doe,*
  486 U.S. 592 (1988) ....................................................................................................... 20

*White v. Berry,*
  171 U.S. 366 (1898) ........................................................................................... 20, 23, 24

* *Wiener v. United States,*
  357 U.S. 349 (1958) ................................................................................................. 8, 23

*Wilcox v. Trump,*
  2025 WL 720914 (D.D.C. Mar. 6, 2025) ................................... 13, 20, 21, 24, 25

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ....................................................................................................... 22

**STATUTES:**

12 U.S.C. § 1752a ............................................................................................................. 3, 8, 27

12 U.S.C. § 1766 ................................................................................................................ 14, 27

12 U.S.C. § 1781 ...................................................................................................................... 17

12 U.S.C. § 1782 ...................................................................................................................... 27

12 U.S.C. § 1786 ................................................................................................................ 14, 27

12 U.S.C. § 1789 ...................................................................................................................... 27

12 U.S.C. § 1795f ..................................................................................................................... 27

12 U.S.C. § 1818 ...................................................................................................................... 14

12 U.S.C. § 1821 ................................................................................................ 17

12 U.S.C. § 1831p–1 .......................................................................................... 14

12 U.S.C. § 1844(b) ........................................................................................... 14

12 U.S.C. § 248 ............................................................................................ 14, 17

12 U.S.C. § 343 .................................................................................................. 17

12 U.S.C. § 347b ................................................................................................ 17

12 U.S.C. §§ 1795, 1795–1795k ....................................................................... 17

12 U.S.C. §§ 242–44 ......................................................................................... 16

15 U.S.C. § 49 ................................................................................................... 13

28 U.S.C. § 1361 ............................................................................................... 29

**LEGISLATIVE MATERIALS:**

123 Cong. Rec. 27,396 (1977) ......................................................................... 1, 7

Act of Apr. 10, 1816,
    ch. 44, § 8, 3 Stat. 266 .................................................................................. 16

Act of Aug. 12, 1790,
    ch. 47, § 2, 1 Stat. 186 .................................................................................. 15

Act of Aug. 20, 1962,
    Pub. L. No. 87-592, 76 Stat. 394 ................................................................... 9

Act of Feb. 25, 1791,
    ch. 10, § 4, 1 Stat. 191 .................................................................................. 16

Act of June 6, 1983,
    Pub. L. No. 98-38, 97 Stat. 205 ..................................................................... 9

Act of Mar. 10, 1970,
    Pub. L. No. 91-206, 84 Stat. 49 ..................................................................... 3

Act of Oct. 3, 1964,
    Pub. L. No. 88-619, 78 Stat. 995 ................................................................... 4

Act of Sept. 21, 1950,
    ch. 967, § 2, 64 Stat. 873 .................................................................................... 9

Banking Act of 1933,
    ch. 89, § 8, 48 Stat. 162 ..................................................................................... 9

Banking Act of 1935,
    ch. 614, § 101, 49 Stat. 684 ............................................................................... 9

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010) ..................................................... 9

Federal Deposit Insurance Corporation Improvement Act of 1991,
    Pub. L. No. 102-242, 105 Stat. 2236 ................................................................ 9

Federal Reserve Act,
    ch. 6, § 10, 38 Stat. 251 (1913) ........................................................................ 9

Federal Reserve Reform Act of 1977,
    Pub. L. No. 95-188, 91 Stat. 1387 .................................................................... 9

Federal Trade Commission Act,
    Pub. L. No. 63-203, 38 Stat. 717 (1914) ......................................................... 13

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
    Pub. L. No. 101-73, 103 Stat. 183 ............................................................... 9, 14

Gramm-Leach-Bliley Act,
    Pub. L. No. 106-102, 113 Stat. 1338 (1999) ..................................................... 9

H.R. Rep. No. 1383, 95th Cong., 2d Sess. 26 (1978) .............................................. 16

SEC Small Business Advocate Act of 2016,
    Pub. L. No. 114-284, 130 Stat. 1447 ................................................................ 9

Securities Acts Amendments of 1975,
    Pub. L. No. 94-29, 89 Stat. 97 .......................................................................... 9

Securities Exchange Act of 1934,
    Pub. L. No. 73-291, 48 Stat. 881 ...................................................................... 9

**ADMINISTRATIVE MATERIALS:**

12 C.F.R. § 308.3 ................................................................................................... 14

12 C.F.R. § 746.101 ............................................................................................... 27

12 C.F.R. § 791.2 ............................................................................................... 27

12 C.F.R. Part 708b ........................................................................................... 27

12 C.F.R. Part 725 ............................................................................................. 27

**OTHER AUTHORITIES:**

Alexander Hamilton, *Report on a Plan for the Further Support of Public Credit* (1795),
    *in* 18 Papers of Alexander Hamilton 46 (Harold C. Syrett ed., 1961) ............................... 15, 17

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)
    ................................................................................................................... 4, 6

Audrey Davis, *A Return to the Traditional Use of the Writ of Mandamus*, 24 Lewis & Clark L.
    Rev. 1527 (2020) ........................................................................................... 30

Christine K. Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for
    Independent Agencies*, 96 Notre Dame L. Rev. 1 (2020) ....................................... 16

Claudia Levy, *Nickerson Successor Expected in Few Weeks, White House Says*, Wash. Post
    (Mar. 13, 1976) ............................................................................................. 1, 6

R. E. Freer, Remarks on the Federal Trade Commission, Its Powers and Duties
    (Aug. 27, 1940) ............................................................................................. 13

William Blackstone, *Vol. 3, Commentaries on the Laws of England* (1768) ........................ 19, 30

## INTRODUCTION

When Herman Nickerson, then-Administrator of the National Credit Union Administration (NCUA), testified before the Senate Banking Subcommittee in March 1976, the conversation turned to whether President Ford could dismiss him without cause. *See* Claudia Levy, *Nickerson Successor Expected in Few Weeks, White House Says*, Wash. Post (Mar. 13, 1976), at A14. At the time, under the NCUA's organic statute, he served "at the pleasure of the President," making it clear he could be so removed. Still, the committee's chair, Senator Thomas J. McIntyre, "assur[ed] him it would never happen." *Id.* But two hours after the hearing, President Ford summoned Nickerson to the White House and fired him summarily. *Id.*

The firing stunned Congress. Senator McIntyre responded by introducing legislation to overhaul the NCUA's governance structure. As he explained on the Senate floor in introducing the bill that Congress later enacted, "the principal thrust of [his proposed] amendment [to the NCUA enabling law] is to transfer management of the [NCUA] from a single Administrator who serves at the pleasure of the President to a three-member board with fixed terms of office." *Swan v. Clinton*, 100 F.3d 973, 982 (D.C. Cir. 1996) (quoting 123 Cong. Rec. 27,396 (1977)).

Congress adopted Senator McIntyre's proposal in 1978. It excised all references to NCUA administrators serving "at the pleasure of the President." And it entrusted the NCUA's administration to a non-partisan board of three expert members, no more than two of whom may be drawn from the same party, and each serving a staggered six-year term. That structure mirrored the governance structure of expert financial regulators, like the 1935 Federal Trade Commission that the Supreme Court examined in *Humphrey's Executor* while upholding the constitutionality of for-cause removal protections for FTC board members.

Nearly five decades after Congress fundamentally changed the NCUA's governance, President Trump surreptitiously tried to remove the two Democratic members of its Board. Now

1

tasked with defending that firing, the government pretends Congress's statutory enactments mean nothing, and that board members still serve at the President's pleasure. That is wrong. "When a statutory provision is deleted in a subsequent reenactment, the omitted term cannot be read into the later statute." *Hazardous Waste Treatment Council v. U.S.E.P.A.*, 861 F.2d 270, 276 (D.C. Cir. 1988). And regardless, there is no other way to read Congress's adoption of the *Humphrey's Executor* structure other than as signifying a clear intent to protect board members. There is also no question, given its parallel to the 1935 FTC, that the NCUA's structure is constitutional.

