# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TODD M. HARPER, *et al.*, | |
| *Plaintiffs*, | Civil Action No. 25-01294 (AHA) |
| v. | |
| SCOTT BESSENT, *et al.*, | |
| *Defendants*. | |

## <u>Memorandum Opinion</u>

This case concerns the President's firing of two Board members of the National Credit Union Administration ("NCUA"), an independent agency that functions much like the Federal Reserve and Federal Deposit Insurance Corporation ("FDIC"), except for credit unions rather than banks. The NCUA is the lender of last resort for, regulates, and can issue penalties to credit unions, like the Federal Reserve does for banks. The NCUA also administers the national insurance fund for credit unions, like the FDIC does for banks.

In the 1970s, Congress decided to make the NCUA similar to the Federal Reserve and FDIC not just in function but in form, too. On the morning of March 10, 1976, the NCUA's Administrator—then, a single agency head serving "at the pleasure of the President"—appeared before the Senate Banking Subcommittee on Financial Institutions to discuss possible restructuring of the NCUA. The Administrator testified that his "day to day" tenure meant "you don't know whether you're going to take a position that would be your last day in office or not." *Restructuring the National Credit Union Administration: Hearing on S. 1475 Before the Subcomm. on Fin. Insts. of the S. Comm. on Banking, Hous. & Urb. Affs.*, 94th Cong. 10 (1976) (statement of Herman

Nickerson, Jr., Adm'r, Nat'l Credit Union Admin.). A few hours after the hearing, President Ford summoned the Administrator to the White House and asked for his resignation. *See* S. Rep. No. 94-751, at 4 (1976); 122 Cong. Rec. 6225 (1976) (statement of Sen. Thomas J. McIntyre).

Congress then enacted legislation that restructured the agency. In 1978, it passed a law replacing the NCUA's single Administrator and "advisory board" with a formal, governing board structure. Congress removed the statutory text saying that agency leadership served "at the pleasure of the President." And it provided that the Board's three members would serve fixed, staggered six-year terms with no more than two members affiliated with the same political party.

Nearly fifty years later, the President summarily fired two NCUA Board members, Todd M. Harper and Tanya F. Otsuka. Harper and Otsuka filed this action challenging their removals as unlawful and seeking reinstatement to their positions. For its part, the government concedes the President lacked any cause for the terminations. The government argues instead that the President maintains absolute authority to remove NCUA Board members at will, and that reinstatement is not an available remedy. These arguments—which the government all but concedes would apply equally to the Chair of the Federal Reserve and FDIC Board members—are unavailing.

The statutory text and context, and the structure and function of the NCUA, make clear Congress restricted the President's authority to fire NCUA Board members. And Congress did so consistent with the separation of powers because the NCUA Board fits comfortably within the traditional model of a multimember expert agency that does not wield substantial executive power. *See Humphrey's Executor v. United States*, 295 U.S. 602 (1935). Under governing Circuit precedent, reinstatement is available when the President unlawfully removes an executive officer and proper here. The Court accordingly grants the plaintiffs' motion for summary judgment and denies the government's cross motion.

## I.      Background

In 1970, through amendments to the Federal Credit Union Act ("the NCUA statute"),
Congress created the NCUA "for the supervision of federally chartered credit unions." Act of Mar.
10, 1970, Pub. L. No. 91-206, 84 Stat. 49, 49. Soon after, Congress created the National Credit
Union Share Insurance Fund, which "insures the accounts of federally chartered credit unions and
of many state chartered credit unions," and designated the NCUA to administer the insurance fund.
*Swan v. Clinton*, 100 F.3d 973, 975 (D.C. Cir. 1996) (citing 12 U.S.C. §§ 1781–1790(c)).

In its original form, the NCUA "was led by a single Administrator with assistance from an
advisory board composed of a Chairman and one member from each of the federal credit union
regions." *Id.* at 974–75. The Administrator and the advisory board members were appointed by
the President, with the advice and consent of the Senate. *Id.* at 975. The Administrator and the
advisory board chair served "at the pleasure of the President." *Id.* (quoting Act of Mar. 10, 1970,
84 Stat. at 50).

A few years later, Congress amended the NCUA statute through the Financial Institutions
Regulatory and Interest Rate Control Act of 1978, Pub. L. No. 95-630, 92 Stat. 3641. *Swan*, 100
F.3d at 975. The 1978 amendments replaced the Administrator and advisory board with a formal,
governing Board made up of three members. 12 U.S.C. § 1752a(b)(1). Congress required that each
member of the Board be appointed by the President, with the advice and consent of the Senate,
and allowed the President to designate one member as chair. *Id.* Congress removed any reference
to leadership serving "at the pleasure of the President." It provided that members would be
appointed to fixed, six-year terms that are staggered, so vacancies arise every two years. *Id.*
§ 1752a(c). It also required that members be "broadly representative of the public interest," with
no more than two members affiliated with the same political party. *Id.* § 1752a(b)(1). In making
appointments, the President must "give consideration to individuals who, by virtue of their

education, training, or experience relating to a broad range of financial services, financial services regulation, or financial policy, are especially qualified to serve on the Board." *Id.* § 1752a(b)(2)(A). The amendments also expanded the responsibilities of the NCUA. *Swan*, 100 F.3d at 975. Congress created the National Credit Union Central Liquidity Facility, which "advances funds to member credit unions so that they are able to meet their liquidity needs." *Id.* The NCUA manages that facility as well. *Id.* (citing 12 U.S.C. §§ 1795–1795k); *see* 12 C.F.R. § 725.1.