The resolution of this case should be exceedingly straightforward, but it is also exceedingly significant. Its outcome will affect Congress's ability to provide for independent oversight over credit unions and safeguard the share deposits and loans of consumers who depend upon them. More generally, though, the government's argument in this case that plaintiffs do not have protection from removal due to Congress's supposed silence, if accepted here, would mean that numerous other financial regulators, from Commissioners of the Securities and Exchange Commission, to board members of the Federal Deposit Insurance Corporation, and the Chair of the Federal Reserve, similarly enjoy no such protection. And the government's arguments that plaintiffs cannot have removal protections consistent with the Constitution would doom the independence of those financial regulators as well, never mind that they all draw their origin to Founding-era institutions and are materially indistinguishable in structure and function to the 1935 FTC, whose removal protections the Supreme Court blessed in *Humphrey's Executor*.

The Court should enter preliminary and permanent relief for plaintiffs and deny defendants' cross-motion. It should also order plaintiffs' full reinstatement, in line with precedent going back to *Marbury v. Madison*, 5 U.S. 137 (1803), and before.

## ARGUMENT

**I.    Plaintiffs' Removal Violates The NCUA Organic Statute.**

To begin, there cannot be a serious question that the President violated the NCUA's organic statute when he purported to terminate plaintiffs from their position as Members of the NCUA Board. Defendants' statutory arguments to the contrary ignore the plain text of the statute, its statutory and historical context, and its structure.

**A.** As plaintiffs explained—and defendants cannot dispute—Congress fundamentally restructured the NCUA in 1978 by replacing the single Administrator expressly serving "at the pleasure of the President," with a bipartisan, multi-member, expert-led board serving staggered six-year terms, mirroring the structure of other independent agencies. *See* Pls. Br. 13–16. Doing so, Congress removed all references to the NCUA's administrators serving "at the pleasure of the President." Thus, as the D.C. Circuit later explained in *Swan*, while reviewing statutory history, "the strongest reason for according [NCUA] Board members any removal protection, in the absence of any express provision for it in the NCUA statute, is that Congress specifically amended the statute to create the Board and give its members fixed terms of office." *Swan v. Clinton*, 100 F.3d 973, 983 (D.C. Cir. 1996). That was the "most obvious purpose" for the overhaul. *Id.* at 990 (Silberman, J., concurring). There is indeed no other way to give meaning to Congress's decision to remove all prior references to board administrators serving "at the pleasure of the President." *Compare* Act of Mar. 10, 1970, Pub. L. No. 91-206, 84 Stat. 49, 50 (authorizing the President to remove the NCUA Administrator "at the pleasure of the President"), *with* 12 U.S.C. § 1752a.

Defendants offer no real answer to that central point. They try to avoid the clear implication of Congress's decision to remove the reference to the NCUA administrators' service being "at the pleasure of the President" by asserting that Congress "completely restructured the NCUA" in 1978 and "effectively replac[ed] the old statute wholesale." Opp. 8. But the law is clear that "[w]hen a

statutory provision is deleted in a subsequent reenactment, the omitted term cannot be read into the later statute." *Hazardous Waste Treatment Council v. U.S.E.P.A.*, 861 F.2d 270, 276 (D.C. Cir. 1988); *see also Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) ("Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning."). That precept aligns with the more general rule that a "change in the language of a prior statute presumably connotes a change in meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 256 (2012). And here, the "change in meaning," given the context and the words that Congress decided to remove, could not be clearer. *See id.*

Moreover, defendants' assertion that Congress removed the President's removal authority as part of a legislative "overhaul" does not change the analysis. Consider *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). Congress had given 28 U.S.C. § 1782, a statute governing foreign-discovery assistance, a "complete revision" in 1964. *Id.* at 248; *see also* Act of Oct. 3, 1964, Pub. L. No. 88-619, 78 Stat. 995, 997 ("Section 1782 of title 28 . . . is amended to read:"). The Supreme Court in *Intel* still gave meaning to Congress's decision in 1964 to "delete[] the requirement that a proceeding be 'pending'" abroad before a petitioner could seek discovery assistance under § 1782, and refused to read those words back into the statute; it thus allowed petitioners to invoke the statute before a proceeding abroad was "pending." *Id.* at 248–49, 258–59. The Court did much the same in *Ross v. Blake*, 578 U.S. 632 (2016), refusing to "reintroduce[] [a] requirement" that Congress deleted into the Prison Litigation Reform Act. *Id.* at 640–41.

Instead of engaging with what Congress did, defendants repeatedly cite a dictum in *Collins v. Yellen*, 594 U.S. 220, 249 (2021), where the Supreme Court stated in passing that NCUA board members were not subject to removal protections. Opp. 1, 6, 7, 8, 9, 10, 11. Of course, this Court

is "not bound to follow [the Supreme Court's] dicta in a prior case in which the point now at issue was not fully debated." *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006). And there can be no question that defendants cite only a passing dictum. *Collins*, as defendants state (Opp. 10), considered the constitutionality of restricting the removal of the head of the Federal Housing Finance Agency (FHFA). The decision turned on the rule that for-cause removal protections are unconstitutional when applied to "an independent agency led by a single Director." 594 U.S. at 251. In the course of its discussion, the Court addressed the plaintiff's assertion that Congress's labeling of the FHFA as "independent" meant the FHFA's head would be protected from removal. At that point, the Court noted that "Congress has described many agencies as 'independent' without imposing any restriction on the President's power to remove the agency's leadership," and then listed 6 agencies, including the NCUA. *Id.* at 249. The Court's inclusion of the NCUA in that list is classic dictum that was "not fully debated." *Katz*, 546 U.S. at 363. Indeed, it was not debated *at all*. The removability of members of the Board of the NCUA was not remotely at issue. And the Court's opinion neither analyzes the text of the NCUA statute, nor the structure of the NCUA Board, nor the context of the statute's enactment relevant to the disposition of this case.

Defendants do not contend that their favorite dictum forms any part of the Court's holding in *Collins*, but nonetheless assert that "lower courts are bound not only by the holdings of higher courts' decisions but also by their 'mode[s] of analysis.'" Opp. 10. The dictum does not form a part of the Court's mode of analysis, however, and defendants point to no part of the mode of analysis in *Collins* they believe to be instructive. That is not a surprise. The FHFA had a single-person head, not a multi-member board. *Collins* thus applied Supreme Court precedent governing single-person independent agencies. And, *Collins* again stressed, the Court had "not revisit[ed] [] prior decisions allowing certain limitations on the President's removal power [for multi-member

agencies], but [] found compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." 594 U.S. at 251.

Finally, defendants try to dismiss *Swan* and Congress's decision to overhaul the NCUA structure on the basis that it impermissibly relies on "legislative history regarding term limits." Opp. 7 n.3. That cramped framing distorts plaintiffs' argument and *Swan*'s detailed analysis. *Swan* did not so much turn on floor statements, but rather, on the record of "*enacted* changes." *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting). That is not "legislative history" by any measure. The point is that Congress eliminated statutory *text* providing for a single Administrator serving at the President's pleasure and enacted new *text* providing for a bipartisan, expert-led Board serving staggered six-year terms, while deliberately deleting the clause that had previously authorized at-will removal. *See* Pls. Br. 13–16. This history is "quite separate from legislative history" and reflects the type of "*statutory* history" that "form[s] part of the context" that must be considered in interpreting Congress's enactment. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 256 (2012) (emphasis in original).