Today, the NCUA's primary mission is "[p]rotecting the system of cooperative credit and its member-owners through effective chartering, supervision, regulation, and insurance." *Mission and Values*, Nat'l Credit Union Admin., https://ncua.gov/about/mission-values (last visited July 22, 2025). The NCUA Board is authorized "to prescribe rules and regulations to accomplish" the agency's obligations and "to manage the NCUA itself." *Swan*, 100 F.3d at 983. The Board may also initiate administrative proceedings against federally insured credit unions and affiliated parties, issue cease-and-desist orders, and remove credit union officers and directors for unsafe practices or breaches of fiduciary duty. 12 U.S.C. § 1786.

The President nominated and the Senate confirmed Harper and Otsuka to terms on the NCUA Board that began in 2022 and 2024, respectively. ECF No. 3-2 ¶¶ 4, 7. In April 2025, they both received emails from a White House official that stated: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the National Credit Union Administration is terminated, effective immediately." *Id.* ¶¶ 9–12. Neither email provided a basis. *Id.* ¶ 13.

Harper and Otsuka filed this action asserting their removals were *ultra vires* and violated the Administrative Procedure Act and the separation of powers. ECF No. 1 ¶¶ 29–36, 39–41. They seek a declaration that their terminations were unlawful and an injunction reinstating them as

Board members. ECF No. 3-7. Each side has moved for summary judgment, and the Court held a hearing on June 12, 2025. ECF Nos. 3, 11.[1]

## II.    Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute "is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). The reviewing court "must view the evidence in the light most favorable to the nonmoving party . . . , draw all reasonable inferences in her favor, and eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).

The Court first addresses whether Congress insulated NCUA Board members from at-will removal and concludes that the statutory text and context, as well as the NCUA's structure and function, confirm it did. The Court then addresses whether such protection is consistent with the separation of powers and concludes it is because the NCUA's multimember expert Board does not wield substantial executive power. *See Humphrey's Executor*, 295 U.S. 602. Finally, the Court considers the proper remedy and, applying Circuit precedent, concludes reinstatement is available and appropriate here.

---

[1]    The plaintiffs initially sought a preliminary injunction, but have since withdrawn that request in favor of resolution of the merits. ECF No. 10 at 2.

**A.  Congress Protected NCUA Board Members From At-Will Removal**

The first dispute between the parties is whether, in amending the NCUA statute in 1978 after President Ford asked for the Administrator's resignation, Congress afforded Board members protection from at-will removal by the President.

The government says no. It argues that NCUA Board members are still removable at the pleasure of the President because Congress did not add express language stating Board members could be removed only for cause. The government's argument would be compelling in many contexts. After all, "[w]hen a statute does not limit the President's power to remove an agency head," courts "generally presume that the officer serves at the President's pleasure." *Collins v. Yellen*, 594 U.S. 220, 248 (2021); *see also Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. __, __ S. Ct. __, No. 24-316, 2025 WL 1773628, at *13 (U.S. June 27, 2025) ("The Court has said that to 'take away' the power of at-will removal from an appointing officer, Congress must use 'very clear and explicit language.'" (quoting *Shurtleff v. United States*, 189 U.S. 311, 315 (1903))). Here, it is undisputed that the NCUA statute does not contain a provision that expressly limits the President's ability to remove the agency's Board members.

Yet both the Supreme Court and D.C. Circuit have been clear that the absence of an express provision should not be treated as dispositive, and agency heads may enjoy for-cause removal protection even in the absence of an express statutory provision. *See, e.g.*, *Wiener v. United States*, 357 U.S. 349, 356 (1958) (concluding President could not remove members of War Claims Commission at will, even though statute was silent on removal protection); *Fed. Election Comm'n v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (explaining Federal Election Commission was "likely correct" that President could remove commissioners only for cause despite statute's silence as to removal protection). Indeed, as to the NCUA specifically, the D.C. Circuit has instructed that "[t]he lack of an express for cause restriction does not dispose of the

question of whether NCUA Board members are entitled to removal protection." *Swan*, 100 F.3d at 981. Rather, "an examination of the NCUA's function, statutory language and legislative history may demonstrate that Congress nonetheless intended such removal protection to exist." *Id.* In accordance with Circuit precedent, this Court looks to the NCUA statute's "plain text" and the agency's "statutory structure and function" to determine whether Congress imposed a removal restriction. *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023).

The Court starts with the statutory text and context. As mentioned, prior to 1978, the statute provided that the NCUA was run by a single Administrator, assisted by an advisory board with a chair. Act of Mar. 10, 1970, 84 Stat. at 50. The Administrator and the advisory board chair did not have fixed terms, and the statute explicitly stated that both served "at the pleasure of the President." *Id.* In moving to a board structure, Congress modified the text related to tenure in two ways. First, Congress specified that, instead of indefinite tenure, Board members would have fixed, six-year terms. 12 U.S.C. § 1752a(c). Providing for fixed terms would not be enough on its own. *Severino*, 71 F.4th at 1047 ("A defined term of office, standing alone, does not curtail the President's removal power during the office-holder's service."). But here, that textual change does not stand on its own. As the D.C. Circuit explained, the legislative history "is revealing" and shows "the Senate Banking Committee believed the six year terms would protect NCUA Board members from at will removal during their appointed terms." *Swan*, 100 F.3d at 982; *see also id.* (referring to Senate Report noting that the NCUA Administrator "is the only Federal financial regulator to serve at the pleasure of the President without tenure" and explaining that "the committee recognizes the need to provide tenure for the Administrator in order to strengthen the [NCUA]'s status as an independent agency" (alteration in original) (quoting S. Rep. No. 94-751, at 3–4)). While the legislative history itself is "obviously not determinative," it is "nonetheless to some degree instructive on Congress' intent"

to create removal protection in the wake of the Administrator's resignation. *Id.* at 983. As Judge Silberman put it, Congress's "most obvious purpose" in adding a term of appointment is "to provide the incumbent with some measure of tenure or security against arbitrary removal." *Id.* at 990 (Silberman, J., concurring).