Moreover, it is also appropriate to cite the historical context for the 1978 statutory amendment as confirming the statute's plain import. Consider that context. While then-NCUA Administrator Nickerson testified before the Senate Banking Subcommittee in March 1976, Senator McIntyre "assur[ed] him" he "would never" be summarily dismissed by the President. *See* Claudia Levy, *Nickerson Successor Expected in Few Weeks, White House Says*, Wash. Post (Mar. 13, 1976), at A14. But President Ford fired Nickerson a mere two hours later. *Id.* Senator McIntyre then introduced legislation to overhaul the NCUA's governance, explaining that "the principal thrust of [his proposed] amendment [to the NCUA statute] [wa]s to transfer management of the

[NCUA] from a single Administrator who serves at the pleasure of the President to a three-member

board with fixed terms of office." *Swan*, 100 F.3d at 982 (quoting 123 Cong. Rec. 27,396 (1977)).

Just as courts take note of Congress's decision to overrule court decisions that Congress

does not like, it is eminently proper to infer from Congress's statutory enactment, considered

against this historical context, that Congress barred future Presidents from repeating what

President Ford had done. *See*, *e.g.*, *Fischer v. United States*, 603 U.S. 480, 491–92 (2024)

(interpreting statutory text "in light of the history of the provision" and rejecting reading that would

ignore the problem Congress sought to address through amendment); *Gundy v. United States*, 588

U.S. 128, 140 (2019) (statutory interpretation is a "'holistic endeavor' which determines meaning

by looking . . . to text in context, along with purpose and history").

**B.** Given the clear import of Congress's 1978 amendment, there is no need to consider

whether "Congress . . . clearly indicate[d] its intent to restrict removals through the statutory

structure and function of an office." *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023). But

that analysis, too, points in the same direction, as *Swan* makes clear. Pls. Br. 16–21.

Defendants tellingly do not seriously contest that the NCUA Board exhibits the structural

and functional hallmarks that courts have long recognized to require removal protection. They do

not deny that the Board is a multi-member body with staggered terms, bipartisan membership, and

a requirement that its members possess expertise across the financial services sector. *See* Opp. 7

("To be sure the statute also sets each Board member's term at six years . . . and provides that those

terms will be staggered."). These are paradigmatic features of agency administrators designed to

operate independently of presidential control—precisely the kind of structure courts have

recognized as supporting for-cause removal protections. *See* Pls. Br. 17.

Nor do defendants seriously dispute that the NCUA exercises the kind of "quasi-judicial and quasi-legislative functions" that reflect Congress's intent to insulate it from at-will removal. *Severino*, 71 F.4th at 1047. Instead, defendants argue that the NCUA wields too much executive power. *See* Opp. 13–15. That conflates a statutory question with a constitutional one, *see Severino*, 71 F.4th at 1044 & n.2, and defendants never contest that the agency's functions are quasi-legislative and quasi-judicial. *See* Pls. Br. 19–20. They do not dispute that the NCUA's authority to issue rules and promulgate regulations under set statutory standards—"that is to say, in filling in and administering the details embodied by [those] general [statutory] standard[s]"—is quasi-legislative power of the sort exercised by independent agencies permissibly subject to removal protection under *Humphrey's Executor v. United States*, 295 U.S. 602, 628 (1935); *see* Pls. Br. 20. They do not dispute that the NCUA Board, like the 1935 FTC, provides the kind of "reports" for "the information of Congress" that reflect it "acts as a legislative agency." *Humphrey's Executor*, 295 U.S. at 628; *see* 12 U.S.C. § 1752a(d) (NCUA Board reports to Congress). Nor do defendants contest that the NCUA's "jurisdiction to receive and adjudicate [administrative claims] according to law" is a hallmark of quasi-judicial authority. *Wiener v. United States*, 357 U.S. 349, 354 (1958); *see* Pls. Br. 19–20. These are precisely the kinds of functions that are "operationally incompatible with at-will Presidential removal," *Severino*, 71 F.4th at 1047, reinforcing Congress's clear instruction to insulate the NCUA Board. And, as further explained below, the powers wielded today by the NCUA are materially indistinguishable from the *Humphrey's Executor*-era FTC.

**C.** Finally, accepting defendants' arguments would entail giving the President license to remove the heads of many other independent federal agencies involved in the oversight of financial markets, including Commissioners of the Securities and Exchange Commission (SEC), members of the board of the Federal Deposit Insurance Corporation (FDIC), and the Chair of the Federal

Reserve. None of these agency heads are protected by express statutory provisions disallowing at-will removal. Yet the courts have long understood these expert-led, multi-member agencies to be so protected, and this Court should not effectuate a sea change.[1]

Of course, Congress was not silent in the case of the NCUA. Congress previously gave the President express removal power—and then took it away. That deliberate and express revocation sends an unmistakable message that Congress "wishe[d] to restrict the President's removal power." *Severino*, 71 F.4th at 1044. Congress thus sent a much stronger signal for the NCUA than anything that can be said of the SEC, FDIC, or Federal Reserve. Congress indeed amended the organic statutes for these agencies multiple times over,[2] but we are not aware of anything in the legislative

---

[1] *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 487 (2010) ("decid[ing] the case with [the] understanding" that SEC "Commissioners cannot themselves be removed by the President except under the *Humphrey's Executor* standard of inefficiency, neglect of duty, or malfeasance in office") (cleaned up); *MFS Sec. Corp. v. S.E.C.*, 380 F.3d 611, 619 (2d Cir. 2004); *Calcutt v. Fed. Deposit Ins. Corp.*, 37 F.4th 293, 303 (6th Cir. 2022), *rev'd on other grounds*, 598 U.S. 623 (2023) (FDIC); *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 285 (2020) (Kagan, J., concurring in part) ("Congress has historically given—with this Court's permission—a measure of independence to financial regulators like the Federal Reserve Board . . . .").

[2] For the SEC, see, for example, (1) Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881, 885; (2) Act of Aug. 20, 1962, Pub. L. No. 87-592, 76 Stat. 394; (3) Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97; (4) Act of June 6, 1983, Pub. L. No. 98-38, 97 Stat. 205; (5) Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 1840, 1911, 1954 (2010); (6) SEC Small Business Advocate Act of 2016, Pub. L. No. 114-284, 130 Stat. 1447.

For the FDIC, see, for example, (1) Banking Act of 1933, ch. 89, § 8, 48 Stat. 162, 168; (2) Banking Act of 1935, ch. 614, § 101, 49 Stat. 684; (3) Act of Sept. 21, 1950, ch. 967, § 2, 64 Stat. 873; (4) Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183, 188; (5) Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. No. 102-242, 105 Stat. 2236; (6) Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1338 (1999); (7) Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 1540 (2010).

For the Federal Reserve, see, for example, (1) Federal Reserve Act, ch. 6, § 10, 38 Stat. 251, 260–61 (1913); (2) Banking Act of 1935, ch. 614, § 203(a), 49 Stat. 684, 704; (3) Federal Reserve Reform Act of 1977, Pub. L. No. 95-188, 91 Stat. 1387, 1388.

record of those enactments that resembles the clear signal Congress gave when it eliminated the NCUA's prior structure and the President's removal authority and replaced them with a multi-member board modeled on the *Humphrey's Executor* framework.

In sum, the Court should hold that Congress limited the President's ability to remove Members of the Board of the NCUA otherwise than for cause, and that President Trump therefore lacked statutory authority to remove plaintiffs from their positions.

## II.    Congress's Removal Restrictions Are Constitutional.

### A.    Congress Did Not Violate the Separation of Powers.

Congress's design for the NCUA Board is no constitutional outlier. It is part of a long, unbroken tradition of tasking independent, multi-member boards with overseeing critical segments of the financial system, and the structure Congress selected mirrors not just that of agencies upheld in *Humphrey's Executor* and *Wiener*, but also that of Founding-era financial regulators. The Court should therefore uphold the constitutionality of Congress's design for the NCUA Board.