In any event, adding a term was not the only change Congress made to the text in the 1978 amendments. Congress's second change concerning the President's removal authority was to remove the statute's prior text stating that agency leadership served "at the pleasure of the President." *Id.* at 982 (majority opinion); *see* 12 U.S.C. § 1752a. In arguing that Board members nonetheless serve at the pleasure of the President, the government asks this Court to read that language back into the statute even though Congress took it out. *But see Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270, 276 (D.C. Cir. 1988) ("When a statutory provision is deleted in a subsequent reenactment, the omitted term cannot be read into the later statute."). As the D.C. Circuit put it, albeit without needing to resolve the issue, these textual changes provide "support for inferring some removal protection." *Swan*, 100 F.3d at 982.[2]

The other way "Congress may clearly indicate its intent to restrict removals" is "through the statutory structure and function of an office." *Severino*, 71 F.4th at 1044. Congress has done that with the NCUA. In *Severino*, the D.C. Circuit identified several structural features in rejecting

---

[2]    The government asks the Court to overlook Congress's deletion of "at the pleasure of the President" because the 1978 amendments "completely restructured the NCUA." ECF No. 11-1 at 8. According to the government, the Court thus cannot "draw inferences from Congress's choice to line-item remove certain provisions from a statute." *Id.* The notion that Congress would not have acted intentionally here is dubious to begin with given the import of the topic at issue—the very leadership of the agency. And it is simply not credible in light of the relevant factual background; as the D.C. Circuit detailed, Congress amended the text in response to concerns about the NCUA's independence. *Swan*, 100 F.3d at 982–83; *see also, e.g.*, *Fischer v. United States*, 603 U.S. 480, 491 (2024) (interpreting statute's subsection as limited "in light of the history of the provision").

for-cause removal protection for members of the council supervising the Administrative Conference of the United States: roughly half of the council's members are subject to at-will removal based on their other positions in the executive branch; members serve three-year terms, so "no member could outlast a President"; and non-governmental members are unpaid. *Id.* at 1049. Congress thus "left no structural or contextual clues that protection from removal was integral, or even desirable, to the performance of Council members within an advisory organization housed squarely in the Executive Branch." *Id.* at 1050.

The structure of the NCUA Board, on the other hand, closely tracks the traditional multimember board held to have removal protection in *Humphrey's Executor*. The *Humphrey's Executor* Court "identified several organizational features that helped explain its characterization of the [Federal Trade Commission ("FTC")] as non-executive." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020). The 1935 FTC was composed of five members, with no more than three from the same political party; it "was designed to be 'non-partisan' and to 'act with entire impartiality.'" *Id.* (quoting *Humphrey's Executor*, 295 U.S. at 624). "The FTC's duties were 'neither political nor executive,' but instead called for 'the trained judgment of a body of experts' 'informed by experience.'" *Id.* (quoting *Humphrey's Executor*, 295 U.S. at 624). "And the Commissioners' staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Id.* (quoting *Humphrey's Executor*, 295 U.S. at 624); *see also Severino*, 71 F.4th at 1049 (noting that staggered terms "promote the independence, autonomy, and non-partisan nature of an agency" (internal quotation marks and citation omitted)).

In its 1978 amendments, Congress reconstituted the NCUA Board to share the structural characteristics from *Humphrey's*. The Board has three members appointed by the President and

confirmed by the Senate, with no more than two members from the same political party. 12 U.S.C. § 1752a(b)(1). The Board members must be "broadly representative of the public interest" and, in making appointments, the President must "give consideration to individuals who, by virtue of their education, training, or experience relating to a broad range of financial services, financial services regulation, or financial policy, are especially qualified to serve on the Board." *Id.* § 1752a(b)(1), (2)(A). And Congress gave the Board members staggered, six-year terms. *Id.* § 1752a(c). The NCUA Board's structure accordingly indicates that Congress restricted the President's removal power.

So too does the NCUA's function support removal restrictions. The D.C. Circuit has said when Congress assigns an agency "quasi-judicial or quasi-legislative functions that are deemed to be operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential removal, even without an explicit textual statement to that effect." *Severino*, 71 F.4th at 1047. In *Humphrey's Executor*, for instance, the Supreme Court held that the FTC acted "'as a legislative agency' in reporting to Congress and 'as an agency of the judiciary' in holding administrative hearings, and that the 'character' of both functions is inconsistent with allowing at-will removal by the President." *Id.* (quoting *Humphrey's Executor*, 295 U.S. at 628–29). The Court took a functional approach again in *Wiener*, concluding that the War Claims Commission "could not fulfill its duty to fairly apply 'evidence and governing legal considerations' to resolve 'the merits of each claim,' without some removal protections." *Id.* (quoting *Wiener*, 357 U.S. at 355).

In *Severino*, the D.C. Circuit distinguished those agencies from the council of the Administrative Conference, whose principal role is to provide advice to the executive branch. *Id.* at 1048. Congress created the Conference "for the purpose of helping '[f]ederal agencies, assisted

by outside experts' to 'study mutual problems, exchange information, and develop recommendations.'" *Id.* (alteration in original) (quoting 5 U.S.C. § 591(1)). While the Conference may inform the other branches about certain aspects of administrative procedure, "the overwhelming majority of the Conference's work focuses on and contributes to the internal workings of the Executive Branch." *Id.*; *see also id.* ("The Executive Branch is the planet around which all of the Conference's responsibilities revolve."). And the Conference does not exercise anything resembling the "quasi-judicial functions" that were essential to the Supreme Court's holdings in *Humphrey's Executor* and *Wiener*. *Id.* In short, the Conference has "no adjudicatory or legislative features that would clearly signal a need for some measure of independence from Presidential control." *Id.* at 1049.