**1.** Although "[t]he President's removal power has long been confirmed by history and precedent," the Supreme Court has recognized "two exceptions—one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority." *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 214, 218 (2020). The first exception, applicable here, was when the Supreme Court "upheld a statute that protected the Commissioners of the FTC from removal except for 'inefficiency, neglect of duty, or malfeasance in office'" in *Humphrey's Executor*. *Seila Law*, 591 U.S. at 215.

As the Court later explained, *Humprey's Executor* "viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power'" because "[i]t acted 'as a legislative agency' in 'making investigations and reports' to Congress and 'as an agency of the judiciary' in making

recommendations to courts as a master in chancery." *Seila Law*, 591 U.S. at 215. The Court recognized that the FTC exercised "'executive *function*[s] as distinguished from executive *power* in the constitutional sense,'" but that was in support of "the discharge of its 'quasi-legislative or quasi-judicial powers.'" *Id.* at 216. Beyond its duties, the Court in *Humphrey's Executor* also stressed "several organizational features that helped explain its characterization of the FTC as non-executive." *Seila Law*, 591 U.S. at 216. There were "five members—no more than three from the same political party"—who were called upon to exercise "the trained judgment of a body of experts"; the FTC Board was indeed meant "to be 'non-partisan' and to 'act with entire impartiality.'" *Id.* Moreover, "the Commissioners' staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Id.*

There can be no question that Congress designed the NCUA Board to parrot the structure of the FTC as it existed in 1935. As explained in the opening brief and further noted above, the NCUA Board is a non-partisan, multi-member board serving staggered terms, with its members drawn from different parties and required to possess expertise in financial services. Pls. Br. 16–17. The staggering of terms serves to ensure continuity, just as with the FTC. And the NCUA's functions mirror the 1935 FTC's—both issued regulations and held quasi-judicial hearings. Congress's statutory restrictions on the President's removal of Members of the NCUA Board thus easily pass constitutional muster under *Humphrey's Executor*, which the Supreme Court has repeatedly reaffirmed. *E.g.*, *Seila Law*, 591 U.S. at 228 ("we do not revisit *Humphrey's Executor* . . . today"); *Collins*, 594 U.S. at 250–51 (2021) (reiterating that *Seila Law* did "not revisit [ ] prior decisions"); *Harris v. Bessent*, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025) (*en banc*) ("*Humphrey's Executor* and *Wiener* remain precedential").

**2.** In the face of clear precedent upholding Congress's desire to insulate members of multi-member agencies like NCUA Board Members from at-will removal, defendants cite cases striking removal protections for single-headed agencies, such as the Supreme Court's holding in *Seila Law* holding that removal protections for the single head of the CFPB violated the Constitution. *See* Opp. 11–13. That gets defendants nowhere. As noted, *Seila Law* reiterated the propriety of imposing removal restrictions on multi-member agencies like the one in *Humphrey's Executor*— precedent that *Seila Law* did "not revisit," 591 U.S. at 228—and the Court's holding in *Seila Law* turned heavily on the CFPB's *single-member* governance structure. And the Court in *Seila Law* made that quite clear when it explained that Congress could avoid the constitutional problem with the CFPB's structure by "converting the CFPB into a multimember agency." 591 U.S. at 237. *Collins* is to the same effect. *See* 594 U.S. at 250–51. The constitutional point is that concentrating power in a single person "exacerbates [] Article II problem[s]" because it diminishes presidential authority "more than the traditional multi-member agencies do." *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 193 (D.C. Cir. 2018) (Kavanaugh, J., dissenting).

In line with the Supreme Court's instructions, courts since *Seila Law* and *Collins* have consistently upheld removal protections for multi-member boards of agencies, drawing a clear line between those boards and single-director structures. The Fifth Circuit thus rejected a challenge to the Consumer Product Safety Commission—an executive agency that "wields what we would today regard as substantial executive power." *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 346, 352–55 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414 (2024). The Commission's removal protections passed muster, the court explained, because it is a "traditional independent agency headed by a multimember board," not the "novel," "single Director" model struck down in *Seila Law*. *Id.* at 352, 355 (cleaned up); *accord Leachco, Inc. v. Consumer Prod.*

*Safety Comm'n,* 103 F.4th 748, 760–63 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1047 (2025). The Fifth Circuit also rejected a post-*Seila* challenge to the FTC, rejecting arguments that the FTC's authority had grown excessively over the decades since *Humphrey's Executor*, and refusing to strike removal protections on the authority of *Seila Law. See Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036, 1046–47 (5th Cir. 2023); *see also Meta Platforms, Inc. v. Fed. Trade Comm'n*, 723 F. Supp. 3d 64, 86–87 (D.D.C. 2024).

**3.** Defendants next contend that the Court should set aside any removal protections for NCUA Board Members because the NCUA "does not resemble the [New Deal-era] FTC as the *Humphrey's Executor* Court understood it." Opp. 9. For support, defendants cite the NCUA's authority to investigate, hold hearings, issue cease-and-desist orders, and promulgate rules—asserting that these are "executive powers" the FTC supposedly lacked in 1935. Opp. 12–14. But that is inaccurate. In 1935, the FTC could open investigations, issue complaints, conduct hearings, and enter cease-and-desist orders subject to appellate review. *See Humphrey's Executor*, 295 U.S. at 620–21; 15 U.S.C. § 49; Federal Trade Commission Act, Pub. L. No. 63-203, 38 Stat. 717, 719–20 (1914). It also had rulemaking authority to interpret and clarify an open-ended statute prohibiting "unfair and deceptive practices," applicable across broad sectors of the economy. *See id.* at 722; R. E. Freer, Member, Fed. Trade Comm'n, Remarks on the Federal Trade Commission, Its Powers and Duties 2 (Aug. 27, 1940);[3] *see also Wilcox v. Trump*, 2025 WL 720914, at *8 (D.D.C. Mar. 6, 2025) (reaffirming that the FTC has long exercised investigative, adjudicative, and rulemaking powers).

---

[3] Available at https://www.ftc.gov/system/files/documents/public_statements/676771/19400827_freer_remarks_._rational_association_of_credit_jewelers.pdf.

We add that every concern that defendants raise about the NCUA Board's powers applies equally to the Federal Reserve Board—an agency long recognized as independent. As noted, Congress modeled the NCUA on the Federal Reserve when it overhauled the agency in 1978. Pls. Br. 4. That parallel is evident not just in the NCUA's role, which parallels the Federal Reserve in overseeing financial institutions, but also in the statutory powers Congress vested in the NCUA Board to mirror those held by the Federal Reserve.