That cannot be said of the NCUA Board, which exercises both quasi-judicial and quasi-legislative functions. The Board is adjudicatory, conducting formal administrative proceedings. That includes proceedings to determine whether a credit union should be ordered to cease and desist from engaging in "an unsafe or unsound practice" and to take affirmative action to correct the practice. 12 U.S.C. § 1786(e). And the Board can remove credit union officers and directors in certain circumstances, upon notice and a hearing. *Id.* § 1786(g). These proceedings are conducted before administrative law judges under uniform rules of practice and procedure, and the Board then renders a final decision. 12 C.F.R. §§ 747.1, 747.5, 747.40. The Board's decisions are appealable to the D.C. Circuit or the court of appeals for the circuit in which the credit union's principal office is located. 12 U.S.C. § 1786(j)(2). The Board thus has several "judicial functions"

that suggest "Congress meant to sheath 'the Damocles' sword of removal by the President'" during the Board members' terms. *See Severino*, 71 F.4th at 1047 (quoting *Wiener*, 357 U.S. at 356).[3]

The NCUA Board is quasi-legislative as well. It exercises its statutory authority to prescribe rules and regulations for the administration of the Federal Credit Union Act. 12 U.S.C. § 1766(a); *see* Cong. Rsch. Serv., IF11713, *Introduction to Financial Services: Credit Unions* 2 (2025) (discussing certain rules implemented by NCUA). The Board also submits a yearly report to Congress and the President summarizing the operations of the NCUA and providing information for Congress "to review the financial program approved by the Board." 12 U.S.C. § 1752a(d). So, like the FTC in *Humphrey's Executor*, "[i]n administering the provisions of the statute . . . , that is to say, in filling in and administering the details embodied by that general standard," the NCUA Board "acts in part quasi legislatively and in part quasi judicially." *See* 295 U.S. at 628; *see also id.* (noting FTC's role in "making investigations and reports thereon for the information of Congress . . . in aid of the legislative power"). The Board "is an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed." *Id.*

The "absolute freedom from Executive interference" the Supreme Court deemed essential in *Humphrey's Executor* and *Wiener* is also critical to the functioning of the NCUA. *See Severino*, 71 F.4th at 1049 (quoting *Wiener*, 357 U.S. at 353); *see also Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *2 (D.D.C. Nov. 14, 1983) (absent express removal provision, "this Court must ascertain whether Congress required the [U.S. Commission on Civil Rights] Commissioners to act

---

[3]    In *Swan*, the government observed: "The [NCUA] Board is authorized to adjudicate issues relevant to the exercise of its authority to terminate the insured status of a credit union, issue cease and desist orders, remove or suspend credit union officials from office, and assess civil monetary penalties." Brief for the Appellees, *Swan*, 100 F.3d 973 (No. 96-5193), 1996 WL 34482875, at *27 (citing 12 U.S.C. § 1786).

independently, with 'absolute freedom from Executive interference,' in the discharge of their duties" (quoting *Wiener*, 357 U.S. at 353)). As the D.C. Circuit put it in *Swan*: "Independence from presidential control is arguably important if agencies charged with regulating financial institutions, such as the NCUA, are to successfully fulfill their responsibilities; people will likely have greater confidence in financial institutions if they believe that the regulation of these institutions is immune from political influence." 100 F.3d at 983. The court continued: "The NCUA's function may therefore provide further evidence indicating that Board members enjoy removal protection during their appointed terms." *Id.* at 983–84. Although *Swan* ultimately did not decide the question because it concerned the removal of a holdover Board member rather than one serving a full term, this Court finds its reasoning persuasive. The function of the NCUA provides support for removal protections.

The government's arguments to the contrary are rather superficial. First, the government says the Supreme Court definitively resolved whether NCUA Board members are protected from at-will removal in *Collins*. ECF No. 11-1 at 10–11. That case concerned the Federal Housing Finance Agency ("FHFA"), which has a single director. *Collins*, 594 U.S. at 226–27. The statute at issue "expressly restricted the President's power to remove a confirmed Director but said nothing of the kind with respect to an Acting Director." *Id.* at 248. The plaintiffs asserted that the statute should be read to restrict the removal of an acting director based on language describing the FHFA as an "independent agency of the Federal Government." *Id.* (emphasis omitted) (quoting 12 U.S.C. § 4511(a)). Rejecting that argument, the Court noted that "Congress has described many agencies as 'independent' without imposing any restriction on the President's power to remove the agency's leadership," including the NCUA. *Id.* at 249. The Court's observation that use of the word "independent" does not necessitate or always accompany removal restrictions does not bear

on, let alone decide, this case. And the notion that the Court intended its reasoning to foreclose statutory interpretation of the NCUA statute, without any analysis, is strained.[4]

Second, rather than meaningfully dispute that the NCUA Board exercises quasi-judicial and quasi-legislative functions, the government asks the Court in a footnote to overlook *Severino*'s focus on function, saying that it is in tension with *Collins*. ECF No. 11-1 at 11 n.5; *see also id.* at 15 (asserting that "legislative power is vested exclusively in Congress . . . and judicial power in the federal courts"). Contrary to the government's argument, the Court does not see tension between *Severino* and *Collins*, which was decided two years earlier. The Supreme Court simply held in *Collins* that there were "no grounds for an exception in this case" to the general presumption that the President can remove executive officers at will. 594 U.S. at 250. While the Court distinguished *Wiener* on the basis that it concerned "an adjudicatory body" with "a unique need for 'absolute freedom from Executive interference,'" it did not set out any rule that would foreclose *Severino*'s method of analysis. *Id.* at 250 n.18 (quoting *Wiener*, 357 U.S. at 353). This Court is bound by Circuit precedent and cannot ignore *Severino*'s holding that an agency's quasi-judicial and quasi-legislative functions are relevant to the question whether Congress intended to impose removal restrictions. *See* 71 F.4th at 1047.