Indeed, like the NCUA, the Federal Reserve has rulemaking authority over both its own operations and the institutions it supervises and insures. *Compare* 12 U.S.C. § 1766(a) (NCUA), *with* 12 U.S.C. §§ 248(k), 1844(b), 1831p–1 (Federal Reserve). Like the NCUA Board, the Federal Reserve Board can bring enforcement actions for "unsafe or unsound practices," remove bank officers, and issue cease-and-desist orders enforceable in Article III courts. *Compare* 12 U.S.C. §§ 1786(b), (e), (i) (NCUA), *with* 12 U.S.C. §§ 1818(b), (e), (i) (Federal Reserve). Congress requires the NCUA and the Federal Reserve to use the *same* administrative law judges, who must apply a "set of uniform rules and procedures" that apply to both agencies when adjudicating enforcement actions. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183, 486–87 (codified at 12 U.S.C. § 1818 note); *see* 12 C.F.R. § 308.3. The Federal Reserve also has remedial authority nearly identical to the NCUA's, including the power to impose civil penalties of up to $1 million per day or 1% of assets. *Compare* 12 U.S.C. § 1786(k) (maximum $1 million-a-day penalties) (NCUA), *with* 12 U.S.C. § 1818(i) (same) (Federal Reserve). These are all the same quasi-legislative and quasi-judicial powers defendants label "quintessential[ly]

executive" when exercised by the NCUA. Opp. 13. But if those powers are constitutionally suspect in the hands of the NCUA, they would be equally so in the hands of the Federal Reserve.[4]

**4.** Finally, lest there be any question, the constitutionality of Congress's removal restrictions for NCUA Board Members is also justified by its "historical pedigree," which defendants all but concede would apply to similar financial regulators. Opp. 15 n.6; *Seila Law*, 591 U.S. at 222 n.8 ("assuming financial institutions like the Second Bank and the Federal Reserve can claim a special historical status"); *id.* at 271–72 (Kagan, J., concurring in part) ("the First Congress gave officials handling financial affairs—as compared to diplomatic and military ones—some independence from the President" and that tradition carried forward).

The need to shield financial regulators from political interference and direct presidential control in our constitutional system finds its origin in the early years of the Republic. Alexander Hamilton—chief architect of the "energetic executive" in The Federalist No. 70—acknowledged that executive power must give way where financial stability is at stake. He warned that public funds might be "diverted" by government "when immediate exigencies press," and called for an independent commission to serve as a "complete barrier" against that risk. Alexander Hamilton, *Report on a Plan for the Further Support of Public Credit* (1795), *in* 18 Papers of Alexander Hamilton 46, 105 (Harold C. Syrett ed., 1973). Congress adopted his design in 1790, creating the Sinking Fund Commission to manage the federal debt through open-market operations. The Commission—which included officers the President could not remove, such as the Vice President (then President of the Senate) and the Chief Justice—functioned as the Founding-era predecessor to today's Federal Reserve. *See* Act of Aug. 12, 1790, ch. 47, § 2, 1 Stat. 186; *see also* Christine

---

[4] The same is true of the SEC, which exercises materially indistinguishable powers—including rulemaking authority, the power to issue and enforce cease-and-desist orders, and the authority to impose civil penalties. *See* 15 U.S.C. §§ 77s(a), 78w(a), 78u–2(a), 78u–3, 78u(d)(1), 78u(d)(3).

K. Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1, 33–39 (2020).

Congress carried that design forward in structuring the First and Second Banks of the United States. The 1791 charter for the First Bank gave the President no removal power over its directors. *See* Act of Feb. 25, 1791, ch. 10, § 4, 1 Stat. 191, 192–93. The 1816 charter for the Second Bank followed suit: only five of its twenty-five directors were presidential appointees. *See* Act of Apr. 10, 1816, ch. 44, § 8, 3 Stat. 266, 269. These choices reflect a Founding-era tradition of limiting presidential influence over institutions superintending credit and monetary stability. *Seila Law*, 591 U.S. at 273–74 (Kagan, J., concurring in part).

And it is a tradition that continued in the modern era. The Federal Reserve System—created in 1913 and restructured in 1935—features a multi-member Board of Governors with staggered fourteen-year terms and (save for the chair) express for-cause removal protection. *See* 12 U.S.C. §§ 242–44. Its Federal Open Market Committee, the modern counterpart to Hamilton's Sinking Fund Commission, makes critical decisions about money supply and interest rates independent of presidential direction. *See* Chabot, *supra*, at 47–49. While the statute does not expressly protect the Fed Chair from at-will removal, longstanding historical practice, reinforced by structural protections and political norms, insulate him in fact. *See Seila Law*, 591 U.S. at 283 (Kagan, J., concurring in part) (noting that "the Federal Reserve's independence stops a President trying to win a second term from manipulating interest rates").

The NCUA stands firmly within this tradition of independence for financial regulators that dates to the Founding. Like other Depression-era market stabilizers, it was designed to operate outside direct presidential control and was explicitly modeled on the Federal Reserve and the FDIC. *See* H.R. Rep. No. 1383, 95th Cong., 2d Sess. 26 (1978). The NCUA thus administers the

National Credit Union Share Insurance Fund that insures share deposits, much like the FDIC's deposit insurance program. *Compare* 12 U.S.C. § 1781 et seq. (NCUA), *with* 12 U.S.C. § 1821 (FDIC). It also functions as a lender of last resort for credit unions, just like the Federal Reserve does for banks and other financial institutions, providing short-term liquidity in times of market stress. *Compare* 12 U.S.C. §§ 1795, 1795–1795k (NCUA), *with* 12 U.S.C. §§ 248(b), 343, 347b (Federal Reserve). In these and other respects (including in exercising powers over financial actors similar to the Federal Reserve's exercise in both nature and scope, *see supra* pp. 14–15), the NCUA fits neatly within the historical model of financial regulators long accorded freedom from presidential interference.

In adopting the current NCUA governance structure, Congress certainly recognized that public confidence in the financial markets depends on supervising agencies being seen as "immune from political influence." *Swan*, 100 F.3d at 983. That insight echoes Hamilton's original design for the Sinking Fund Commission, which he urged Congress to create as a "complete barrier" against short-term political pressure. Hamilton, *supra*, at 105. That principle was born with the Republic, shaped the architecture of modern finance, and lives on in Congress's deliberate and constitutional insulation of the NCUA.

### B.    Limiting the Agency's Independence Is Not an Appropriate Remedy for Any Perceived Constitutional Violation.

As explained, given the clear parallels between the modern-day NCUA Board and the 1935 FTC examined in *Humphrey's Executor*, there is no basis to find a constitutional violation. But if the Court were to conclude that some categories of action that the Board is authorized to pursue are excessively executive, it does not follow that the Court should uphold plaintiffs' removal, and defendants have not shown they are entitled to summary judgment.

"Generally speaking, when confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Seila Law*, 591 U.S. at 234. Courts "answer [such a] remedial question by looking to legislative intent," "seek[ing] to determine what 'Congress would have intended' in light of the Court's constitutional holding." *United States v. Booker*, 543 U.S. 220, 246 (2005).

Here, as stated above, it is plain that Congress wanted an independent agency. If Congress crossed a constitutional line by allowing the NCUA Board to issue particular orders deemed excessively executive (as the government now alleges), then the remedial question will be whether "Congress would have preferred a dependent" NCUA Board, *Seila Law*, 591 U.S. at 236, or an independent Board lacking the particular authorities the government now contests.

The government assumes that Congress would have preferred the former, but it does nothing to establish as much. Nor would there be any reason for this Court to redline the grant of any unconstitutional authority for the NCUA Board to issue hypothetical orders the government fears might be unconstitutional. There is no dispute that the NCUA Board can, consonant with the Constitution, carry out the core of its functions free from presidential interference. And any marginally unconstitutional powers can be challenged if and when they are exercised, given that the Supreme Court's "precedents have long permitted private parties aggrieved by an official's exercise of executive power to challenge the official's authority to wield that power while insulated from removal by the President." *Id.* at 212. One thing is clear, the government has done nothing to show that this Court should invalidate the removal restrictions here and now, which would radically alter the NCUA Board by making it subservient to the President. *Cf. Bowsher v. Synar*, 478 U.S. 714, 735 (1986) ("striking the removal provisions would lead to a statute that Congress would probably have refused to adopt"); *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("The

fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment.").