In sum, the text and history of the NCUA statute, along with the structure and function of the NCUA Board, confirm Congress restricted the President's power to remove Board members.

---

[4]    The Court also referred to several other agencies' enabling statutes, including the Peace Corps, the Defense Nuclear Facilities Safety Board, the Commodity Futures Trading Commission, the Farm Credit Administration, and the Railroad Retirement Board. *Collins*, 594 U.S. at 249. The government's position would mean that the Court, in a single sentence, definitively resolved the interpretation of each statute without any analysis of the text, structure, or function applicable to the particular agency. *Cf. Seila Law*, 591 U.S. at 215 ("[T]he contours of the *Humphrey's Executor* exception depend upon the characteristics of the agency before the Court.").

## B. Congress's Removal Restriction For NCUA Board Members Does Not Violate The Separation Of Powers

The Court next considers whether Congress's removal restriction is constitutional. Article II provides the President shall "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. "To fulfill that duty, the President generally must be able to 'control[] those who execute the laws' on his behalf." *Severino*, 71 F.4th at 1044 (alteration in original) (quoting *Seila Law*, 591 U.S. at 213). Without the power to remove executive officials, "the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 514 (2010)). At the same time, the Supreme Court has recognized "two exceptions to the President's unrestricted removal power." *Seila Law*, 591 U.S. at 215. The first exception applies to "multimember expert agencies that do not wield substantial executive power." *Id.* at 218. That exception, established in *Humphrey's Executor* and reaffirmed in *Wiener*, is the one the plaintiffs rely on in this case.[5]

More recently, in *Seila Law*, the Court held unconstitutional the for-cause removal protection enjoyed by the director of the Consumer Financial Protection Bureau ("CFPB"). The Court distinguished the CFPB from the 1935 FTC because the former was "led by a single Director who cannot be described as a 'body of experts' and cannot be considered 'non-partisan' in the same sense as a group of officials drawn from both sides of the aisle." *Id.* (quoting *Humphrey's Executor*, 295 U.S. at 624). The Court identified two constitutional defects in the design of the CFPB. First, the CFPB's structure was "almost wholly unprecedented." *Id.* at 220. The Court observed that in "only a handful of isolated incidents" had Congress provided for-cause protection

---

[5]   The second exception applies to "inferior officers with limited duties and no policymaking or administrative authority" and is not relevant here. *Seila Law*, 591 U.S. at 218. The plaintiffs do not argue NCUA Board members are inferior officers.

to a single principal officer. *Id.* (internal quotation marks and citation omitted). So the CFPB's single-director model represented "an innovation with no foothold in history or tradition." *Id.* at 222. Second, and relatedly, the Court found that the single-director design was "incompatible with our constitutional structure," which "scrupulously avoids concentrating power in the hands of any single individual." *Id.* at 222–23. The Court therefore concluded that the CFPB's leadership by a single director with for-cause removal protection violated the separation of powers. *Id.* at 232.

The Court was careful to emphasize, however, that it was "not revisit[ing] *Humphrey's Executor* or any other precedent." *Id.* at 228. Indeed, the government concedes *Humphrey's Executor* "remains good law." ECF No. 20 at 29. The NCUA Board fits at the core of the *Humphrey's* exception. The Board is designed in the classic pattern of a multimember, bipartisan, expert agency that does not exercise substantial executive power. As discussed above, the Board's structure closely resembles the 1935 FTC—as well as several other independent agencies—so the single director and "lack of historical precedent" that posed problems in *Seila Law* are wholly inapposite. *See* 591 U.S. at 220 (citation omitted).[6]

The government asserts that the NCUA Board does not fit within the *Humphrey's* exception because "unlike the 1935 FTC . . . , the NCUA exercises significant executive power." ECF No. 11-1 at 13. It points to several powers to support this argument, but none bring the NCUA Board outside the parameters of the exception. *See id.* at 13–14. At the hearing, the government emphasized that the NCUA investigates and prosecutes violations of the Federal Credit Union Act

---

[6]    In *Seila Law*, the Supreme Court emphasized that the removal protection at issue was "even more problematic" because the CFPB director served a five-year term, so some Presidents might be denied the opportunity to "shape [the agency's] leadership and thereby influence its activities." 591 U.S. at 225. NCUA Board members serve staggered six-year terms, meaning that vacancies arise every two years—and the President designates one member as chair. There is no possibility that a President serving a four-year term will not have the opportunity to shape the agency's leadership.

and related regulations, and "can issue daunting monetary penalties." ECF No. 20 at 28; *see also* ECF No. 11-1 at 14 (noting that NCUA Board may impose daily penalties of up to $5,000 for violations and up to $1,000,000 if the violation is "knowing or reckless" (citing 12 U.S.C. § 1786(k))). It also highlighted that the NCUA prescribes rules and regulations "fleshing out numerous federal statutes with implications for broad swaths of the American economy." ECF No. 20 at 28. According to the government, "those activities are quintessential exercises of executive power." *Id.*

The NCUA Board does not exercise the kind of substantial executive power that would warrant a departure from *Humphrey's Executor*. Indeed, the Board does not exercise any more significant executive power than the 1935 FTC as characterized by the *Humphrey's* Court. The FTC Act empowered the FTC to prevent persons and corporations "from using unfair methods of competition in commerce." *Humphrey's Executor*, 295 U.S. at 620. To carry out that statutory obligation, the FTC could issue complaints, enter cease-and-desist orders after a hearing, and apply to the appropriate court of appeals for enforcement of those orders. *Id.* at 620–21. The statute also gave the FTC "wide powers of investigation in respect of certain corporations." *Id.* at 621. If the 1935 FTC did not exercise sufficient executive power to necessitate at-will removal by the President, neither does the NCUA Board. *See also Slaughter v. Trump*, __ F. Supp. 3d __, No. 25-cv-909, 2025 WL 1984396, at *11–12 (D.D.C. July 17, 2025) (discussing 1935 FTC's powers and noting that the *Humphrey's Executor* Court "was plainly aware of the FTC's investigatory, adjudicatory, and rulemaking abilities and yet it upheld the FTC Act's removal protections as constitutional"), *appeal docketed*, No. 25-5261 (D.C. Cir. July 18, 2025).