**III.    This Court Has the Authority To Grant The Requested Relief And Should Do So.**

The Court should enter an injunction against removing plaintiffs from their office or treating them as having been removed and declare that plaintiffs may be removed only for cause. Compl., ECF No. 1 at 10. Alternatively, it should enter mandamus. Everything from Blackstone to recent D.C. Circuit precedent indeed confirms this Court may grant a "full and effectual remedy" "for wrongful removal." 3 W. Blackstone, Commentaries on the Laws of England *264–65. Here, that means entering a judicial decree invalidating and enjoining the purported termination, and ensuring that plaintiffs can complete their term without hindrance, and with all the authorities and benefits attendant thereto.

**A.    D.C. Circuit Authority Confirms the Availability of the Requested Relief.**

Just last month, the D.C. Circuit ruled *en banc* that the exact form of relief plaintiffs seek here is available. In *Harris v. Bessent* (consolidated with *Wilcox v. Trump*), the D.C. Circuit declined to stay, pending appeal, this Court's judgments (i) declaring that the President had unlawfully removed Cathy Harris as a Member of the Merit Systems Protection Board and Gwynne Wilcox as an NLRB Commissioner and that these plaintiffs remain in their positions, and (ii) enjoining subordinate executive officers from interfering with plaintiffs' execution of their duties. *See* 2025 WL 1021435, at *1–2 (D.C. Cir. Apr. 7, 2025) (*en banc*). In doing so, the Circuit recognized the likely availability of the relief this Court had ordered in their cases. *Id.* at *2.

The *en banc* Court cited as support Judge Millett's dissent while on the motions panel, *id.*, where she rejected arguments against the issuance of declaratory and injunctive relief, *Harris v. Bessent*, 2025 WL 980278, at *43–45 (D.C. Cir. Mar. 28, 2025). This Court's underlying decisions

in those cases were in accord. *See Wilcox v. Trump*, 2025 WL 720914, at *16–17 (D.D.C. Mar. 6, 2025); *Harris v. Bessent*, 2025 WL 679303, at *13 (D.D.C. Mar. 4, 2025); *see also Grundmann v. Trump*, 2025 WL 782665, at *14–16 (D.D.C. Mar. 12, 2025) (awarding injunctive relief against subordinate officials to remedy President's unlawful dismissal of member of Federal Labor Relations Authority).

Defendants' silence about these rulings is not an effective means of avoiding them. They are persuasive, if not controlling, and this Court has every reason to follow them.

**B.    The Court Can Grant Injunctive Relief.**

The Court should order plaintiffs' reinstatement, in line with recent cases from this Circuit and more than two centuries of Supreme Court precedent recognizing federal courts' authority to order reinstatement of officials wrongfully denied their office. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 604–05 (1988); *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974); *Vitarelli v. Seaton*, 359 U.S. 535, 537, 546 (1959); *White v. Berry*, 171 U.S. 366, 377 (1898); *In re Sawyer*, 124 U.S. 200, 212 (1888); *Marbury v. Madison*, 5 U.S. 137, 172–73 (1803).

**1.    Governing Law Establishes the Availability of Injunctive Relief in Removal Cases.**

Although defendants contend that "[t]his Court lacks the power to issue any order reinstating principal executive officers removed by the President," Opp. 16, numerous cases uphold district-court authority to "review the claim of a discharged governmental employee" and use "injunctive power" as a remedy. *Sampson*, 415 U.S. at 71–72, 92 n.68; *see Vitarelli*, 359 U.S. at 537, 546 (federal employee challenging "illegal and ineffective" dismissal was "entitled to the reinstatement which he seeks"); *Service v. Dulles*, 354 U.S. 363, 370, 389 (1957) (based on unlawful termination, federal employee obtained injunctive and declaratory relief on remand); *Miller v. Clinton*, 687 F.3d 1332, 1360 n.7 (D.C. Cir. 2012) (Kavanaugh, J., dissenting) ("Courts

have long held that citizens facing unconstitutional conduct can seek equitable relief—for an employee facing unconstitutional discrimination, equitable relief could include an injunction prior to termination or reinstatement subsequent to termination.").

This includes injunctive relief entered when the President unlawfully dismisses a member of a multi-member board of an independent federal agency. In *Swan*, the D.C. Circuit held that courts have the authority to issue injunctions against subordinate federal officials to "redress" an official's "injury" caused by unlawful removal. 100 F.3d at 976–81 (addressing President Clinton's removal of plaintiff from the National Credit Union Administration Board). Then, just two years ago, *Severino* reiterated that courts "can enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment." 71 F.4th at 1042–43 (quoting *Swan*, 100 F.3d at 980) (addressing removal of council member of Administrative Conference of the United States). Recent cases have followed these precedents. *Grundmann*, 2025 WL 782665, at *13–16; *Wilcox*, 2025 WL 720914, at *16; *Harris*, 2025 WL 679303, at *12; *Harris*, 2025 WL 1021435, at *1–2. So should this Court.

Defendants do not mention *Severino* and, relegating *Swan* to a footnote, attempt to distinguish it on standing grounds. Opp. 19 n.8. But the government's argument—that relief may be available for purposes of Article III redressability yet unavailable "as a remedy" when sought— makes no sense. To establish standing, plaintiffs must show, *inter alia*, that their "injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Accordingly, standing (and jurisdiction) in *Swan* depended on whether an injunction was available to redress Swan's alleged unlawful removal. By finding standing, the Court necessarily found that the court could restore an unlawfully terminated federal officer to office. *Swan*, 100 F.3d at 976– 81; *see also Mackie v. Bush*, 809 F. Supp. 144, 148 (D.D.C. 1993) (enjoining termination of Postal

Service Board of Governors members), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993); *Berry v. Reagan*, 1983 WL 538, at *6 (D.D.C. Nov. 14, 1983) (enjoining "prevent[ion] or interfer[ence] with plaintiffs['] service as members of the U.S. Commission on Civil Rights"), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983).[5]

In a last-ditch attempt to rebut the overwhelming wealth of caselaw establishing the availability of injunctive relief, the government argues that "an injunction against subordinate Executive Branch officials . . . usurps the President's exclusive appointment authority." Opp. 18. But as the D.C. Circuit confirmed in *Dellinger*, "a court can unquestionably review the legality of the President's action by enjoining the officers who would attempt to enforce the President's order." 2025 WL 559669, at *6 n.1 (D.C. Cir. Feb. 15, 2025); *see also Elrod v. Burns*, 427 U.S. 347, 352 (1976) (plurality op.) (rejecting the argument that "the executive's responsibility to insure that the laws be faithfully executed requires the power of appointment or removal at will, unimpaired by any judicial oversight").[6] This Court can and should enjoin the President's subordinates, who are defendants here. *Severino*, 71 F.4th at 1042–43; *Swan*, 100 F.3d at 980.

### 2.    Tradition and History Do Not Limit Plaintiffs to Backpay.

Rather than grapple with the precedents on point, defendants seek to derive a "rule" that injunctive relief lies beyond the judicial power from the fact that officers challenging their removal

---

[5] Defendants' effort to distinguish *Berry*, 1983 WL 538, at *2 (Opp. 18), conflates the merits with entitlement to a remedy for an unlawful purported dismissal.

[6] Injunctions against subordinate executive officials to prevent illegal action by the Executive Branch are commonplace. *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 567 (2006); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583–84 (1952); *see also Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and in judgment) ("Review of . . . Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."). Such injunctions do not "necessarily target[] the President," *Dellinger*, 2025 WL 559669, at *13 n.2 (Katsas, J., dissenting), as they put the President under no legal obligation.

by the President have sometimes pursued claims for backpay. Opp. 16. A backpay-only rule would render courts impotent, and "the bedrock principle that our system of government is founded on the rule of law" would crumble if the President could flout the "terms of legislative enactments" simply by writing a check. *Swan*, 100 F.3d at 978. And there is no such rule.