That conclusion is reinforced by the particular importance of independence for agencies that play key roles as financial regulators. To reiterate the D.C. Circuit in *Swan*: "Independence

from presidential control is arguably important if agencies charged with regulating financial institutions, such as the NCUA, are to successfully fulfill their responsibilities; people will likely have greater confidence in financial institutions if they believe that the regulation of these institutions is immune from political influence." 100 F.3d at 983. The Supreme Court has since indicated that removal protections for certain financial regulators may be permissible. *See Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) (rejecting argument that decision necessarily implicated constitutionality of for-cause removal protection for Federal Reserve Board of Governors because the Fed "is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States"); *Seila Law*, 591 U.S. at 222 n.8 (assuming that "financial institutions like the Second Bank and the Federal Reserve can claim a special historical status"); *cf. id.* at 285 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part) ("Congress has historically given—with this Court's permission—a measure of independence to financial regulators like the Federal Reserve Board and the FTC.").

If the NCUA Board exercises substantial executive power, it is difficult to see how the same would not be true of the Federal Reserve. The Fed has broad regulatory authority. *See, e.g.*, 12 U.S.C. § 1844(b) (authorizing Federal Reserve Board "to issue such regulations and orders, including regulations and orders relating to the capital requirements for bank holding companies, as may be necessary to enable it to administer and carry out the purposes of this chapter and prevent evasions thereof"); *id.* § 1831p-1 (authorizing each "appropriate Federal banking agency" to prescribe certain standards by regulation or guideline for insured depository institutions); *see also Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 365 (1986) (noting Federal Reserve Board's "broad regulatory authority . . . over bank holding companies to restrain the undue concentration of commercial banking resources and to prevent possible abuses related

to the control of commercial credit" (internal quotation marks and citation omitted)). Like the NCUA Board, the Fed is also authorized to initiate enforcement actions, issue cease-and-desist orders that are enforceable in federal court, remove officers and directors, and impose daily civil penalties up to $1,000,000. 12 U.S.C. § 1818(b)–(e), (i). The NCUA and the Fed even use the same administrative law judges to adjudicate enforcement actions. *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183, 486 (codified at 12 U.S.C. § 1818 note) (requiring the Fed, other federal banking agencies, and the NCUA to jointly establish "their own pool of administrative law judges" and "develop a set of uniform rules and procedures for administrative hearings"). In *Seila Law*, the Supreme Court distinguished the CFPB as in "an entirely different league" from other financial regulators because of its vast powers and because "it is the only agency of its kind run by a single Director"—neither distinction applies to the NCUA. *See* 591 U.S. at 222 n.8.

The government all but concedes that its position as to the NCUA would lead to the same conclusion as to the Federal Reserve, relegating its response to a footnote that states, without elaboration, that the Fed is unique because of its historical pedigree. ECF No. 11-1 at 15 n.6. At the hearing, the government declined to expand on that footnote, stating that it "do[es] not have a formal position" on the implications of its arguments for the Federal Reserve. ECF No. 20 at 27. When asked what executive power the NCUA Board wields that the Federal Reserve and the FDIC do not, the government responded again that it would not "take a position on those agencies at this time." *Id.* at 29. At the end of the day, the government does not point to any difference at all between the agencies with respect to the relevant executive power analysis. The overlap in powers wielded by the NCUA Board and the Federal Reserve, and their common role as financial

regulators, supports the conclusion that Congress can insulate NCUA Board members from at-will removal.

The Court accordingly holds that Congress's for-cause removal restrictions for NCUA Board members do not pose any constitutional problem. And because the government does not dispute that the plaintiffs were terminated without cause, those removals were unlawful.[7]

### C. The Plaintiffs Are Entitled To Declaratory And Injunctive Relief

That conclusion prompts the question of what remedy is appropriate for the unlawful removals. The plaintiffs ask the Court to declare that the President removed them unlawfully and to enjoin all the defendants—except the President—from (1) removing the plaintiffs from office; (2) treating them as having been removed; (3) denying or obstructing their access to benefits or resources of their office; (4) replacing them as Board members; or (5) recognizing any other person as a Board member in their stead. ECF No. 3-7; *see* ECF No. 3-1 at 21–24. The Court concludes that the plaintiffs are entitled to declaratory and injunctive relief.[8]

---

[7] Because the Court concludes that the removal restrictions are constitutional, it need not reach the plaintiffs' argument that it would still be appropriate for the Court to limit removal in some way in the event of a constitutional defect. *See* ECF No. 13 at 17–19. Similarly, because the removals were *ultra vires*, the Court need not address the plaintiffs' claims that they violated the Administrative Procedure Act and the separation of powers. *See* ECF No. 1 ¶¶ 34–36, 39–41.

[8] The plaintiffs also request mandamus relief in the alternative. ECF No. 3-1 at 24–25. The Court need not reach the issue because it grants the requested declaratory and injunctive relief, but other courts have found mandamus is likely available in similar circumstances. *See, e.g.*, *Wilcox v. Trump*, 775 F. Supp. 3d 215, 237 n.22 (D.D.C. 2025) ("[I]f injunctive relief were not available here because of adherence to the historical dividing lines of law and equity, a writ of mandamus would likely be available, and the effective relief provided to plaintiff would be the same."), *appeal docketed*, No. 25-5057 (D.C. Cir. Mar. 7, 2025); *Harris v. Bessent*, 775 F. Supp. 3d 164, 188 (D.D.C. 2025) ("Were equitable injunctive relief unavailable here, . . . the Court would not hesitate to 'vigilantly enforce federal law' and 'award[] necessary relief' through a writ of mandamus as an alternative remedy at law." (alteration in original) (quoting *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017))), *appeal docketed*, No. 25-5055 (D.C. Cir. Mar. 4, 2025).