Defendants' cases are not at all in point. Reinstatement was not an issue in *Humphrey's Executor* or *Myers v. United States*, 272 U.S. 52 (1926) because Humphrey was dead, and Myers's term had ended. *See* 295 U.S. at 618–19; 272 U.S. at 106. Plaintiff in *Wiener* initially did seek reinstatement but abandoned that effort after the War Claims Commission was abolished. *See* 357 U.S. at 350–51 & n.*. Further, any argument from two older cases—*Shurtleff v. United States*, 189 U.S. 311 (1903), and *Parsons v. United States*, 167 U.S. 324 (1987), in which the Court made no mention of reinstatement as a remedy—fails to account for other cases where plaintiffs did seek reinstatement. *E.g.*, *Swan*, 100 F.3d at 980; *Severino*, 71 F.4th at 1042–43.

Quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999), defendants argue that an injunction would exceed the Court's equitable powers because a "federal court may grant only those equitable remedies that were 'traditionally accorded by courts of equity.'" Opp. 17. *Grupo* is inapposite. It held only that the specific relief ordered by the district court there—an injunction prohibiting "defendant[s] from transferring assets in which no lien or equitable interest is claimed"—had "never been available before" and was "specifically disclaimed by longstanding judicial precedent." *Id.* at 310, 322. By contrast, there is a long history of courts ordering that the government respect for-cause removal protections.

Defendants also invoke *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898); *White*, 171 U.S. at 377; and *In re Sawyer*, 124 U.S. at 212. These cases all predate "the merger of law and equity, which was accomplished by

the Federal Rules of Civil Procedure," *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 283 (1988), and they demonstrate that, before the merger of law and equity, plaintiffs proceeded in the "courts of law" for this form of relief, *see, e.g.*, *White*, 171 U.S. at 377. And at least two of the government's cases recognize that meaningful relief *was available* at law, including via mandamus. *Id.* (availability of "mandamus," among other writs); *In re Sawyer*, 124 U.S. at 212 (same); *see also infra* Part III.E. The rigid historic divide between law and equity has little relevance today. *See Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 297 (1943).

Finally, defendants point to three "members of the First Congress [who] argued against requiring the Senate's advice and consent for removals precisely because . . . such a procedure would require the President to retain someone he had sought to remove." Opp. 16–17. This is unconvincing. As *Grundmann* explained, the argument "paints with too broad a brush . . . . [T]hree individuals cannot speak for the entire First Congress, especially considering the wide spectrum of opinion it expressed on removal protections. The implications of the debate, properly understood, were highly ambiguous and prone to overreading." 2025 WL 782665, at *15 (cleaned up). This Court, too, should "decline[] to enter this historical fray," *id.*, which provides no bar against the requested relief.

## C.    The Court Should Grant Injunctive Relief.

### 1.    Plaintiffs Have Suffered Irreparable Harm.

Numerous courts in this Circuit have recognized that the deprivation of a "statutory right" to serve as members of the multi-member board of an independent agency created by Congress is "irreparable" injury. *See, e.g.*, *Grundmann*, 2025 WL 782665, at *17; *Wilcox*, 2025 WL 720914, at *15; *Harris*, 2025 WL 679303, at *13; *Berry*, 1983 WL 538, at *5. Defendants nevertheless argue that this loss of employment is not irreparable because backpay is available. Opp. 20 (citing *Sampson*, 415 U.S. at 92 n.68). But *Sampson* expressly contemplates that "cases may arise in which

24

the circumstances surrounding an employee's discharge . . . may so far depart from the normal situation that irreparable injury might be found" and that injunctive relief is not "foreclose[ed]" in a "genuinely extraordinary situation." 415 U.S. at 92 n.68. This is such a case.

"A check in the mail does not address the gravamen of this lawsuit." *Grundmann*, 2025 WL 782665, at *17. Backpay would not get plaintiffs their roles as Board Members—roles that the President appointed them to, that the Senate confirmed them for a set term, in an agency that Congress created while providing for-cause removal protection. If plaintiffs are barred from their office, no amount of money will repair that injury. *See Wilcox*, 2025 WL 720914, at *15 (depriving plaintiffs improperly of "ability to carry out . . . congressional mandate" "cannot be repaired in the absence of an injunction," nor "retroactively cured by monetary damages"); *Harris*, 2025 WL 679303, at *13 (violation of statutory removal limits is a "genuinely extraordinary situation" that "merit[s] injunctive relief" under *Sampson*) (cleaned up); *Berry*, 1983 WL 538, at *5 (*Sampson* exception met where "Commission's ability to fulfill its mandate is disrupted by plaintiffs removal").

In arguing that plaintiffs face no meaningful harm, defendants primarily cite *Raines v. Byrd*, 521 U.S. 811, 821 (1997). But *Raines* confirms that when individuals are "deprived of something to which they *personally* are entitled" like "seats as Members of Congress" (or positions as Members of the Board), they do suffer a legally cognizable harm. *Id.* (emphasis in original). That supports an injunction in this case.

The government dismisses the harms to the Board on the theory that the Board is a "separate legal entity" and "injuries to third parties are not a basis for finding irreparable harm." Opp. 21. But the Board is inextricably linked to plaintiffs, because plaintiffs are two of the three members of the Board. The threat to the Board's congressionally mandated independence and the

impairment of its ability to perform its congressionally entrusted functions are not "[a]bstract harm[s]" that would "befall unnamed third parties"; rather, they are "connected specifically to" plaintiffs themselves and their statutory right to function as Board Members. *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021); *see also Berry*, 1983 WL 538, at *5 (finding irreparable injury to plaintiffs because denial of relief would have an "obviously disruptive effect" on "the Commission's final activities").

The government also endeavors to distinguish *Berry v. Reagan* on the ground that the Board "will not cease to exist," Opp. 21, even after plaintiffs' unlawful firing, unlike the commission at issue in *Berry*. But *Berry*'s holding was not so limited. The court there looked to "the obviously disruptive effect the denial of" "relief [would] likely have on the Commission[]." 1983 WL 538 at *5 (emphasis omitted). In that case, the disruption happened to be the commission's expiration. Here, the Board of which plaintiffs are lawful Members will be unable to function for an indefinite period of time, a harm which cannot be remedied by backpay.

Finally, defendants contend that denying relief "would not deprive the NCUA of the ability to fulfill its mandate" and that Mr. Harper "conceded as much" during a recent talk at the Brookings Institution.[7] Opp. 21. Defendants grossly mischaracterize Mr. Harper's remark. Mr. Harper simply noted that "the [NCUA] can continue to do its essential functions," as reflected in the agency's standing delegations of authority. In that regard, Delegation GEN-5A delegates "[a]uthority to carry out any *essential* function of the NCUA Board when there is only one NCUA Board member currently serving on the Board" to that sole Member. Harper Decl. ¶ 4 (emphasis added). "Essential" functions cannot contemplate "all" functions, and the Board's lack of a

---

[7] Brookings Institution, *Credit Union Regulation at a Crossroads: A Conversation with NCUA Board Member Todd M. Harper*, YouTube (May 1, 2025), https://www.youtube.com/watch?v=nQsg7KqGKfQ.

quorum, *see* 12 U.S.C. 1752a(d), 12 C.F.R. § 791.2, puts on indefinite hold all other core agency functions, including the adoption and repeal of regulations, 12 U.S.C. §§ 1766, 1789; approval of certain types of mergers and mergers exceeding certain thresholds, 12 C.F.R. Part 708b; conservation and liquidation of credit-union assets under certain circumstances, 12 U.S.C. § 1786(h); adjudication of material supervisory determinations and share insurance claims appealed to the Board, 12 C.F.R. § 746.101; establishing the Normal Operating Level for the desired level of reserves for the National Credit Union Share Insurance Fund, 12 U.S.C. § 1782(c); conducting the NCUA's annual public budget hearing, 12 U.S.C. § 1789(b); and operation of the National Credit Union Central Liquidity Facility, 12 U.S.C. § 1795f, 12 C.F.R. Part 725. As defendants do not contest, denying plaintiffs injunctive relief would render the NCUA Board powerless to perform any of these statutory functions, among others.