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A declaratory judgment "rests within the sound discretion of the court" and will "ordinarily be granted only when it will either serve a useful purpose in clarifying the legal relations in issue or terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980) (internal quotation marks and citation omitted).

As other courts in this District have concluded in recent cases finding the removal of independent agency members unlawful, "a declaratory judgment would serve a useful purpose to clarify the legal relations between the parties and afford relief from the underlying challenged actions." *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, __ F. Supp. 3d __, No. 25-cv-542, 2025 WL 1454010, at *25 (D.D.C. May 21, 2025) (collecting cases), *appeal docketed*, No. 25-5197 (D.C. Cir. May 29, 2025). The plaintiffs challenge their removal as members of the NCUA Board and seek clarity on whether they may resume work. The government, for its part, maintains that the President may lawfully remove NCUA Board members at will. The Court therefore exercises its discretion to provide declaratory relief.[9]

---

[9]   The government contends that declaratory relief is not available, relying primarily on *Samuels v. Mackell*, 401 U.S. 66 (1971). ECF No. 11-1 at 23–24. But the limited holding of *Samuels* was that declaratory relief "should ordinarily be denied" where a state criminal prosecution has been initiated prior to the federal lawsuit, since "the basic policy against federal interference with pending state criminal prosecutions will be frustrated as much by a declaratory judgment as it would be by an injunction." 401 U.S. at 73. The Court made clear that it was expressing "no views on the propriety of declaratory relief when no state proceeding is pending at the time the federal suit is begun." *Id.* at 74. The government also cites no controlling authority for the proposition that a court "cannot issue a declaratory judgment against the President." ECF No. 11-1 at 23 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part and concurring

The Court also finds it proper to order injunctive relief in the form of reinstatement. According to the government, injunctive relief is not available because this Court lacks the authority to reinstate principal executive officers removed by the President. ECF No. 11-1 at 16. The government suggests instead that back pay is the proper remedy for an officer who has been unlawfully removed. *Id.* Asked whether that means an award of back pay would be the only remedy for the Chair of the Federal Reserve if he were unlawfully terminated, the government declined to answer, repeating its refrain that "we don't take a position on other entities not before the Court." ECF No. 20 at 36.

The government's position and its extreme consequences find no support in D.C. Circuit precedent, which makes clear that reinstatement is available. Analyzing redressability in *Swan*, the Circuit recognized that "[a] question exists . . . as to whether a federal court has the power to grant injunctive relief against the President of the United States in the exercise of his official duties." 100 F.3d at 976. But the court did not need to reach that question because injunctive relief against officials subordinate to the President could substantially redress the plaintiff's injury. *Id.* at 979. Those subordinate officials could not officially reinstate the plaintiff, but they could accomplish "de facto" reinstatement "by treating [the plaintiff] as a member of the NCUA Board and allowing him to exercise the privileges of that office." *Id.* at 980. The court reached a similar conclusion in *Severino*, holding that it could enjoin the agency's chair to include the plaintiff in board meetings, grant him access to his former office, and allow him to cast votes "as if he were a Council member." 71 F.4th at 1043.

---

in the judgment)); *cf. Clinton v. City of New York*, 524 U.S. 417, 420–21 (1998) (affirming declaratory judgment that President's actions under Line Item Veto Act were invalid); *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (opting to issue declaratory decree against President instead of mandamus).

The same principles apply here. The Court need not enjoin the President himself—and the plaintiffs do not ask the Court to do so. Instead, injunctive relief against the other defendants, including the Chair of the NCUA Board and the agency's executive director, can accomplish de facto reinstatement. The government insists that *Swan* and *Severino* are not controlling because they concerned whether the plaintiffs had Article III standing. ECF No. 11-1 at 19 n.8; ECF No. 15 at 14. But standing is a jurisdictional requirement. *E.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). So the Circuit necessarily concluded in both cases that the plaintiffs could be reinstated to their offices; otherwise, the redressability prong would not have been satisfied. *See Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *44 (D.C. Cir. Mar. 28, 2025) (Millett, J., dissenting) ("Because jurisdiction in both *Swan* and *Severino* depended on holding that an injunction could issue, and both cases held that there was jurisdiction and went on to decide the merits, both cases necessarily held that an injunction could restore someone to office *de facto*."); *see also Grundmann v. Trump*, 770 F. Supp. 3d 166, 185–86 (D.D.C. 2025) (collecting cases holding that *Swan* and *Severino* stand for the proposition that de facto reinstatement is an available remedy), *appeal docketed*, No. 25-5165 (D.C. Cir. May 14, 2025).[10]

Several other courts in this District have addressed the same question in recent months and held that reinstatement is available when an executive officer is unlawfully removed by the President. *See Slaughter*, __ F. Supp. 3d at __, 2025 WL 1984396, at *17; *LeBlanc*, __ F. Supp.

---

[10]   The government's assertion that suits challenging unlawful removals have traditionally sought back pay—rather than reinstatement—disregards the type of relief requested in *Swan* and *Severino*. *See* ECF No. 11-1 at 16. As other courts have pointed out, moreover, reinstatement would not have made sense in several of the cases the government cites: the plaintiffs were deceased in both *Humphrey's Executor* and *Myers v. United States*, 272 U.S. 52 (1926); in *Wiener*, the War Claims Commission was no longer in existence. *See Grundmann*, 770 F. Supp. 3d at 186. And in any event, the Court does not lack power to issue injunctive relief "simply because the plaintiffs in *Wiener* and *Humphrey's Executor* decided to seek another remedy." *Harris*, 775 F. Supp. 3d at 185 n.15.