### 2.    The Balance of Equities and Public Interest Favor Plaintiffs.

Defendants' contention that "the equities and public interest weigh strongly against Plaintiffs' reinstatement" has it backwards. Opp. 22. Defendants submit no authority to counter the D.C. Circuit's considered view that "substantial public interest" favors "'having governmental agencies abide by the federal laws that govern their existence and operations,'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)), including when it comes to removal protections, Pls. Br. 23–24 (citing cases); *cf. R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required").

Rather than address applicable law, defendants rehash merits arguments to assert that "an injunction functionally reinstating" two Members of the NCUA Board "would raise grave separation-of-powers concerns and work a great and irreparable harm to the Executive." Opp. 22.

They submit that "the public interest is better served by an NCUA Board member who holds the President's confidence and, accordingly, will more effectively serve him in executing his duties as Chief Executive." *Id.* True, "the strength of [plaintiffs'] showing on public interest rises and falls with the strength of its showing on likelihood of success on the merits." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 335 (D.C. Cir. 2018). But plaintiffs are right on the merits, so the public interest favors entry of an injunction. *Id.*

### D.    Plaintiffs Are Entitled to Declaratory Relief.

The Court can and should issue declaratory relief. "[I]t is well settled that a declaratory judgment always rests within the sound discretion of the court." *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980). Plaintiffs have demonstrated, Pls. Br. Part II.A, that a declaration that their purported terminations were unlawful and that plaintiffs are NCUA Board Members would "clarify[] the legal relations at issue" and "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016)).

Moreover, courts have entered similar relief in like cases. *See Salleh v. Christopher*, 876 F. Supp. 297, 307 (D.D.C. 1995) (granting declaratory relief to Foreign Service officer illegally dismissed without cause), *aff'd*, 85 F.3d 689 (D.C. Cir. 1996); *United States v. Wilson*, 290 F.3d 347, 362 (D.C. Cir. 2002) (remanding with instructions to enter judgment that plaintiff was "a member of the United States Commission on Civil Rights with all the powers, privileges, and emoluments thereunto of right appertaining" (cleaned up)). This Court should do the same.

Defendants submit that "the same principles that foreclose reinstatement likewise foreclose declaratory relief." Opp. 23. Selectively quoting *Samuels v. Mackell*, 401 U.S. 66 (1971), defendants seek to apply the standard for an injunction as a barrier to declaratory relief. Opp. 23–24. But, *Samuels* merely applied *Younger* abstention to a claim for a declaratory judgment when

there was an ongoing state criminal prosecution, to avoid a *res judicata* effect on state court proceedings. *See Samuels*, 401 U.S. at 73 (holding that "*in cases where the state criminal prosecution was begun prior to the federal suit*, the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment, and that where an injunction would be impermissible . . . declaratory relief should ordinarily be denied as well") (emphasis added). Indeed, the Court explicitly stated it was "express[ing] no views on the propriety of declaratory relief when no state proceeding is pending at the time the federal suit is begun." *Id.* at 73–74.

The government's other authority, Opp. 23–24, is farther afield. In *Macauley v. Waterman S.S. Corp.*, the Supreme Court held a declaration was unavailable when the district court lacked jurisdiction because the applicable "administrative process, far from being exhausted, had hardly begun." 327 U.S. 540, 545 & n.4 (1946). And the Court in *Great Lakes* made clear that declaratory judgments arise "both at law *and* in equity." 319 U.S. at 299 (1943) (emphasis added). Declaratory relief may thus be available even if the only available remedy is issuance of mandamus (a legal remedy). *See infra* Part III.E.

### E.    Alternatively, This Court Can and Should Grant Mandamus.

Even if no equitable remedy were available, plaintiffs are entitled to a remedy at law "in the nature of mandamus." *See* 28 U.S.C. § 1361; *In re Cheney*, 406 F.3d 723, 728–29 (D.C. Cir. 2005). Pls. Br. Part II.C. "[O]verwhelming" authority establishes that "mandamus" is an "appropriate remedy" for an illegal removal from office—including when the power of removal may not be exercised "except for the causes specified" by law. *Kalbfus v. Siddons*, 42 App. D.C. 310, 319–21 (D.C. Cir. 1914) (discussing authorities and treating attempted illegal removal as "void"). That has long been the law. *See, e.g.*, 3 W. Blackstone, Commentaries on the Laws of England *264–65 ("mandamus" provides a "full and effectual remedy" "for refusal or admission

where a person is intitled to an office" and "for wrongful removal, when a person is legally possessed" and "the franchise[] concern[s] the public").

The use of mandamus to request "restoration to public office" was not only "frequently" employed and "welcomed by courts"; it was "listed in treatises as the primary type of case in which a court would grant mandamus." *See* Audrey Davis, Note, *A Return to the Traditional Use of the Writ of Mandamus*, 24 Lewis & Clark L. Rev. 1527, 1540–41 (2020) (explaining that such requests "brought into play" and were understood to satisfy "many of the fundamental characteristics of mandamus," such as the existence of "a clear, legal right," the "lack of an adequate remedy," and a legal duty involving "little to no discretion").

Defendants err in asserting that plaintiffs have not established that defendants owe them a "clear nondiscretionary duty." Opp. 24. Defendants have a "clear" and statutorily required "ministerial duty" to treat plaintiffs as what they are—properly appointed federal officers who have not been removed for cause. *See Humphrey's Executor*, 295 U.S. at 632; *see also Swan*, 100 F.3d at 976 n.1, 979–80 (finding, in context of case challenging plaintiff's removal by the President from federal office, that the "prerequisites for stating a cause of action under the mandamus statute are met," including that "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff," and explaining that certain non-presidential defendants could substantially redress plaintiff's injury by "direct[ing] the staff to treat [plaintiff] as a Board member").

Defendants do not help their cause by asserting that "[t]he President's selection of who should lead an Executive Branch agency is certainly not a mere ministerial task." Opp. 24. Plaintiffs do not seek relief directing the President to select them as NCUA Board Members; they want to ensure defendants cannot illegally prevent them from occupying offices to which they

have already been lawfully nominated and confirmed by the Senate. Mandamus has been an appropriate remedy since *Marbury v. Madison*, 5 U.S. at 173 (concluding that a Senate-confirmed official whose commission was wrongfully withheld presented "a plain case for a mandamus"), and it is appropriate in the alternative here.

## **CONCLUSION**

The Court should hold that defendants violated Congress's directives by terminating plaintiffs from their position as Members of the Board of the NCUA without cause, and that the statutory removal restrictions on Board Members are constitutional. The Court should thus grant plaintiffs' motion, award plaintiffs preliminary and final relief, deny defendants' cross-motion, and enter an order invalidating and enjoining the purported terminations, and ensuring that plaintiffs can complete their term without hindrance, and with all authorities and benefits attendant thereto.

Respectfully submitted,

Dated: May 19, 2025  
      New York, New York

*/s/ Vincent Levy*  
Vincent Levy (NY0487)  
Denis D. Metin (*Admission forthcoming*)  
Christopher M. Kim (*Admission forthcoming*)  
HOLWELL SHUSTER & GOLDBERG LLP  
425 Lexington Avenue, 14th Floor  
New York, NY 10017  
(646) 837-5151  
vlevy@hsgllp.com  

*Attorneys for plaintiffs*