3d at __, 2025 WL 1454010, at *27; *Grundmann*, 770 F. Supp. 3d at 187; *Wilcox v. Trump*, 775 F. Supp. 3d 215, 237 (D.D.C. 2025), *appeal docketed*, No. 25-5057 (D.C. Cir. Mar. 7, 2025); *Harris v. Bessent*, 775 F. Supp. 3d 164, 184 (D.D.C. 2025), *appeal docketed*, No. 25-5055 (D.C. Cir. Mar. 4, 2025). The en banc D.C. Circuit, citing a panel dissent from Judge Millett, has also held in the stay context that the government failed to show a strong likelihood of success on its claim that there was "no available remedy" for two unlawfully removed officials. *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025) (en banc); *see Harris*, 2025 WL 980278, at *43–46 (Millett, J., dissenting).[11]

Having concluded that injunctive relief is available, the Court turns to the requirements for a permanent injunction. To obtain that relief, a plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). All those factors are satisfied in this case.

To start, the plaintiffs have demonstrated irreparable injury. A federal employee seeking injunctive relief must show "irreparable injury 'sufficient in kind and degree to override the factors cutting against the general availability of preliminary injunctions [such as disruption of the

---

[11]  The Supreme Court granted the government's motion for a stay pending appeal in *Wilcox* and *Harris*, concluding that it was likely to show the agencies in question "exercise considerable executive power." *Wilcox*, 145 S. Ct. at 1415. The D.C. Circuit has also granted a stay pending appeal in *Grundmann* and *LeBlanc. See Grundmann v. Trump*, No. 25-5165, 2025 WL 1840641, at *1 (D.C. Cir. July 3, 2025); *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 25-5197, 2025 WL 1840591, at *1 (D.C. Cir. July 1, 2025). The Supreme Court and the Circuit did not address the issue of reinstatement in those decisions.

administrative process] in Government personnel cases.'" *Berry*, 1983 WL 538, at *5 (alteration in original) (quoting *Sampson v. Murray*, 415 U.S. 61, 84 (1974)). Again, several courts have recognized irreparable harm in similar cases "involving the removal of individuals appointed to independent, multimember boards based on the[ir] unlawful removal from office by the President and the obviously disruptive effect that such removal has on the organization's functioning." *LeBlanc*, __ F. Supp. 3d at __, 2025 WL 1454010, at *30 (alteration in original) (internal quotation marks and citation omitted). Here too, the plaintiffs have been removed from "a presidentially appointed and congressionally confirmed position of high importance"; both they and the NCUA Board "have been deprived of the ability to carry out their congressional mandate." *Wilcox*, 775 F. Supp. 3d at 236. And those injuries "cannot be retroactively cured by monetary damages." *Id.*; *see also Grundmann*, 770 F. Supp. 3d at 188 ("A check in the mail does not address the gravamen of this lawsuit."). The plaintiffs have therefore demonstrated irreparable injury and inadequate remedies at law. *See, e.g.*, *Slaughter*, __ F. Supp. 3d at __, 2025 WL 1984396, at *18 ("In the wrongful-termination context, irreparable injury and the availability of remedies at law tend to collapse into one another.").

The balance of the equities and the public interest weigh in favor of injunctive relief as well. *See generally Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that these factors merge where the government is a party). The public has a substantial interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted). Congress restricted the circumstances under which NCUA Board members may be removed from office, and the President terminated the plaintiffs outside those circumstances. *See, e.g.*, *Harris*, 775 F. Supp. 3d

at 187 (noting the "substantial public interest in the for-cause removal protections Congress has given to certain members of independent agencies").

The government asserts that an injunction reinstating the plaintiffs "would raise grave separation-of-powers concerns and work a great and irreparable harm to the Executive." ECF No. 11-1 at 22. In the government's view, "the public interest is better served by an NCUA Board member who holds the President's confidence and, accordingly, will more effectively serve him in executing his duties as Chief Executive." *Id.* These arguments simply presume that the government is correct on the merits and that the President can remove NCUA Board members at will. As explained above, that is not correct. The plaintiffs are entitled to permanent injunctive relief.[12]

## III.    Conclusion

For these reasons, the plaintiffs' motion for summary judgment is granted, and the government's cross motion for summary judgment is denied. The plaintiffs' motion for preliminary injunction and motion for expedition are denied as moot.

The Court declares the terminations of Plaintiffs Todd M. Harper and Tanya F. Otsuka unlawful. Harper and Otsuka remain members of the NCUA Board and may be removed by the President prior to the expiration of their terms only for cause.

The Court further orders that Defendants Scott Bessent, Larry Fazio, Kyle S. Hauptman, and Trent Morse, as well as their subordinates, agents, and employees, are enjoined, during Harper's and Otsuka's terms as members of the NCUA Board, from removing Harper and Otsuka

---

[12]   The plaintiffs' proposed order appears to seek relief that would enjoin the relevant defendants from removing Harper and Otsuka—or treating them as having been removed—without limitation. ECF No. 3-7. The Court will narrow this language to reflect that Harper and Otsuka may be removed for cause.

from their offices without cause or in any way treating Harper and Otsuka as having been removed from office, from impeding in any way their ability to fulfill their duties as members of the NCUA Board, and from denying or obstructing their authority or access to any benefits or resources of their offices. Those defendants and their subordinates, agents, and employees shall provide Harper and Otsuka with access to the necessary government facilities and equipment so that they may carry out their duties during their terms as members of the NCUA Board.

A separate order accompanies this memorandum opinion.

_____
AMIR H. ALI
United States District Judge

Date:   July 22, 2025